# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ———————————————— ) | | |
| PLAINTIFFS UNDER SEAL ) | **Civil Action No.** _____ | |
| ) | | |
| v. ) | | |
| ) | **FILED UNDER SEAL** | |
| DEFENDANTS UNDER SEAL ) | **Pursuant to 31 U.S.C. § 3730(b)(2)** | |
| ———————————————— ) | | |
| ) | **JURY TRIAL DEMANDED** | |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 ET SEQ. AND STATE LAW COUNTERPARTS

James A. O'Brien
Stephen A. Weiss *(Pro Hac Vice Application to be filed)*
SEEGER WEISS LLP
77 Water Street, 26th Floor
New York, NY  10005
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

*Counsel for Plaintiffs/Relators*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOHN DOE #1 and JOHN DOE #2, and on behalf of the STATES of COLORADO, CONNECTICUT, THE DISTRICT OF COLUMBIA, FLORIDA,  ILLINOIS, INDIANA, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, OHIO, OKLAHOMA, TEXAS, AND VIRGINIA, | ) ) ) ) ) ) ) ) ) ) ) |
| | |
| Plaintiffs, | ) ) |
| v. | ) ) |
| SPINEFRONTIER, INC.; KICVENTURES, LLC; LESSURGEON INSTITUTE FLORIDA, LLC; IMPARTIAL MEDICAL EXPERTS, LLC; KINGSLEY R. CHIN, M.D.; and ADITYA HUMAD, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**<u>FILED UNDER SEAL</u>**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

Civil Action No. _____

**<u>JURY TRIAL DEMANDED</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

I.  JURISDICTION AND VENUE ........................................................... 3

II.  PARTIES ............................................................................................. 4

    A.  PLAINTIFF/RELATOR JOHN DOE NUMBER ONE ................................ 4

    B.  PLAINTIFF/RELATOR JOHN DOE NUMBER TWO ............................... 6

    C.  DEFENDANT SPINEFRONTIER ......................................................... 6

    D.  DEFENDANT KICVENTURES LLC .................................................. 8

    E.  DEFENDANT LESSURGEONS INSTITUTE FLORIDA LLC ............... 8

    F.  DEFENDANT IMPARTIAL MEDICAL EXPERTS LLC ......................... 8

    G.  DEFENDANT KINGSLEY R. CHIN, M.D. ............................................ 9

    H.  DEFENDANT ADITYA HUMAD ......................................................... 9

III.  DEFENDANTS' KICKBACK SCHEME ............................................. 10

    A.  IME CONSULTANTS ...................................................................... 10

    B.  RECRUITMENT EFFORTS BY IME CONSULTANTS TO BUILD
       DEFENDANTS' BUSINESS ............................................................... 15

    C.  THE IME CONSULTANT AGREEMENTS DO NOT
       FALL WITHIN THE SAFE HARBOR PROVISIONS
       OF THE ANTI-KICKBACK STATUTE OR STARK LAW ...................... 17

    D.  DEFENDANTS' CONDUCT WAS AIMED AT SHIELDING
       THEIR VIOLATIONS OF FEDERAL LAW .......................................... 18

    E.  DEFENDANTS INDUCED PHYSICIANS TO PARTICIPATE IN
       THE KICKBACK SCHEME WITH INCENTIVES THAT
       INCLUDED ROYALTY PAYMENTS AND BOARD POSITIONS ............. 20

    F.  DEFENDANTS' AGGRESSIVE GROWTH PLAN
       TO INCREASE SALES OF SPINEFRONTIER'S
       MEDICAL DEVICES ....................................................................... 23

G.    DEFENDANTS' SALES REVENUES OF SPINEFRONTIER'S MEDICAL DEVICES THROUGH THE IME CONSULTANTS ................................ 25

H.    RELATOR #1'S ATTEMPTS TO REFORM SPINEFRONTIER ................ 25

I.    DEFENDANTS' ILLEGAL KICKBACK SCHEME VIOLATED FEDERAL LAW .......................................................................................... 27

J.    DEFENDANTS' HCPCS/CPT CODES .............................................. 29

K.    PROVIDER AGREEMENTS AND HOSPITAL COST REPORTS SUBMITTED FOR REIMBURSEMENT FROM MEDICARE ........................................ 29

L.    THE PRESENTATION OF FALSE CLAIMS TO THE GOVERNMENT ..... 31

IV.    PHYSICIAN-OWNED DISTRIBUTORSHIPS AND RELATED INVESTIGATIONS BY THE OFFICE OF THE INSPECTOR GENERAL AND THE U.S. DEPARTMENT OF JUSTICE ................... 33

A.    THE OIG'S SPECIAL FRAUD ALERT ............................................. 33

B.    THE OIG'S 2013 REPORT ON SPINAL DEVICES SUPPLIED BY PODS ........................................................................................ 35

C.    THE U.S. DOJ'S ACTIONS AGAINST SPINAL DEVICE PODS .......... 37

V.    SPINEFRONTIER'S ILLEGAL TERMINATION OF RELATOR #1 ... 38

VI.    THE UNITED STATES AND QUI TAM STATES WERE CHEATED OUT OF SUBSTANTIAL SUMS AS A RESULT OF THE FALSE REPORTS INDUCED BY DEFENDANTS' KICKBACK SCHEME .... 39

VII.    STATUTORY AND REGULATORY ENVIRONMENT ...................... 39

A.    THE FALSE CLAIMS ACT .............................................................. 39

B.     THE FCA'S AND MASSACHUSETTS' ANTI-RETALIATION PROVISIONS AND STATE COMMON LAW PROHIBITING WRONGFUL TERMINATION ................................................................... 41

C.     THE ANTI-KICKBACK STATUTE ...................................................... 42

D.     THE STARK STATUTE ...................................................................... 45

E.     THE PHYSICIAN PAYMENTS SUNSHINE ACT .................................. 45

VIII.   REIMBURSEMENT BY GOVERNMENT-FUNDED HEALTH CARE PROGRAMS ........................................................................................ 48

A.     MEDICARE PART A ........................................................................ 49

B.     MEDICARE PART B ........................................................................ 51

C.     REIMBURSEMENT FOR SURGERIES USING SPINEFRONTIER MEDICAL DEVICES ....................................................................................... 54

D.     COMPLIANCE WITH THE AKS AND THE SUNSHINE ACT IS A CONDITION OF PAYMENT .............................. 55

IX.    DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY KNOWINGLY CAUSING THE SUBMISSION OF FALSE OR FRAUDULENT CLAIMS OR STATEMENTS ..................................... 57

Count I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)) ........................................................................................... 59

Count II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)) ........................................................................................... 59

Count III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C)) .......................................................................................... 60

Count IV (Violation of False Claims Act, 31 U.S.C. § 3730(h)) ......................... 60

Count V (Violation of Mass. Gen. Laws Ch. 12, § 5J) ........................................ 60

Count VI Wrongful Termination in Violation of Public Policy ........................... 62

Count VII (Violation of Colorado Medicaid False Claims Act) ......................... 63

Count VIII (Violation of Connecticut False Claims Act) .................................... 64

Count IX (Violation of District of Columbia False Claims Act) ........................ 66

Count X (Violation of Florida False Claims Act) ................................................. 67

Count XI (Violation of Illinois False Claims Whistleblower Reward and
Protection Act) ....................................................................................................... 68

Count XII (Violation of Indiana False Claims and Whistleblower Protection
Act) ........................................................................................................................ 70

Count XIII (Violation of Maryland False Health Claims Act) ............................ 71

Count XIV (Violation of Massachusetts False Claims Act) ................................ 72

Count XV (Violation of New Jersey False Claims Act) ...................................... 74

Count XVI (Violation of New York False Claims Act) ....................................... 75

Count XVII (Violation of Oklahoma Medicaid False Claims Act) ..................... 77

Count XVIII (Violation of Texas Medicaid Fraud Prevention Act) .................... 78

Count XIX (Violation of Virginia Fraud Against Taxpayers Act) ...................... 80

JURY TRIAL DEMAND ...................................................................................... 90

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 ET SEQ., AND STATE LAW COUNTERPARTS

### INTRODUCTION

1.      Plaintiffs Relators, John Doe #1 and John Doe #2, on their behalf and on behalf of the United States of America, and on behalf of the State of Colorado, the State of Connecticut, the District of Columbia, the State of Florida, the State of Illinois, the State of Indiana, the State of Maryland, the State of Massachusetts, the State of New Jersey, the State of New York, the State of Oklahoma, the State of Texas, and the State of Virginia (collectively, the "Qui Tam States"), bring this qui tam action against the Defendants SpineFrontier, Inc., KICVentures LLC, LESSurgeons Institute Florida LLC, Impartial Medical Experts LLC, Kingsley R. Chin, M.D., and Aditya Humad (collectively, "Defendants").

2.      Relators bring this action on behalf of the United States and the Qui Tam States to recover damages and civil penalties under the False Claims Act and State qui tam statutes against Defendants for causing the submission of false or fraudulent claims; and for making, using, or causing to be made or used false records or statements material to false or fraudulent claims.

3.      Relators bring this action against the Defendants pursuant to the following State qui tam provisions: the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 et seq. (2010); the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a et seq. (2010); the District of Columbia False Claims Act, DC Code §§ 2-381.01 to 2-381.09; the Florida False Claims Act, Fla. Stat. § 68.081 et seq. (2000); the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 et seq. (2000); the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind.

Code §§ 5-11-5.7-1 through 5-11-5.7-18; the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-601 et seq. (LexisNexis 2010); the Massachusetts False Claims Act, Mass. Gen. Laws, Chapter 12, §§ 5A -5O; the New York False Claims Act, N.Y. State Fin. Law. § 187 et seq. (McKinney 2010); the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.; the Ohio Medicaid Fraud Act, R.C. § 2913.40 et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053.1 through 5053.7; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. (West 2006); and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq. (2011) (collectively, the "State qui tam statutes" or "Qui Tam States").

4.      In addition, Relator John Doe #1 brings this action to recover under the anti-retaliation provisions of the federal False Claims Act, 31 U.S.C. § 3730(h), the anti-retaliation provisions of the Massachusetts False Claims Act, M.G.L. ch. 12, § 5J, and Massachusetts common law prohibiting wrongful termination in violation of clearly established public policy.

5.      Relators seek civil penalties, damages, declaratory relief, injunctive relief and such other relief as is available under the False Claims Act and/or the State False Claims Acts, and demand a trial by jury for all claims for which the right to a jury trial is authorized.

6.      This case arises from the Defendants' unlawful participation in (a) the presentment to the federal government and the relevant States of false or fraudulent claims for payment under federal health care programs relating to the medical device products designed, manufactured, marketed and sold by SpineFrontier, Inc., and (b) the

2

making or use of false records or statements material to the false or fraudulent claims relating to the SpineFrontier medical device products.

7.     Defendants are companies that manufacture, market, and sell a variety of medical device products relating to spine surgery.  Beginning in approximately 2006, Defendants have engaged in a variety of fraudulent activities involving their medical spine device products.

8.     Defendants have, as part of their fraudulent scheme, engaged in an illegal kickback scheme and a scheme to not disclose certain financial relationships with physicians as required by federal law, all part of a successful effort by Defendants to induce third parties (physician and hospitals) to submit false claims to the government for Medicare and Medicaid reimbursement.

## I.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730, 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

10.     The Court has original jurisdiction of the State law qui tam claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under State laws for the recovery of funds paid by the Qui Tam States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

11.     This Court has personal jurisdiction over the Defendants because, among other things, SpineFrontier, Inc. and KICVentures LLC have their principal places of business in Massachusetts, all of the Defendants transact business in this judicial district, and all of them engaged in wrongdoing in this judicial district.

12.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  The Defendants transact business within this judicial district, and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

13.     The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## II.    PARTIES

### A.    PLAINTIFF/RELATOR JOHN DOE NUMBER ONE

14.     Plaintiff/Relator John Doe Number 1 ("Relator #1") was employed as a member of the executive staff of SpineFrontier from August 2014 through on or about April 7, 2015, when he was wrongfully terminated by the company after urging reforms to prevent it from engaging in the unlawful activities that resulted in the illegal sale and reimbursement of SpineFrontier's medical device products.

15.     Relator #1 has personal knowledge and experience regarding Defendants' kickback and off-label promotion activities, including personal contact with the employees and executives who have committed violations of law alleged herein. Relator #1 was personally aware of Defendants' participation in the scheme involving the providing of illegal kickbacks to healthcare providers in exchange for their favorable treatment of its medical device products.  By reporting to SpineFrontier's legal counsel that the scheme and Defendants' failure to comply with the Physician Payments Sunshine Act were improper, he was attempting to stop further violations of the False Claims Act that involved the sale and reimbursement (by the Government) of SpineFrontier's products.

4

16.     Prior to filing this Complaint, Relator #1 brought allegations of the wrongdoing described in this Complaint (i.e., those relating to the Defendants' kickback scheme, off-label promotion, and lack of compliance with the Physician Payments Sunshine Act) to the attention of Defendants' legal and regulatory executives.  Relator #1 raised these concerns with Paul L. Speidel, General Counsel for SpineFrontier and its Regulatory Affairs Manager.  For example, approximately five months before he was terminated, Relator #1 told Speidel that the scheme involving the consulting agreements was improper because it did not comply with the Physician Payments Sunshine Act, and violated federal law.  Later, upon discovering that Defendants still had not complied with the Physician Payments Sunshine Act, Relator #1 repeated his concerns to Speidel in or about March 2015.  Relator #1 also separately reported to SpineFrontier's Director of Quality and Regulatory Affairs that Defendants were engaging in illegal off-label promotion.  Shortly after raising these concerns, on April 7, 2015, as a result of Relator #1's internal reports to members of the executive staff, SpineFrontier abruptly terminated his employment.

17.     Upon his termination, Relator #1 was presented with a separation agreement and release, which he did not sign.  The terms of the release provided in part that, if he signed, Relator #1 would not file any complaints or claims with any court or agency arising from his employment, and would be precluded from receiving any compensation as a result of his participation in any investigation or proceeding before any federal or state agency.

18.     Relator #1 is an original source of the allegations in this Complaint, and these allegations are not based upon publicly-disclosed information.  Prior to filing this

action, Relator #1 voluntarily disclosed to the Government the information forming the basis of this Complaint pursuant to 31 U.S.C. § 3730(e)(4)(B).

**B.    PLAINTIFF/RELATOR JOHN DOE NUMBER TWO**

19.    Plaintiff/Relator John Doe #2 ("Relator #2") was employed as a sales representative by Defendant SpineFrontier from February 2, 2015 through April 7, 2015, when he was terminated by the company.

20.    Relator #2 has personal knowledge and experience regarding Defendants' off-label promotion activities, including personal contact with the employees who instructed sales representatives employed by SpineFrontier to commit violations of federal law.  He also observed numerous instances of such conduct, which involved off-label promotion to healthcare providers to induce their favorable treatment of SpineFrontier's medical device products.

21.    Relator #2 is an original source of the allegations in this Complaint, and these allegations are not based upon publicly-disclosed information.  Prior to filing this action, Relator #2 voluntarily disclosed to the Government the information forming the basis of this Complaint pursuant to 31 U.S.C. § 3730(e)(4)(B).

**C.    DEFENDANT SPINEFRONTIER**

22.    Defendant SpineFrontier, Inc. is an S-Corp that was incorporated in Delaware on June 16, 2006 and has its principal place of business located in Massachusetts.  It is a medical device company that is owned, and was founded by, Dr. Kingsley R. Chin.  He is its sole corporate officer, listed as its Director and Chairman, Chief Technology Officer, President and Chief Executive Officer.  SpineFrontier manufactures, designs, develops, and markets implants and instruments, including

medical devices and technologies, used in the treatment of spinal diseases. SpineFrontier's principal place of business is at 500 Cummings Center, Suite #3500, Beverly, MA 01915.  SpineFrontier is a privately-held company and has approximately seventy employees.  It is also a portfolio company of KICVentures LLC.  Its revenue in 2014 totaled over $26,000,000.00.

23.     SpineFrontier is part of a Physician-Owned Distributorship ("POD"), which is owned solely by Dr. Kingsley R. Chin.  It derives revenue from selling implantable medical devices and instruments for use in surgical spine-related procedures, many of which are performed by IME Consultants who work indirectly, through IME, for SpineFrontier and KICVentures.

24.     As described more fully herein, SpineFrontier is engaged in the manufacture, promotion, distribution, commercialization, and sale of medical device products.  At all times material hereto, SpineFrontier manufactured, marketed and sold spine-related medical devices throughout the United States, including within this judicial district.

25.     SpineFrontier manufactures, markets and sells, and marketed and sold, brand-name medical device products that are paid for, or reimbursed by, various government programs, including Medicare, Medicaid, the Department of Defense's TRICARE/CHAMPUS programs, the Department of Veterans Affairs' CHAMP/VA program, and the Federal Employees Health Benefit Plan.

### D.   DEFENDANT KICVENTURES LLC

26.     KICVentures LLC is a Delaware Corporation that is owned by Dr. Kingsley R. Chin and was founded by him in 2005.  Dr. Chin is the CEO of KICVentures LLC.  Its principal place of business is at 500 Cummings Center, Suite 3500, Beverly, Massachusetts 01915.  KICVentures LLC is an umbrella company that owns multiple businesses, including SpineFrontier and the LESS Institute.   The manager of KICVentures LLC is the Kingsley Investment Company LLC, which is located in Beverly, Massachusetts and also is owned by Dr. Chin.

### E.   DEFENDANT LESSURGEONS INSTITUTE FLORIDA LLC

27.     LESSurgeons Institute Florida LLC ("LESS Institute" or "LESSurgeons Institute" or "LESSi") is a Delaware Corporation.   It is managed by LESSurgeons Institute Holdings LLC, which in turn is owned by Dr. Chin.  LESS Institute is registered in Florida as a foreign limited liability corporation, with an address of 1100 W. Oakland Park Boulevard, #3, Fort Lauderdale, Florida, 33311.

### F.   DEFENDANT IMPARTIAL MEDICAL EXPERTS LLC

28.     Impartial Medical Experts, LLC ("IME") is a Delaware corporation formed in 2012 by Dr. Kingsley R. Chin.  IME is one of the portfolio companies of KICVentures LLC.  IME's website describes IME as "a premier consultant referral firm that connects its Clients to leading medical and surgical specialists with extensive, real-world experience in healthcare services, medical device and instruments design and evaluations, lectures, didactic skills training, and expert witness and litigation support." IME's website, http://impartialmedicalexperts.com/, does not disclose that it is owned by Dr. Chin.

### G.     DEFENDANT KINGSLEY R. CHIN, M.D.

29.     Kingsley R. Chin, M.D., holds a Doctor of Medicine from Harvard Medical School, graduating on June 6, 1996.  He is the founder and owner of all of the companies that are Defendants in this action (SpineFrontier, Inc., KICVentures LLC, LESSurgeons Institute, Impartial Medical Experts LLC), as well as other companies that are related and were involved in the scheme alleged in this Complaint, including LESS Institute Online, Less Exposure Surgery Society, LESSurgeons Institute Holdings LLC, LESS Institute Clinical, PLLC, Kingsley Investment Company, LLC, INVU Holdings LLC, 1801 Sample Road LLC, the Institute for Minimally Invasive Spine Surgery LLC (or "IMIS"), and Axiomed LLC.

### H.     DEFENDANT ADITYA HUMAD

30.     Aditya Humad has worked together with Dr. Chin for over ten years.  He is a co-founder and the Chief Financial Officer of KICVentures, having been employed at it since November 2009.  Since July 2011, Humad has been the Chief Financial Officer of SpineFrontier, Inc.  He has been the President of SpineFrontier, Inc. since June 2014, and works at the Beverly, Massachusetts headquarters of SpineFrontier and KICVentures. Since November 2014, he has also been the Chief Financial Officer of Axiomed LLC, one of the companies owned by Dr. Chin.  Prior to June 2014, Humad was employed by SpineFrontier as the Vice President of Business Development, from July 2011 through June 2014, and as its Director of Finance and Business Relations, from July 2010 through July 2011.  Prior to that, he was employed by SpineFrontier as a financial analyst, from July 2009 through July 2010.

## III.    DEFENDANTS' KICKBACK SCHEME

31.    Defendants' kickback scheme involves a business model that incentivizes physicians to use SpineFrontier medical devices by rewarding them with lucrative consulting agreements, investment opportunities in the Defendants' business, memberships on the boards of Defendants' companies, bonuses for successfully recruiting other surgeons to become IME Consultants, shares in profits of Defendants' medical device products, medical malpractice insurance coverage, an AMEX card for expenses, and royalty fees—all as an illegal quid pro quo.  In addition, Defendants offer remuneration to the physician IME Consultants in the form of reimbursement, to induce the physicians to use Defendants' medical devices while performing certain surgical spine-related procedures.

### A.    IME CONSULTANTS

32.    A central aspect of the Defendants' kickback scheme involves consulting agreements arranged by IME.  Specifically, IME enters into consulting agreements with physicians through which the physicians agree to provide a "referral service" purportedly involving product consulting for clients referred to the physician-consultants by IME. The IME Consultants are characterized by IME as providing an impartial opinion to determine product usability, and may assist clients in training with the products, research related to the products, and discussing industry trends.  The Consultants (or physicians) retained by IME agree to provide the clients referred by IME with evaluations and reviews of spine-related medical products.  In return, IME agrees to compensate the Consultants between $500 and $1,000 per hour for their work, depending upon the type of spine-related medical device product reviewed (or other service provided, such as

discussing industry trends or assisting in training on the client's products) and upon receipt of payment from the client for the service. Part of the job of an IME Consultant includes leveraging the surgeons of the client company to become part of the LESSurgeons Institute network.

33. Once signed on to a consulting agreement, IME Consultants used SpineFrontier medical device products in performing surgeries on their own patients. Many of these patients were covered by a government health-care program, including federal and state medicare programs.

34. In order to provide IME with information regarding their consulting work, IME Consultants, using a personalized URL and password, log onto a website provided by IME, the link of which is http://impartialmedicalexperts.com/spinefrontier/ (last visited May 14, 2015). The URL and website is set up by a "web developer" employed by SpineFrontier. The URL asks the Consultants to enter the date of their work involving evaluation of medical device products (relating to Cervical or Lumbar surgery) or other matters, the amount of time spent on each task, and the monthly number of cervical or lumbar cases evaluated. Times are split into 30 minute increments. There is a box that can be checked that states "Completed Monthly Review with CTO/Engineer for comprehensive feedback on Clients technology portfolio." But there is no provision made for the entry of the information or details regarding product review or evaluation. There are also three categories of SpineFrontier medical devices listed, each with their own individual check box, and concerning at least twenty-four such devices. The instructions state "check the box for the products you have evaluated. If product is not listed, enter the product name in 'Other Products' column."

35.    Surgeons who are IME Consultants include those listed as such in Exhibit F (listing at least 34 IME Consultants); *see also* Exhibit A.

36.    In an email dated June 4, 2014, Dr. Chin, discussing several IME Consultants, states "we are in [the] Ohio Health System with [Drs.] Josue Gabriel, Paul DeGenova and Joseph Shehadi."  In another email to SpineFrontier's legal counsel, Dr. Chin states that "Dr. Gabriel, Dr. Shehadi, etc. are using us."

37.    For years, even before the creation of IME, the other Defendants engaged in financial arrangements and agreements with physicians (similar to the IME consulting agreements) whereby the physicians hired by Defendants would use SpineFrontier's medical devices in their surgeries.

38.    The medical device products that Defendants characterize as being reviewed and evaluated by IME Consultants include those produced by SpineFrontier. For SpineFrontier cervical products, these include Arena-C, Invue, Invue Max, and Inset. For SpineFrontier biologics products, these include DBM Pure Micro, DBMPure Macro, Cancellous MORSelized, DBMForm, FacetFuse-Allo, Arena-L Allo, and Cervical Allograft.  For SpineFrontier lumbar products, these include Arena-L, S-Lift, P-Lift, T-Lift, E-Lift, FacetFuse, PedFuse Return, PedFuse Respond, PedFuse Reset, PedFuse Remind, MISquito, InSpan, and InSpan Slimm.

39.    Between 2005 and 2014, the United States Patent Office granted 25 patents to SpineFrontier, many of which concern its spine-related medical devices.

40.    Although Defendants describe the alleged purpose of the consulting agreements as providing consulting work for IME as described above, most of the time no consulting work is provided.  Rather, approximately eighty percent of the time, IME

Consultants, acting on behalf of SpineFrontier, perform surgeries involving its medical devices, but do not provide any follow-up product review, feedback or evaluation, or other consulting work.  In turn, IME pays the Consultants for this work without requiring any such product evaluation, review or feedback.  For example, pursuant to a formula for surgical procedures involving SpineFrontier medical devices, IME pays a fee for cervical cases based on an estimated one-hour rate, and for lumbar cases based on an estimated two-hour rate—as noted, for most cases without any corresponding product review.  In other words, the IME Consulting positions essentially are sham consulting jobs that are intended to operate as channels for selling SpineFrontier's medical devices for use in spine-related surgeries on the patients of the IME Consultants.

41.     While Defendants purport to compensate the IME Consultants for consulting services, the Defendants in fact made these payments, and conferred other benefits upon them, as kickbacks to induce the IME Consultants to use SpineFrontier medical devices in the surgeries performed on the IME Consultants' clients.  These kickbacks were a substantial factor in causing the IME Consultants, acting on behalf of the owner of SpineFrontier, to use SpineFrontier medical devices in their surgeries.

42.     As an example of the involvement of SpineFrontier medical devices in surgeries performed by IME Consultants as part of their paid "consulting" work, in a September 2, 2014 email to SpineFrontier executive staff members concerning Dr. Jacob Rosenstein, a IME Consultant, Dr. Chin states "Please let surgeons know if they are only doing pedicles screws they cannot bill for a full hour per me unless more than one level. . . . otherwise they will consult on the interbody and with us on the screws and double dip which will raise a red flag."

43.    In a September 2, 2014 email from Aditya Humad, the President and Chief Financial Officer of SpineFrontier, to Dr. Chin, Humad notes that a physicians' organization, Your Extra Hands Surgical Services ("YEHSS"), located in Normal, Illinois, "receives $3,200 per month as management fee for [SpineFrontier sales] rep (Sid covering Dr. Atwater).  Sid receives $2,500 per month for coverage.  Total of $5,800 per month, but Dr. Atwater has been doing 1-2 cases per month for $10-15K/month.  With Dr. Atwater moving to FL, this will drop further."  Another physician wants to replace Dr. Atwater and "is adamant on current arrangement of flat rate but I cannot justify the numbers given low sales volume."

44.    In an email dated September 8, 2014 from Dr. Chin to SpineFrontier executive staff members, Dr. Chin asks Kevin Chappius, a technology deployment director, to "call Dr. Bash," an IME Consultant, and states "I think we should visit with him to show the midline screw technique on a Sawbone so he can do a case in a week or so. . . .  I recommend [the SpineFrontier] unilateral Remind and Inspan or FacetFuse or bilateral Remind if no spinous process or big slip or heavy patient or diabetic or smoker."

45.    In a February 25, 2015 email to Dr. Richard Francis, another IME Consultant, Dr. Chin states "I think you will want to try this [SpineFrontier] stand alone cervical cage.  It is the best engineered product I have ever placed in the spine and the simplest. . . .  You have to try it. . . .  I expect you will want to use it all the time."

46.    Examples of substantial kickback payments to IME Consultants are set forth in Exhibit B, which details the payments that were made by Defendants from IME and KIC Management Group bank accounts to the IME Consultants on their payroll.  For example, IME paid Dr. F. Paul DeGenova $43,700 on January 2, 2015, $19,950 on

February 9, 2015, $14,725 on March 6, 2015, and $18,525 on April 16, 2015.  IME paid
Dr. Josue Gabriel $34,912.50 on February 9, 2015, and $22,800 on March 6, 2015.

**B.    RECRUITMENT EFFORTS BY IME CONSULTANTS TO BUILD
DEFENDANTS' BUSINESS**

47.    The services performed by IME Consultants include efforts to recruit other
surgeons to join IME as a consultant, and the promotion of Defendants' medical device
products, investment opportunities in Defendants' businesses, and job opportunities as an
IME Consultant or surgeon with LESSurgeons Institute, in violation of federal law.  IME
Consultants are rewarded with bonuses for successfully recruiting other surgeons to
become IME Consultants.

48.    In connection with recruiting surgeons, Dr. Chin stated in a March 26,
2015 email (copied to SpineFrontier executives) that "[w]e need to blow out sales [of our
products] by simply letting young surgeons know we are the next big deal and they
should check us out.  We feel [']fellows['] are ripe to try something new and we are
[']it[']."

49.    In an email dated July 24, 2014 from Dr. Jason Tinley to Aditya Humad
and Dr. Chin, Tinley inquires "[w]hat sort of compensation is appropriate for me getting
other surgeons involved?  I have 15 or so that would be good candidates for LES, SF, and
LESS Institute in addition to my own 2 other guys."  In response, Humad advises Tinley
that "[a]s a Board Member, we will pay you a discretionary bonus per quarter.  The
executive team will discuss this with you personally and confidentially."

50.    LESSurgeons Institute is another part of Defendants' recruitment of
physicians into their kickback scheme.  The LESSurgeons Institute is a single member
LLC that is owned by KICVentures.  It provides spine and orthopaedic treatments

15

(surgical procedures) through a surgeon network.  LESSurgeons pays the surgeons with money provided by patients, including cash and proceeds from personal injury settlements.

51.     Surgeons hired by LESSurgeons are also encouraged to become partners and receive bonuses by recruiting other surgeons.  For example, surgeons performing work for it earn as much as $1 million in bonuses merely by bringing other surgeons into the LESSurgeons Institute that provide substantial revenue to the company.

52.     In an email dated December 26, 2014 concerning the subject of incentivizing surgeons to network for LESS Institute and SpineFrontier, Lucas Diehl, a Field Clinical Engineer for SpineFrontier, asks Aditya Humad "what kind of bonus could we offer [surgeons] for introducing us to a new user?  It would probably be especially powerful to offer to graduating fellows, since they're likely to get excited about making a quick lump sum."  In response, Humad responded that "[s]urgeons already [working for] LESSi will do this as being part of the company and have bonuses based on company performance."

53.     In an email dated March 15, 2015 from Dr. Kingsley Chin to Jake Lubinski, the Chief Operating Officer at SpineFrontier, other executives, and "Surgeon[s]," Dr. Chin discusses his preferred sales technique of "cold calling" by sales representatives on physicians, and states that he "added our LES surgeons on the email because they are going to be one of our most formidable weapons to bring on more surgeons through viral marketing."

54.     As part of the hiring process with LESSurgeons Institute, a "Non-Binding Letter of Intent" is sent to the prospective surgeon, in which it is stated that "[t]he

intention is for [LESS Institute] members to secure a pipeline of patients." Such letters have offered "partnerships," issuance of a "LESS Institute AMEX card for expenses," "Medical Malpractice Insurance coverage," and the cost of a medical license to practice in a LESS Institute location. The job duties listed in the "letter" including "[c]ollaberat[ing] with our internal research organization to become a prolific researcher *without personally writing papers*." (Emphasis added).

55. Surgeons hired by LESSurgeons Institute sign a Professional Services Agreement and agree to provide clinical and ambulatory spine-related surgery services on behalf of LESSurgeons Institute or LESS Institute Clinical, PLLC. The Agreement states that surgeons who are hired "provide clinical and ambulatory surgery services on behalf of the Company." The surgeons who sign the agreement are paid a range of fees depending upon the type of spine surgery performed. As part of the Agreement, LESSurgeons Institute or LESS Institute Clinical, PLLC agrees to provide SpineFrontier medical devices to the surgeons. The Agreements are processed by the Human Resources Manager for KICVentures.

### C. THE IME CONSULTANT AGREEMENTS DO NOT FALL WITHIN THE SAFE HARBOR PROVISIONS OF THE ANTI-KICKBACK STATUTE OR STARK LAW

56. The IME consulting agreements do not fall within the safe harbor provisions set forth by the Anti-Kickback statute's regulations.

57. The IME consulting agreements do not set forth whether the term of employment is for not less than one year.

58. The IME consulting agreements do not set forth in advance the aggregate amount of compensation paid to the consultant over the term of his employment, but

instead indicate that IME Consultants are paid on an hourly rate basis, depending upon the type of service provided or the type of surgery provided (all of which involve SpineFrontier medical devices).   Thus, since the hours of service can vary, the compensation arrangement does not qualify for safe harbor protection.

59.     The IME consulting agreements are intended to provide for services on a periodic, sporadic or part-time basis, rather than on a full-time basis, and they fail to specify exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

60.     Although the IME consulting agreements provide that the consulting duties "will not include surgical time utilizing and/or implanting spinal products," the IME Consultants' actual job duties, for which they are compensated by IME, include performing such surgical work involving SpineFrontier medical devices.   Thus, the IME consulting agreements do not cover all of the services the Consultants provide for the term of their agreements and do not specify the services to be provided by the Consultants.

61.     The aggregate services performed under the IME consulting agreements by the IME Consultants exceed those which are reasonably necessary to accomplish the commercially reasonable business purposes of the IME consulting service.   As set forth above, IME Consultants perform as part of their job duties surgeries involving SpineFrontier products and attempt to recruit other surgeons to join IME as a Consultant.

### D.   DEFENDANTS' CONDUCT WAS AIMED AT SHIELDING THEIR VIOLATIONS OF FEDERAL LAW

62.     One of the central underpinnings of Defendants' kickback scheme is that none of the consulting agreements and related remuneration through which IME enters

with numerous surgeons and puts on their payroll are disclosed as required under federal law. Specifically, the compensation and other forms of remuneration that are received by those surgeons who work for IME are not reported, as required by the Physician Payments Sunshine Act.

63.     In this regard, the purpose of IME and the consultancy agreement scheme is not only to grow the revenues of Defendants' business, but also to avoid having to disclose the involvement of KICVentures and SpineFrontier in the scheme, and to avoid compliance with the reporting requirement of the Physicians Payment Sunshine Act, 42 U.S.C.A. § 1320a-7h. In fact, none of the Consultant fees paid by IME are reflected in the database created as part of the Sunshine Act and as required by that law. Defendants were required to report, by March 31, 2014, such payments or transfers of value for the last five months of 2013, the first reporting cycle, and by March 31, 2015, for payments or transfers of value during the year 2014, the second reporting cycle. Defendants did not comply with these requirements. By avoiding compliance with the Sunshine Act, which would have disclosed Defendants' financial arrangements with IME Consultants, Defendants sought to avoid liability under the False Claims Act, the Stark Law, and the Anti-Kickback statute.

64.     In a SpineFrontier advertisement for IME Consultant positions circulated by SpineFrontier sales representatives to surgeons, the advertisement states that "[w]e have recently signed an agreement with Impartial Medical Experts (IME) to have surgeons consult for [SpineFrontier]. Therefore, you would sign up as a consultant with them and consult for one of their clients, SpineFrontier. This protects you from the Sunshine Act and OIG [Office of Inspector General], by not having to disclose working

directly with a single device company and receiving anything directly from them." The advertisement further states "Consultants are through a 3rd party (IME), protecting you from disclosing consulting with a specific company." The advertisement also sets forth the "Benefits" to joining IME, including "[a]ll the benefits SpineFrontier offers additionally to surgeons" and the "[o]pportunity to make over $150,000 annually."

65.     On or about October 20, 2014, in an email to SpineFrontier staff members that discusses this advertisement, Dr. Kingsley Chin states that "[t]his letter would have a better feel without mentioning OIG and Sunshine Act."

66.     In a September 23, 2014 email responding to a surgeon's concern that "the association between SpineFrontier and IME is to[o] close," Aditya Humad states that "we decided to have it through IME so no direct payments come from SF just as an added layer of separation."

**E.     DEFENDANTS INDUCED PHYSICIANS TO PARTICIPATE IN THE KICKBACK SCHEME WITH INCENTIVES THAT INCLUDED ROYALTY PAYMENTS AND BOARD POSITIONS**

67.     Another aspect of the scheme involves inducements to surgeons in the form of Defendants' payment of royalty payments and positions on the boards of Defendants' companies. Specifically, selected physicians are invited to join one of the Defendants' Boards (i.e., the Clinical Advisory Board ("CAB"), Strategic Medical Advisory Board ("SAB"), and Executive Advisory Board ("EAB")). Such individuals are also given royalty agreements, which entitles them to a share of profits on specific SpineFrontier products, ranging from approximately a 0.5% to 1% royalty percentage, and "10,000 units" as part of the membership on SpineFrontier's CAB. The royalty agreements are developed by Dr. Chin. In the event that SpineFrontier becomes a public

20

company, Defendants proposed that each of the Boards would be allotted approximately 15% of the shares in SpineFrontier (split among the respective Board members) from SpineFrontier's revenue.

68.     Most of the surgeons who sign or are given royalty agreements with Defendants do not perform any design or development work on, or in connection with, the SpineFrontier medical devices to which the agreements relate.  There is no transfer of intellectual property between a physician who signs a royalty agreement and Defendants. The agreements that most of the surgeons are parties to involve SpineFrontier medical device products that are already designed, developed, and on the market and selling. Moreover, many of the surgeons who are parties to the royalty agreements are not listed as owners of the medical devices.  The only owners listed for the medical devices produced by SpineFrontier are Dr. Chin and a select handful of other individuals.

69.     The royalty agreements do not set forth in advance the aggregate amount of compensation paid to the surgeons who receive them, but instead indicate that the royalties are paid to surgeons as a percentage of the profits from sales of SpineFrontier medical devices.

70.     The purpose of the royalty agreements is to motivate surgeons to use SpineFrontier's medical devices.  In a KICVentures executive summary, Defendants observe that "surgeons see a royalty agreement from these [large public, competitor] companies as the ultimate value and a compliant way to be paid for their loyalty."

71.     In an email dated August 28, 2014 from Seth Jacknowitz, a SpineFrontier Territory Manager for South Florida, Mr. Jacknowitz discusses his meeting with the contract administrator of the Carilion Clinic in Roanoke, Virginia, in which he explained

which SpineFrontier products Dr. Caleb Behrend and his partner Dr. John Carmouche want to use at the Clinic.  Mr. Jacknowitz explains that Dr. Behrend "wants to use us in smaller non deformity cases and . . . as his 'LES surgery' option.  This will be 1 to 2 level lumbar and cervical. . . .  Dr. Behrend . . . will not give us 100% of his business, but he definitely will use us regularly."  In response, Dr.  Chin directed Mr. Jacknowitz to "[o]ffer his partner and himself royalty agreements and [an] IME [consulting agreement]."

72.     In an August 9, 2014 email to executive staff members, Dr. Chin discusses Dr. Darren R. Lebl of New York as "a very important surgeon for us to partner with." Dr. Chin notes that Lebl had been given a Clinical Advisor Agreement, and directs that SpineFrontier "[s]end him a portfolio of our products he can understand and appreciate. Send him a royalty agreement on our pedicles screw reset system.  Dr. Lebl can be an ambassador to get other surgeons to join us.  He will also head up the LES Society Local Manhattan Chapter."  Dr. Chin also states:  "he needs a great [SpineFrontier sales] rep to cover his cases."

73.     In an email dated August 6, 2014 from Dr. Chin to Aditya Humad, Dr. Chin directs Mr. Humad: "Please send Dr. Ghiselli [an IME Consultant] a royalty agreement in the Inset plate."

74.     In an email dated August 8, 2014 to Dr. Bonaventure Ngu, an IME Consultant, Mr. Humad states:  "I wanted to follow-up on the TLIFT Royalty Agreement for 0.5% and the 10,000 units granted as part of your membership to Spinefrontier's CAB [Clinical Advisory Board].   Latest copies of both documents are uploaded to your personal profile."

75.     In an email dated March 15, 2015 to executive staff members and select physicians working for LESS Institute, Dr. Chin highlights his preferred method of calling by sales representatives on physicians (involved in minimally invasive surgery ("MIS")) in connection with SpineFrontier medical devices.  The sales script he quotes states, in part, "If you accept our invitation [to look at our MIS portfolio or to join our Perc Screws development team], you would be among 20 select MIS surgeons and you will receive $2 M in royalty milestone payments."

**F.     DEFENDANTS' AGGRESSIVE GROWTH PLAN TO INCREASE SALES OF SPINEFRONTIER'S MEDICAL DEVICES**

76.     Another aspect of the kickback scheme involves an aggressive growth plan to significantly increase the profitability of Defendants' medical devices, including the aim of the Defendants to enroll surgeons as investors in the Defendants' companies, using its "sales people" to meet with surgeons and "sell" them the investment opportunity.  In a September 6, 2014 email to Aditya Humad, Dr. Chin states that he "want[s] to revisit raising money though KICVentures from surgeons. . . . A guaranteed 10% per year return is still very good with the upside formula we have."

77.     In a February 14, 2015 email exchange between Dr. Chin and Dr. Bob Barcohana, captioned "Join the Growing Investor Network in Motion Preservation," Dr. Barcohana discuss investment opportunities in Axiomed, LLC, another KICVentures portfolio company that would develop a disc replacement product.  Dr. Chin asks Dr. Barcohana if he "can interest [his] investor friends," and "suggest[s] tak[ing] a loan" to invest in Axiomed and in return obtain a 5% return, and that "using [SpineFrontier Inc. to] cover the loan you don't touch your cash. . . . Get some investors we talk."

78.     In a February 18, 2015 email between Dr. Chin and Dr. Caleb Behrend, captioned "Working together Axiomed," Dr. Chin "invite[s] Dr. Behrend to the advisory board on Axiomed, and asks him "how can we get you and your partner to use us.  There is a lot at stake if we don't get surgeons to come together.  There is $8 B in surgeries evaporating every year and surgeons are propping up the companies making all that cash."

79.     In a March 30, 2015 email to Dr.  James Fleming, Dr. Chin states:  "I am attaching our executive summary so you see we are going to blue we are next.  Need to get to $50 M this year could use your help.  Please read and come on board."

80.     As another example of Defendants' ambitious growth plan, SpineFrontier projected that for 2014 the LESS Institute, through one surgeon, would collect $8 million and generate $40 million in receivables, and would handle 6,000 patients.  It also predicted that LESS Institute would expand to 20 surgeons in 2015 handling 24,000 patients, and then to 500 surgeons in 2018 handling 600,000 patients, resulting in an estimated $1 billion in collections and $8 billion in receivables.

81.     An executive summary for KICVentures, in describing its revenue model for Defendants' businesses, including SpineFrontier, states that "[t]he goal is to get a high number of surgeons buying into what we stand for and earning over 50% of their business.  We will then provide each with a direct employed service representative at a lower commission."

G.   **DEFENDANTS' SALES REVENUES OF SPINEFRONTIER'S MEDICAL DEVICES THROUGH THE IME CONSULTANTS**

82.    The IME Consultants employed by Defendants generated substantial revenues as a result of sales of SpineFrontier's spinal medical devices for use in surgical procedures they performed.

83.    For example, the sales revenues of Defendants' devices through the IME Consultants amounted to $21,714,814.00 for fiscal year 2013, and $26,316,200.00 for fiscal year 2014.  Exhibit C.

84.    As for representative examples involving individual physicians working as IME Consultants, revenue from sales of SpineFrontier devices in fiscal year 2014 through Dr. Josue Gabriel of Columbus, Ohio, amounted to $3,701,510.00.  Exhibit C.

85.    Revenue from sales of SpineFrontier medical devices in fiscal year 2014 through Dr. Jeffrey R. Carlson of Newport News, Virginia, amounted to $2,393,962.00. Exhibit C.

86.    Revenue from sales of SpineFrontier medical devices in fiscal year 2014 through Dr. Vivek Kushwaha of Houston, Texas, amounted to $2,142,417.00.  Exhibit C.

87.    Revenue from sales of SpineFrontier medical devices in fiscal year 2014 through Dr. F. Paul DeGenova of Columbus, Ohio, amounted to $1,258,995.00.  Exhibit C.

88.    Other such representative examples of revenue from sales of SpineFrontier medical devices through IME Consultants are set forth in Exhibit C.

H.   **RELATOR #1'S ATTEMPTS TO REFORM SPINEFRONTIER**

89.    As part of his employment with SpineFrontier, Relator #1's job was to manage the company's sales business.   Relator #1 learned that Defendants were

funneling the consulting agreements through IME in order to shield the surgeons hired by IME from having to report the consulting agreements under the Physician Payments Sunshine Act and therefor avoid liability under federal law.  Relator #1 knew that Defendants were not complying with the Sunshine Act by reporting the consulting agreements and related remuneration as required by that federal law.  About five months before he was terminated, as part of his effort to reform the company, Relator #1 contacted SpineFrontier's legal counsel, Paul Speidel, in an effort to alert the Defendants to the illegal conduct associated with the kickback scheme, including the Defendants' failure to comply with the Sunshine Act.

90.     Relator #1 pushed back against the IME consulting arrangement, and advised Speidel that not reporting the consultant fees as required by the Sunshine Act was improper under federal law.  Relator #1 repeated his concerns to Speidel in March 2015. Defendants, however, never responded to or addressed Relator #1's concerns.

91.     In a February 27, 2015 email, less than six weeks before he was terminated, Relator #1 brought to the attention of Ed Rule, Director of Quality and Regulatory Affairs at SpineFrontier, an email from Dr. Kingsley Chin that concerned a "stand alone cervical cage" (a SpineFrontier medical device) and that was sent by Dr. Chin to potential customer physicians of SpineFrontier.  In the email, Dr. Chin urges the potential customer physicians to "try" the medical device.  In his email to Ed Rule, Relator #1 expressed concern that he has "seen the [slide] images [of the procedure involving this medical device performed by Dr. Chin] being sent" by SpineFrontier to potential physician customers and that the slides involved improper "promoting off label."  In an email in response to Relator #1, Rule admitted that Relator #1 was correct:

"You're right, the indications are for one level between C2/C3 and C7/T1.  I will start with CAPA [Corrective Preventative Action] so that this issue is properly addressed."

92.     Rather than expressing gratitude to Relator #1 for coming forward and seeking to reform the company, on April 7, 2015, SpineFrontier terminated Relator #1 in retaliation for his whistleblowing activities.   The Defendants' retaliatory act was, not coincidentally, taken shortly after Relator #1 raised his concerns about the illegal conduct.   Defendants' wrongful termination of Relator #1 was made in violation of the False Claims Act's prohibition against such retaliation.  *See* 31 U.S.C. § 3730(h).

## I.   DEFENDANTS' ILLEGAL KICKBACK SCHEME VIOLATED FEDERAL LAW

93.     Defendants' illegal kickback scheme has caused numerous false claims to be submitted to federal and state healthcare programs throughout the United States, and constitutes a violation of the Anti-Kickback and Stark statutes.  Defendants' misconduct cheated the federal and state governments out of hundreds of thousands of dollars that should not have been paid, thereby illegally enriching the Defendants at taxpayer expense.

94.     At all relevant times, Defendants have known that SpineFrontier's spine-related medical devices were being paid for or reimbursed by Government Programs, including Medicaid and Medicare Parts A and B.  Defendants supervised the kickback scheme and knew that Medicare, Medicaid, and other federal program beneficiaries represent a significant percentage of spine-surgery patients, and that as a result of the kickbacks, doctors across the country had performed spinal surgeries on Medicare and Medicaid patients using SpineFrontier's medical devices.

95.     Approximately eighty percent of all medical devices approved by the FDA are covered by Medicare.  Moreover, Medicare spends more than $20 billion per year on Implantable Medical Devices ("IMD") as part of its Part A (hospital insurance) budget, and Part A payments increased 4.3% each year from 2004 to 2009 according to the US Government accountability Office (cumulatively, a 52% increase since 2002).  Medicare Part A payments for IMDs between 2006 and 2014 increased 32.6% alone.

96.     The largest users of medical devices are the elderly, people 65 years-old or older, who are covered by Medicare.  Elderly populations (those over 65 and otherwise eligible) are the largest consumer of orthopaedic medical devices.  And most spinal implant surgeries are performed to treat degenerative disease that occurs in the elderly, namely, osteoarthritis.  Dr. Chin has stated that one of the reasons he founded SpineFrontier, Inc. was to expand spine surgery to treat elderly patients.

97.     Defendants knew, or reasonably should have known, that their conduct described herein would lead to the submission of claims for reimbursement by government programs that were not eligible for reimbursement.  But for Defendants' illegal conduct, reimbursement for the use of Defendants' medical device products would not have occurred.  As a result, Defendants have caused, and continue to cause, the submission of false claims to government programs, and they have benefited from the payment of those false claims.

98.     The fraudulent kickback scheme served its intended purpose, as it has induced physicians to seek reimbursement for surgical procedures involving Defendants' medical device products.  The government programs did, in fact, reimburse those claims based on Defendants' illegal kickback scheme.

99.     The fraudulent kickback scheme has caused substantial claims for reimbursements of Defendants' medical device products to be submitted for reimbursement by Government Programs. The Government Programs did, in fact, reimburse those claims.

100.    At least in part as a result of Defendants' illegal kickback scheme, Defendants' medical device products have been heavily used for the treatment of Medicaid, Medicare Part A, Medicare Part B, Medicare Part D, and other government program participants.

### J.     DEFENDANTS' HCPCS/CPT CODES

101.    When a healthcare provider seeks reimbursement from Medicare, it first identifies the particular reimbursement code for the drug or device prescribed.  These reimbursement codes are a component of the CMS Healthcare Common Procedure Coding System ("HCPCS"), under which Current Procedural Terminology ("CPT") codes are assigned to various procedures.  The HCPCS or CPT code system is designed to bill Medicare for drugs and devices that are utilized in the physician's office, clinic or at a hospital.

102.    The HCPCS or CPT codes assigned to SpineFrontier's spine-related medical devices are 22899, 22840, 22612, 22630, 22558, 22851, 20930, and 20936.

### K.     PROVIDER AGREEMENTS AND HOSPITAL COST REPORTS SUBMITTED FOR REIMBURSEMENT FROM MEDICARE

103.    In order to establish eligibility for Medicare reimbursement, health care providers and hospitals must sign mandatory Medicare Enrollment forms known as CMS 855 (the "Provider Agreement").  Within the CMS 855 form, the services rendered must be identified by entering the relevant HCPCS code.  In signing the Form CMS–855,

providers and hospitals agree to comply with all Medicare laws, regulations, and program instructions, including the Anti–Kickback Statute and Sunshine Act, as a precondition of Medicare payment.   The certification of compliance with these requirements that is contained in the Provider Agreement and to which health care providers and hospitals attest in signing the form reads:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Form CMS–855A; Form CMS–855I.   The Provider Agreement further states that this certification is one of the "requirements that the provider must meet and maintain in order to bill the Medicare program."

104.   Hospitals, but not doctors, must submit a Hospital Cost Report along with their claim for reimbursement for Medicare.   42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. The Hospital Cost Report includes the following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

CMS Form 2552.   The person certifying the report is required to sign a statement which reads:

> To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

105.    In reimbursing hospitals for operating costs, Medicare pays according to a per-patient standardized rate, called the Diagnostic Related Group ("DRG") rate.   42 U.S.C.   §   1395ww(d)(3)(A),   (D).    The hospital submits a claim for a surgery by identifying the DRG associated with the surgery.   The DRG reimbursement rate is "intended to fairly compensate the hospital for all costs associated with the surgery, including the medical device costs."

**L.    THE PRESENTATION OF FALSE CLAIMS TO THE GOVERNMENT**

106.    As part of the kickback scheme discussed above, health care providers who worked as IME Consultants for Defendants entered into such Provider Agreements, pursuant to which each provider was induced to submit at least one false claim to the Medicare Program for performing surgical procedures involving SpineFrontier's medical devices, and that was paid for by Medicare.   For example, Dr. Jeffrey Carlson, an orthopaedic surgeon located in Newport News, Virginia, received, as an IME Consultant, various forms of remuneration from Defendants, including consulting fees, as discussed above.   As a direct and intended result of Defendants' kickback scheme, Dr. Carlson has used a SpineFrontier medical device product while performing at least one surgery for which he sought and received Medicare reimbursement.   In 2012, for example, he billed Medicare for 52 procedures involving an HCPCS code assigned to SpineFrontier medical devices (22612), and for which he sought $291,564.00 in Medicare reimbursements, and

31

received $52,151.75 in such reimbursements. *See* Exhibit D. In 2013, he billed Medicare for 86 procedures involving HCPCS codes assigned to SpineFrontier medical devices (22612, 22851), and for which he sought $400,042.00 in Medicare reimbursements, and received $73,441.81 in such reimbursements. *See* Exhibit E.

107. Dr. F. Paul DeGenova, an orthopedic surgeon located in Columbus, Ohio, received, as an IME Consultant, various forms of remuneration from Defendants, including consulting fees, as discussed above. As a direct and intended result of Defendants' kickback scheme, Dr. DeGenova has used a SpineFrontier medical device product while performing at least one surgery for which he sought and received Medicare reimbursement. In 2012, he billed Medicare for 69 procedures involving several HCPCS codes assigned to SpineFrontier's medical devices (22612, 22840, and 22851), and for which he sought $170,858.00 in Medicare reimbursements, and received $49,981.55 in such reimbursements. *See* Exhibit D. In 2013, he billed Medicare for 70 procedures involving HCPCS codes assigned to SpineFrontier medical devices (22612, 22840, 22851), and for which he sought $159,152.00 in Medicare reimbursements, and received $44,521.00 in such reimbursements. *See* Exhibit E.

108. As described herein, and as further illustrated in the attached Exhibits D and E, providers employed as IME Consultants billed Medicare for surgical procedures involving SpineFrontier medical devices, and received reimbursement as the result of these false claims and the kickback scheme. The examples of Medicare claims involving SpineFrontier medical devices in Exhibits D and E are representative of the instances in which Consultants were employed by Defendants as part of a kickback scheme that entailed using SpineFrontier products in procedures involving Government Program

32

beneficiaries, and which has resulted in the submission and reimbursement of false claims for such procedures.

109.    As another result of the kickback scheme discussed above, hospitals in which IME Consultants performed surgeries involving SpineFrontier's medical devices entered into the aforementioned Provider Agreements and Hospital Cost Reports, pursuant to which each such hospital submitted at least one false claim to the Medicare Program in connection with such surgical procedures involving SpineFrontier's medical devices, and for which each such hospital was reimbursed by Medicare.   For example, Dr. Jeffrey Carlson performed his surgeries at Bon Secours Mary Immaculate Hospital in Newport News, Virginia.   Dr. F. Paul DeGenova performed his surgeries at Grant Medical Center in Columbus, Ohio.   The examples of hospitals that submitted Medicare claims involving SpineFrontier medical devices used by IME Consultants are listed in Exhibits D and E and are representative of the instances in which hospitals submitted such claims, and which resulted in the reimbursement of such false claims for such procedures.

## IV.   PHYSICIAN-OWNED DISTRIBUTORSHIPS AND RELATED INVESTIGATIONS BY THE OFFICE OF THE INSPECTOR GENERAL AND THE U.S. DEPARTMENT OF JUSTICE

### A.    THE OIG'S SPECIAL FRAUD ALERT

110.    Congress established the Office of Inspector General ("OIG") in 1976 to identify and eliminate fraud, abuse, and waste in federal healthcare programs.   To this end, OIG issues Special Fraud Alerts to discuss "trends of health care fraud and certain practices of an industry-wide character."   59 Fed. Reg. 65,372, 65,373 (Dec. 19, 1994). The purpose of these Alerts is "to provide general guidance to the health care industry"

and offer "additional insight to the Medicare carrier fraud units in identifying health care fraud schemes." *Id.*

111.   Physician-owned distributorships ("PODs") have attracted scrutiny from Congress and the OIG of the Department of Health and Human Services for several years.   On March 26, 2013, the HHS-OIG issued a Special Fraud Alert that addressed physician-owned entities that derive revenue from selling, or arrange the sale of, implantable medical devices.

112.   The OIG's Alert stated that it applies to a "'POD,'" which is defined as "any physician-owned entity that derives revenue from selling, or arranging for the sale of, implantable medical devices and includes physician-owned entities that purport to design or manufacture . . . their own medical devices or instrumentation."

113.   The OIG's Alert noted that in guidance it provided by letter in 2006, it had "noted 'the strong potential for improper inducements between and among the physician investors, the entities, device vendors, and device purchasers' and stated that such ventures 'should be closely scrutinized under the fraud and abuse laws.'"

114.   The Alert noted that "[w]hen remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated."   "PODs that exhibit questionable features potentially raise four major concerns typically associated with kickbacks—corruption of medical judgment, overutilization, increased costs to the Federal health care programs and beneficiaries, and unfair competition.   This is because the financial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the devices the PODs

sell in lieu of other, potentially more clinically appropriate, devices.  We are particularly concerned about the presence of financial incentives in the implantable medical device context because such devices typically are 'physician preference items,' meaning that both the choice of the brand and the type of device may be made or strongly influenced by the physicians, rather than being controlled by the hospital or ASC [ambulatory surgery center] where the procedure is performed."  OIG Special Fraud Alert, at 2.

115.    The Alert further opined:  "we believe that PODs are inherently suspect under the anti-kickback statute.  We are particularly concerned when PODs, or their physician owners, exhibit any of the following suspect characteristics:

. . . .

•      Physician-owners are required, pressured, or actively encouraged to refer, recommend, or arrange for the purchase of the devices sold by the POD . . . .

•      The POD is a shell entity that does not conduct appropriate product evaluations . . . .

**B.      THE OIG'S 2013 REPORT ON SPINAL DEVICES SUPPLIED BY PODS**

116.    In October 2013, the OIG issued a Report or Study entitled "Spinal Devices Supplied by Physician-Owned Distributors:  Overview of Prevalence of Use."  The Report responded to a congressional request (from members of the Senate Finance and Judiciary Committees) that expressed concerns that PODs were a breeding ground for fraud and could have potential adverse effects on Medicare beneficiaries and the Federal health care programs.  The Report noted that PODs have the opportunity to profit using spinal devices that the PODs sell, and that critics of PODs had asserted that they create a conflict of interest that might affect physicians' clinical decisionmaking.  The

OIG thus set out to determine the extent to which PODs provide spinal medical devices to hospitals.

117.    The Report noted that in Fiscal Year 2012, Medicare paid hospitals a total of $3.9 billion for 178,789 spinal surgeries.  Medicare reimbursed hospitals an average of $21,613 for the least complicated spinal surgeries and $34,676 for the most complicated spinal surgeries.

118.    As part of the Study, the OIG selected a sample of 1,000 claims billed to Medicare in fiscal year 2011 that included spinal fusion surgery.

119.    The Report found that for Fiscal Year 2011, out of this sample, PODs supplied spinal devices that were used in 19 percent of, or nearly one in five, spinal fusion surgeries billed to Medicare.

120.    Among the hospitals in the OIG's sample, thirty-four percent, or about a third, reported buying spinal devices from PODs.  When hospitals in the sample began buying from PODs, their growth rates of spinal surgery grew by three times (by 16%) the rate for all hospitals.  Moreover, the hospitals' rate of spinal fusions—surgeries that are more likely to use spinal devices—grew more than twice as fast (by 21%) among hospitals that used PODs compared to the rate for hospitals overall.

121.    The majority (88%) of hospitals that purchased from PODs began doing so after 2005.  Nearly half of the hospitals that purchased from PODs began doing so between 2010 and 2012.

122.    Ninety-four percent of hospitals that purchased from PODs reported that surgeon preference influenced their decision to purchase from PODs.

123.   In Fiscal Year 2012, surgeons performed more spinal surgeries (28% more) at hospitals in the OIG's sample that purchased from PODs than at those that did not purchase from PODs.

124.   The OIG's Report concluded that, taken together, these factors may increase the cost of spinal surgery to Medicare and its beneficiaries over time.

125.   Upon receiving the OIG's Report, the congressional members who requested it found that the Report shows a direct correlation between doctors who have a financial relationship in spinal medical device companies, and an increase in spinal fusion surgeries—putting patients' health at risk and imposing costs on taxpayers through increased billings to the Medicare program caused by unnecessary surgeries.   "The findings of the [OIG] show that [PODs] are driving up health care costs and may even be encouraging unnecessary surgeries."

## C.   THE U.S. DOJ's ACTIONS AGAINST SPINAL DEVICE PODS

126.   In September of 2014, the U.S. Department of Justice first sued over a kickback scheme involving a POD.   It filed two complaints under the FCA against Dr. Aria Sabit, a spinal implant company (Reliance Medical Systems), two spinal device PODs (Apex Medical Technologies and Kronos Spinal Technologies), and their owners, for alleged kickbacks and medical unnecessary surgeries.

127.   The DOJ alleged that the defendants paid physicians, including Dr. Sabit, to induce them to use the spinal implant company's medical device products in the surgeries they performed.   "Improper payments to physicians can alter a physician's judgment about patients' true health care needs and drive up health care costs for

everyone," DOJ stated.  "The Justice Department is committed to enforcing the laws that prohibit such payments."

128.    Apex allegedly paid Sabit $438,570 between May 2010 and July 2012, during which Sabit used Reliance implants in approximately 90 percent of his spinal fusion surgeries.

## V.    SPINEFRONTIER'S ILLEGAL TERMINATION OF RELATOR #1

129.    SpineFrontier terminated Relator #1 in direct retaliation for his having come forward to report the Defendants' kickback scheme, off-label promotion, and Sunshine Act violations.

130.    On April 7, 2015, SpineFrontier abruptly terminated Relator #1's employment, shortly after he brought to the attention of SpineFrontier's legal and regulatory executives the fact that it was engaging in conduct, detailed above, that was improper under federal law.  As the facts set forth above also show, SpineFrontier knew that Relator #1 was engaged in conduct protected under the FCA.

131.    SpineFrontier also took adverse employment action against Relator #1 in the form of his termination as a direct response to his complaining internally.  Until he was terminated, SpineFrontier never informed Relator #1 that he had any performance issues.

132.    Relator #1's efforts to alert executives at SpineFrontier that its conduct was illegal reasonably could have led to an FCA action, because proof that Defendants' kickback scheme, off-label promotion, and failure to comply with the Sunshine Act, caused false claims to be submitted to the government would demonstrate a violation of the FCA.

133.    As a direct and proximate result of this unlawful retaliation, Relator #1 has suffered emotional pain and mental anguish, together with serious economic hardship.

## VI.     THE UNITED STATES AND QUI TAM STATES WERE CHEATED OUT OF SUBSTANTIAL SUMS AS A RESULT OF THE FALSE REPORTS INDUCED BY DEFENDANTS' KICKBACK SCHEME

134.    Because Defendants intentionally intended that false reports be submitted to the Government, Government was wrongfully overcharged for reimbursement of Defendants' medical device products.

135.    Defendants knowingly (with actual knowledge of the information, and acting in deliberate ignorance, or reckless disregard, of the truth or falsity of the information) made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

136.    By virtue of the false or fraudulent claims that Defendants knowingly caused to be presented, the United States and the Qui Tam States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

## VII.    STATUTORY AND REGULATORY ENVIRONMENT

### A.     THE FALSE CLAIMS ACT

137.    The federal False Claims Act ("FCA") was originally enacted during the Civil War, and was substantially amended in 1986 and 2009. Congress enacted these amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of fraud

against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

138.    The FCA imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2008).   The statute further imposes liability on a person who "uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;" who "conspires to defraud the government by getting a false or fraudulent claim paid or approved by the government," or who uses "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government."   *Id.* at 3729 §§ (a)(2), (3), (7).   To satisfy the statute's knowledge requirement, a person must "(1) ha[ve] actual knowledge of the information; (2) act in deliberate ignorance of the truth or falsity of the information; (3) or act in reckless disregard of the truth or falsity of the information," but "no specific intent to defraud is required." *Id.* § 3729(b).

139.    The False Claims Act does not create a private cause of action, but permits a person, designated a "Relator" to bring a civil action "for the person and for the United States government . . . in the name of the government." 31 U.S.C. § 3730(b).

140.    Liability under these FCA provisions is a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

141.    A "claim" means any request or demand for money or property provided by the Government under one of its programs, such as Medicare or Medicaid. 31 U.S.C. § 3729(b)(2). Claims made to the states are actionable under the False Claims Act if the Government will reimburse the state for any portion of the claim.   31 U.S.C. § 3729(b)(2)(A).

### B.    THE FCA'S AND MASSACHUSETTS' ANTI-RETALIATION PROVISIONS AND STATE COMMON LAW PROHIBITING WRONGFUL TERMINATION

142.    The False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h), prohibits discrimination against a person in the terms and conditions of employment because of that person's efforts in furtherance of an action under that statute or efforts to stop one or more violations of the federal False Claims Act.  A person retaliated against in violation of this section is entitled to reinstatement, double the amount of lost back pay, interest on the back pay, and special damages, including attorney fees and litigation costs.

143.    The anti-retaliation provision of the Massachusetts False Claims Act, 12 M.G.L. ch. 12, § 5J(2), is similar to the FCA's anti-retaliation provision and prohibits efforts to stop violations of the Massachusetts False Claims Act, 12 M.G.L. ch. 12, § 5B, 5C.  It is unlawful to terminate an employee from his job because of lawful acts done by the him in furtherance of an action under 12 M.G.L. ch. 12, § 5B, or because of other efforts to stop a violation of 12 M.G.L. ch. 12, § 5B.

144.    Additionally, under the common law of Massachusetts, where SpineFrontier is headquartered and where Defendants manage their medical device business, an employer cannot terminate an at-will employee where to do so would violate

clearly established public policy (such as investigating fraud on an agency of the Commonwealth).

### C.   THE ANTI-KICKBACK STATUTE

145.    The Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), arose out of a Congressional concern that payoffs to those who influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

146.    The Anti-Kickback statute prohibits any person or entity from offering or providing "any remuneration" to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment is sought from under any federally-funded health care program, including Medicare, Medicaid, and TRICARE.  42 U.S.C. § 1320a-7b(b).  Violation of the statute can subject the perpetrator to criminal and civil penalties, as well as exclusion from participation in federally-funded healthcare programs.

147.    The term "remuneration" includes anything of value, in whatever form, whether in cash or in kind, or offered directly or indirectly.

148.    Payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals.

42

149.    Thus, the AKS prohibits medical device manufacturers or suppliers from offering to pay any remuneration, if one of the purposes of the remuneration is to induce physicians or others to recommend or use products paid in whole or in part by federal healthcare programs.

150.    Examples of activities prohibited by the AKS include payments for sham consulting services, bogus research and educational grants, travel and lodging expenses, expensive meals and wine, and other gifts and discounts.  These activities are especially suspect if the medical device supplier selects the physician based on its belief that the physician is likely to prescribe the company's products, rather than on the physician's professional qualifications or services he or she actually rendered to the company.

151.    The AKS provides safe harbor provisions for personal service arrangements, 42 C.F.R. § 1001.952(d), which, as discussed above, Defendants do not satisfy.

152.    Each of the federally-funded health care programs requires every provider and supplier providing items and services for federal healthcare beneficiaries to promise and ensure compliance with the AKS as a material condition of payment of the resulting claims.

153.    A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act.  42 U.S.C § 1320a-7b(g).

154.    Giving a person the opportunity to earn money for referring patients may constitute an inducement under the AKS.

155.    As stated by the Office of Inspector General of the Department of Health

& Human Services ("OIG") with respect to medical device suppliers:

> Manufacturers, providers, and suppliers of health care
> products and services frequently cultivate relationships
> with physicians in a position to generate business for them
> through a variety of practices, including gifts,
> entertainment, and personal services compensation
> arrangements. These activities have a high potential for
> fraud and abuse and, historically, have generated a
> substantial number of anti-kickback convictions. There is
> no substantive difference between remuneration from a
> pharmaceutical manufacturer or from a durable medical
> equipment or other supplier--if the remuneration is
> intended to generate any federal health care business, it
> potentially violates the anti-kickback statute.

OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg.

23731, 23737 (May 5, 2003).

156.    As discussed above, federal health care programs require every provider,

hospital, and supplier who provides items and services to federal healthcare beneficiaries

to sign Provider/Supplier Agreements, and Hospital Cost Reports, to establish their

eligibility to seek reimbursement.

157.    The express language of the AKS, the certification of the provider/supplier

agreements and hospital cost reports, and the repeated statements of the agency charged

with administering the statute establish without question that compliance with the AKS is

material to decision to pay claims for federal program beneficiaries.

158.    Compliance with the AKS is a material condition of payment under all

publicly-funded healthcare programs, including Medicare, Medicaid, CHAMPUS-

TRICARE, CHAMPVA, Federal Health Benefit Program, and other federal and state

health care programs (hereinafter referred to as "government healthcare programs").

### D.    THE STARK STATUTE

159.    The Stark Statute, 42 U.S.C. § 1395nn, prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity with which he or she (or an immediate family member) has a financial relationship, unless an exception applies. The statute also prohibits the entity from billing Medicare for those referred services. The Center for Medicare and Medicaid ("CMS") has promulgated regulations interpreting the statute.

160.    A financial relationship under the Stark laws includes arrangements involving any remuneration between a physician (or an immediate family member of such physician) and an entity. 42 U.S.C. §§ 1395nn(a)(2)(B), (h)(1)(A).

161.    A "referral" includes, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare...." 42 C.F.R § 411.351. A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

162.    Claims submitted in violation of the Stark Statute are ineligible for payment, and violate material conditions of payment of federal healthcare programs.

163.    A claim for payment that is based on a violation of the Stark Statute constitutes a false claim under the FCA.

### E.    THE PHYSICIAN PAYMENTS SUNSHINE ACT

164.    Regulatory scrutiny of the medical industry has also increased with the enactment of the Physician Payments Sunshine Act and the Patient Protection and Affordable Care Act in 2010, Pub. L. No. 111-148, § 6002, 124 Stat. 119 (codified as amended 42 U.S.C. § 1320a-7h) (2010)). Financial relationships between physicians and

medical device companies can create negative influences on physician judgment that compromise patient care and jeopardize the public's trust. In response to these concerns, when Congress passed the Sunshine Act in March 2010, it seized the opportunity to mandate greater transparency regarding these financial relationships by including the Sunshine Act.

165. These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning August 1, 2013. It is applicable to manufacturers of prescription drugs, devices, biologicals and medical supplies requiring pre-market approval or notification and products covered under Medicare, Medicaid or the Children's Health Insurance Program ("CHIP").

166. Specifically, the Physician Payments Sunshine Act ("PPSA" or "Sunshine Act")—also known as section 6002 of the Affordable Care Act (ACA) of 2010—requires medical device manufacturers to disclose to CMS any payments or other transfers of value made to physicians or teaching hospitals. 42 C.F.R. § 403.904. It also requires certain manufacturers and group purchasing organizations (GPOs) to disclose any physician ownership or investment interests held in those companies. 42 C.F.R. § 402.906. Another broad category of reporting covers research payments. This includes any payment made for participation in preclinical research, clinical trials, or other product development activities. 42 C.F.R. § 403.904(f).

167. As a whole, the Sunshine Act seeks to help make financial relationships clearer by providing a central location for financial interactions to be reported and

monitored.   Furthermore, it is meant to discourage "dishonest influence on research, education, and clinical decision-making."

168.    Unlike other state and federal laws governing the health care industry, the Sunshine Act depends on self-reporting instead of relying on whistleblowers and government investigators.  In particular, the program requires "applicable manufacturers" and "applicable GPOs," collectively deemed "Reporting Entities," to report to CMS any payment or transfers of value made to physicians and teaching hospitals.  Applicable manufacturers, such as medical device manufacturers, are required to report all payments falling into the following categories:

> consulting fees, compensation for services other than consulting, including serving as faculty or as a speaker at an event other than a continuing education program, [h]onoraria, [g]ifts, [e]ntertainment, [f]ood and beverage, [t]ravel and lodging, [e]ducation, [r]esearch, [c]haritable contributions, [r]oyalty or [l]icense, [c]urrent or prospective ownership or investment interest, [c]ompensation for serving as faculty or as a speaker for an unaccredited and non-certified continuing education program, [c]ompensation for serving as faculty or as a speaker for an accredited or certified continuing education program, [g]rants, [and] [s]pace rental or facility fees (teaching hospital only).

Federal Register 66 (February 8, 2013): 78,9457, 78,9477-78,9481: 42 CFR 402 (as specified by Pub. L. No. 111-148 § 6002, (2010) (codified at 42 U.S.C.A § 1128G(a)(1)(A)(vi) (West Supp. 2011)).

169.    Sunshine Act penalties are severe and include civil monetary penalties of up to $10,000 for each item not reported.  There is an annual maximum of $150,000 with respect to each annual submission.  If a company knowingly fails to accurately and

completely report a payment or ownership interest, the penalty is up to $100,000 for each item with an annual maximum of one million dollars.  42 C.F.R. § 912.

## VIII.   REIMBURSEMENT BY GOVERNMENT-FUNDED HEALTH CARE PROGRAMS

170.   The Health Insurance for the Aged and Disabled Program, popularly known as Medicare, was created in 1965 as part of the Social Security Act (SSA).   The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Studies ("CMS"), a component of HHS.

171.   The Medicare program consists of two primary parts. Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c to 1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of other "medical and other services."  42 U.S.C. §§ 1395j to 1395w-5.

172.   The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury.  42 C.F.R. §§ 430.0-430.30 (1994). The federal share of each state's Medicaid expenditures varies by state.

173.    Various other federally-funded medical coverage programs exist to help discrete populations of enrollees obtain medical care, including the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Veterans Administration, among others.

174.    Reimbursement practices under all federally-funded healthcare programs closely align with the rules and regulations governing Medicare reimbursement.

175.    Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the carriers act on behalf of CMS.  42 C.F.R. § 421.5(b) (1994).

176.    To participate in the Medicare Program, a health care provider must file a provider agreement with the Secretary of HHS.   42 U.S.C. § 1395cc.  The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the Medicare Program and in order to receive reimbursement from Medicare.   The provider agreement specifically requires compliance with the federal Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(b).

A.    MEDICARE PART A

177.    Part A of the Medicare program authorizes payment for institutional care, including hospitalization, for eligible patients.

178.    Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health items and services to treat Medicare patients.  The hospital, also called a "provider," is authorized to bill Medicare for that treatment.

179.   During the relevant time period, CMS reimbursed hospitals for impatient Part A services through Medicare Administrative Contractors ("MACs").

180.   MACs are private insurance companies that are responsible for determining the amount of payments to be made to providers.  See 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006).  Under their contracts with CMS, MACs review, approve, and pay Medicare bills, called "claims," received from hospitals.  See 42 C.F.R. § 421.5(b).

181.   Since 2007, in order to get paid, Hospitals must submit claims for payment on Form CMS-1450, also called Form UB-04.  This form contains patient-specific information including the diagnosis and type of services that are assigned or provided to the Medicare patient.  The Medicare program relies upon the accuracy and truthfulness of the UB-04 Forms to determine whether the service is payable and what amounts the hospital is owed.

182.   In addition, and at the end of every fiscal year, as a prerequisite to payment, CMS requires hospitals to submit to the MAC a form CMS-2552, commonly known as the hospital "cost report."  42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. The cost report identifies any outstanding costs that the hospital is claiming for reimbursement that year.  It serves as the final claim for payment that is submitted to Medicare.  The Medicare program relies upon the accuracy and truthfulness of the cost report to determine what amounts, if any, the hospital is owed, or what amounts the hospital has been overpaid during the year.

183.   In 1983, Congress established the prospective payment system ("PPS") as the system by which hospitals are reimbursed for inpatient hospital costs.  Under PPS, the amount Medicare pays a hospital for treating an inpatient Medicare beneficiary is based

in large part on the particular condition that led to the patient's admission to, or that was principally treated by, the hospital.

184.   Under PPS, a patient's illness or condition is categorized under a classification system called a diagnostic related group ("DRG").  The DRG establishes how much the hospital will be paid under Medicare and reflects the resources the patient's condition or treatment typically requires.  The MAC uses the patient specific information (for example, the diagnosis codes) submitted by the hospital on the UB-04 to determine what DRG is assigned to a certain claim, and hence, what amount will be paid.

185.   The DRG is intended to reimburse the hospital for the expected costs of any items that it must purchase in connection with the hospitalization.  The DRG is intended to compensate the hospital for any spinal implants, where those devices are appropriately used to treat a Medicare beneficiary.

### B.   MEDICARE PART B

186.   Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury.  Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums.  Payments under Medicare Part B are typically made directly under assignment to service providers and practitioners, such as physicians, rather than to the patient/beneficiary.  In that case, the physician bills the Medicare Program directly.

187.   The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS.  To assist in the administration of the Medicare Part B Program, CMS contracts with MACs.  42 U.S.C. § 1395u.  MACs are

responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

188.    Medicare reimburses physicians for their professional services pursuant to a Physician Fee Schedule ("PFS").  42 C.F.R. § 414.58(a).  Physician fees under the PFS are determined according to a standardized coding system assigned to procedures set forth in the Health Care Financing Administration's Common Procedure Coding System (HCPCS).

189.    In order to bill Medicare, a physician must submit an electronic or hard-copy claim form called a CMS 1500 form to the carrier.  When the CMS 1500 is submitted, the physician certifies that he or she is knowledgeable of Medicare's requirements and that the services for which payment is sought were "medically indicated and necessary for the health of the patient."

190.    Physicians wishing to submit the CMS 1500 electronically must submit a provider enrollment form.

191.    For a CMS 1500 claim to be paid by the Medicare Part B Program, the claim must identify each service rendered to the patient by the physician.  As discussed above, under the HCPCS coding system, the service is identified through a corresponding code that is listed in the American Medical Association ("AMA") publication called the Current Procedural Terminology ("CPT") Manual.  The CPT is a systematic list of codes for procedures and services performed by or at the direction of a physician.  Each procedure or service is identified by a five-digit CPT code.  The CPT code set accurately describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders,

patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.

192.    The CPT code assigned to a medical procedure determines the payment amount to the physician under Part B. The payment amount for each service paid under the PFS is the product of three factors-(1) a nationally uniform relative value for the service; (2) a geographic adjustment factor for each physician fee schedule area; and (3) a uniform conversion factor for the service." Final Rule, 68 Federal Register 63190 (November 7, 2003).   For each physician service, there are three relative values: for physician work; for practice expense; and for malpractice expense. Id. These are referred to as Relative Value Units ("RVU's"). The work RVU's are based on national valuations of physician time expended for a particular service, and can be accessed on CMS's website in published schedules.

193.    In addition to the CPT Manual, the AMA publishes the International Classification of Diseases (ICD-9) Manual, which assigns a unique numeric identifier to each medical condition.   In order to be payable by Medicare, the CMS 1500 claim form must identify both the CPT code that the provider is billing for and the corresponding ICD-9 code that identifies the patient's medical condition that renders the provider's service medically necessary.

194.    Thus, the DRG system establishes standardized payments for Part A (inpatient) services, and the CPT system established a standardized payment amount for physician services, based on evaluation of the actual average costs of performing that procedure, by region and type of provider, as reported by providers annually.

C.    REIMBURSEMENT FOR SURGERIES USING SPINEFRONTIER MEDICAL DEVICES

195.    Costs associated with spine surgery utilizing medical devices are separately billed by the hospitals and surgeons to payors, including Medicare, Medicaid, and TRICARE.

188.    Hospitals submit claims to federal programs for the inpatient costs associated with the surgeries, including the cost of the medical devices, on interim claims forms called Forms CMS-1450 (formerly UB-92's) and hospital cost report forms (the final claim). Hospital claims identify the DRG associated with the surgery, which CMS uses to determine the payment amount to the hospital, to include payment for the medical devices used during the surgery.

189.    DRG codes are calculated in a manner intended to fairly compensate the hospital for all the costs associated with the surgery, including the medical device costs. DRG rates are recalculated annually based on, among other things, actual claims data.

190.    The surgeon performing the surgical procedure separately bills for his or her professional services on a Form CMS-1500, identifying the surgical procedure by the appropriate CPT code.

191.    Each surgeon chooses which manufacturer's spine hardware to use in each surgery.  However, the devices utilized in a spinal surgery are generally purchased by the hospital from the manufacturer.

192.    The surgical devices used in spinal surgery include various products that are used to stabilize an injured or degenerating spine. Products used in cervical spinal surgery (neck) include anterior cervical plates and screws, lateral mass screws and rods, laminoplasty plates and screws and bone products, such as bone spacers or cellular bone

54

matrix. Products used in lumbar spinal surgery (lower back) generally consist of pedicle screws and rods, interbody devices such as peek spacers, or corpectomy devices such as mesh spacers, anterior buttress plates and some bone products such as bone spacers and cellular bone matrix.

**D.     COMPLIANCE WITH THE AKS AND THE SUNSHINE ACT IS A CONDITION OF PAYMENT**

193.    Compliance with the Anti-kickback Statue and the Sunshine Act is a condition of payment for federally-funded healthcare programs, including Medicare, Medicaid, and TRICARE, meaning that if a provider tells CMS or its agent that it provided services in violation of the Anti-kickback Statute or the Sunshine Act, CMS will not pay the claim.

194.    Hospitals and physicians enter into Provider Agreement with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from federal health care programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I.

195.    When a hospital submits a claim for payment, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-kickback Statue and the Sunshine Act.

196.    When a physician submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-kickback Statute and the Sunshine Act.

197.    Every Hospital Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator.

198.    The CMS Form 2552 Hospital Cost Report certification page includes the following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

199.    The cost-report certifier is also required to certify that:

> To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

200.    Thus, by signing CMS Form 2552, a hospital provider is required to and does certify that its cost report was (1) truthful, *i.e*, that the cost information contained in the report is true and accurate; (2) correct, i.e., that it is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the cost report is based upon all information known to the provider; (4) did not include any services that resulted from an illegal kickback; and (5) the services provided in the cost report were billed in compliance with all provisions of the Stark laws.

201.    As a result of the systematic payment of kickbacks to physicians made with the intent and effect of inducing them to use its spinal surgery products, and Defendants' violations of the Sunshine Act, Defendants caused hospitals to submit claims in violation of conditions of payment and claims with false certifications to the United States.  Claims submitted as a result of illegally-induced surgeries were false claims.

## IX.    DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY KNOWINGLY CAUSING THE SUBMISSION OF FALSE OR FRAUDULENT CLAIMS OR STATEMENTS

202.    As a party to a Medicaid Rebate Agreement with the United States Secretary of Health and Human Services pursuant to the Social Security Act, 42 U.S.C. § 1396s, Defendants' medical device products and surgical procedures involving such products are only eligible for reimbursement if and when Defendants are in compliance with applicable federal and state laws.

203.    These laws include, but are not limited to, the federal and corresponding state anti-kickback statutes, the FDMA, the Food, Drug & Cosmetic Act and all related regulations, HIPAA, and the Sunshine Act.  As described in this Complaint, Defendants have been and continue to be in violation of the aforementioned laws.

204.    As described in this Complaint, Defendants have knowingly and repeatedly violated these laws in connection with the use and sale of its medical device products.  These violations have not been incidental, but instead have been central to the Defendants' sales strategy.

205.    Accordingly, Defendants have knowingly caused the false or fraudulent certification of compliance with these federal and state statutes and regulations.

206.    The submission of false or fraudulent certifications of compliance with these statutes and regulations were material to Government Programs' decisions to make reimbursements for Defendants' medical device products.  Had Government Programs known that the certifications of compliance with the law were false, they would not have made reimbursements for their medical devices.

207.    Defendants' knowingly causing the submission of false certifications of compliance with the law constituted the making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, and this directly caused Government Programs to pay or reimburse for medical device products that were not eligible for payment or reimbursement.

208.    Defendants knew that the certifications of compliance with the law that they knowingly caused to be submitted were false, and that the false certifications would cause Government Programs to make payments for its drugs.

209.    Defendants' false certifications that they knowingly caused to be submitted have directly caused Government Programs to pay or reimburse for medical device products not eligible for payment or reimbursement.

## Count I
## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

210.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

211.     Defendants knowingly caused to be presented, and may still be knowingly causing to be presented, to the Government false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

212.     As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## Count II
## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

213.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

214.     Defendants knowingly caused to be made or used, and may still be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

215.     The United States, unaware of the falsity of the claims and/or statements made by Defendants, their IME Consultants, and certain hospitals, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Defendants' medical device products used in surgical procedures for patients enrolled in Federal Programs.

216.     As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## Count III
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))**

217.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

218.    As detailed above, Defendants knowingly conspired, and may still be conspiring, with health care professionals identified and described herein to commit acts, in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). Defendants and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

219.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## Count IV
**(Violation of False Claims Act, 31 U.S.C. § 3730(h))**

220.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

221.    Relator #1 was engaged in conduct protected under the FCA, including the investigation and reporting of fraud.

222.    Defendants knew that Relator #1 was engaged in such protected conduct.

223.    Relator #1's termination of employment was because of Relator #1's involvement in the protected conduct, causing Relator #1 to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

## Count V
**(Violation of Mass. Gen. Laws Ch. 12, § 5J)**

224.    Relator #1 incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

225.    Relator #1 was engaged in conduct protected by the anti-relation provision of the Massachusetts False Claims Act, 12 M.G.L. ch. 12, § 5J(2) because he was a SpineFrontier employee, and because of his efforts to stop Defendants' practice of failing to comply with the federal laws, including the Medicare and Medicaid laws, in connection with the illegal sales of Defendants' medical device products.   Because Medicare and Medicaid are not authorized to pay for devices that cannot be legally sold, Relator #1's efforts to stop Defendants kickback scheme were efforts to stop violations of the Massachusetts False Claims Act, 12 M.G.L. ch. 12, § 5B, 5C.

226.    Defendants terminated Relator #1 from his job because of lawful acts done by the him in furtherance of an action under 12 M.G.L. ch. 12, § 5B, or because of other efforts by Relator #1 to stop a violation of 12 M.G.L. ch. 12, § 5B.

227.    As a result of SpineFrontier's wrongful retaliatory conduct, Relator #1 has suffered substantial financial losses and suffered substantial emotional distress.

WHEREFORE, Relator #1, on his behalf and pursuant to M.G.L. ch.12, § 5J(3), requests that this Court:

(a)      Reinstate Relator #1 to the same position that he would have had but for the wrongful termination;

(b)      Award Relator #1 two times the amount of back pay he would have earned but for the retaliation, and interest on that award;

(c)      Award Relator #1 compensation for all special damages he has sustained as a result of SpineFrontier's termination in violation of public policy.

(d)      Award him his costs and reasonable attorneys' fees for prosecuting this action; and

(e)     Enter such other relief which the Court finds just and equitable.

## Count VI
### Wrongful Termination in Violation of Public Policy

228.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

229.     Under the common law, Massachusetts employees have a right to act in good faith to halt harm to the public, to try to prevent conduct that the employee believes will endanger the public.  Any type of disciplinary action or termination which is taken in retaliation for such protected conduct is against public policy and constitutes wrongful retaliation or termination.

230.     Relator #1 was retaliated against for conduct protected under the common law of Massachusetts.  Conduct which results in the illegal sale of, and reimbursement for, medical devices may constitute a violation of federal and criminal law.  Relator #1 was retaliated against for trying to prevent the sale and reimbursement of medical devices in violation of federal law, conduct which Relator #1 believed would endanger the public.

231.     SpineFrontier's termination of Relator #1 was in violation of public policy and constitutes wrongful termination.  As a result of the wrongful termination, Relator #1 has suffered substantial financial losses, and suffered substantial emotion distress.

WHEREFORE, Relator #1, on his behalf, requests that this Court:

(a)     Reinstate Relator #1 to the same position that he would have had but for the wrongful termination;

(b)     Award Relator #1 the amount of back pay he would have earned but for the retaliation, and interest on that award;

(c)     Award Relator #1 compensation for all special damages he has sustained as a result of SpineFrontier's termination in violation of public policy;

(d)     Award him his costs and reasonable attorneys' fees for prosecuting this action; and

(e)     Enter such other relief which the Court finds just and equitable.

## Count VII
### (Violation of Colorado Medicaid False Claims Act)

232.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

233.     This is a civil action brought by Relators, on behalf of the State of Colorado, against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

234.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly caused to be presented, and may still be causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

235.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

236.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information,

63

knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

237.    The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state and state subdivision funded health insurance programs.

238.    As a result of Defendants' actions as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count VIII**
**(Violation of Connecticut False Claims Act)**

239.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

240.    This is a civil action brought by Relators, on behalf of the State of Connecticut, against Defendants under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301d.

241.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent claims for payment or approval under a medical

assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

242.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(2).

243.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(7).

244.   The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state and state subdivision funded health insurance programs.

245.    As a result of Defendants' actions as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count IX
### (Violation of District of Columbia False Claims Act)

246.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

247.    This is a civil action brought by Relators, on behalf of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

248.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

249.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

250.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease

an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

251.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance programs funded by the District.

252.    As a result of Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

### Count X
### (Violation of Florida False Claims Act)

253.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

254.    This is a civil action brought by Relators, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

255.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

256.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used, or caused to be made or used, and may still be making, using or

causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

257.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

258.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance plans funded by the State of Florida or its agencies.

259.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**Count XI**
**(Violation of Illinois False Claims Whistleblower Reward and Protection Act)**

260.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

261.    This is a civil action brought by Relators, on behalf of the State of Illinois, against Defendants under the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/4(b).

262.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois, or a member of the Illinois National Guard, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

263.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false record or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

264.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

265.   The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state funded health insurance programs.

266.    As a result of Defendants' actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

### Count XII
### (Violation of Indiana False Claims and Whistleblower Protection Act)

267.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

268.    This is a civil action brought by Relators, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

269.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

270.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

271.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and

may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

272.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state funded health insurance programs.

273.    As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XIII
### (Violation of Maryland False Health Claims Act)

274.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

275.    This is a civil action brought by Relators, on behalf of the State of Maryland, against Defendants under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-604.

276.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

277.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the

information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

278.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

279.    The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for Defendants' medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

280.    As a result of Defendants' actions, as set forth above, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count XIV**
**(Violation of Massachusetts False Claims Act)**

281.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

282.    This is a civil action brought by Relators, on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

72

283.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

284.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

285.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

286.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

287.    As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XV
### (Violation of New Jersey False Claims Act)

288.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

289.    This is a civil action brought by Relators, on behalf of the State of New Jersey, against Defendants pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

290.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

291.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

292.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the

74

information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

293.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance programs funded by the state or its political.

294.    As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XVI
## (Violation of New York False Claims Act)

295.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

296.    This is a civil action brought by Relators, on behalf of the State of New York, against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

297.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer, employee or agent of the State of New York, or

its political subdivisions, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

298.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved by the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(b).

299.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

300.   The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

301.   As to the New York Medicaid program, the state's regulatory regime provides that an "overpayment includes any amount not authorized to be paid under the medical assistance program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." N.Y.

Comp. Codes R. & Regs. tit. 18, § 518.1(c). The regime defines "unacceptable practice," to include "[b]ribes and kickbacks," id. § 515.2(b)(5), and lists within this category both "soliciting or receiving," id. § 515.2(b)(5)(ii), and "offering or paying," id. § 515.2(b)(5)(iv), "either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for purchasing, leasing, ordering or recommending any medical care, services or supplies for which payment is claimed under the program," id. § 515.2(b)(5)(ii), (iv). New York's anti-kickback statute forbids kickbacks in similar terms. See N.Y. Soc. Serv. Law §§ 366–d, – f.

302.     As a result of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

### Count XVII
### (Violation of Oklahoma Medicaid False Claims Act)

303.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

304.     This is a civil action brought by Relators, on behalf of the State of Oklahoma, against Defendants pursuant to the Oklahoma Medicaid Fraud False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

305.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

306.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

307.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

308.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of Medicaid.

309.    As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XVIII
### (Violation of Texas Medicaid Fraud Prevention Act)

310.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

311.    This is a civil action brought by Relators, on behalf of the State of Texas against, Defendants under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

312.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

313.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

314.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of false statements or misrepresentations of material fact concerning information required to be

provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

315.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

316.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of Medicaid.

317.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

### Count XIX
### (Violation of Virginia Fraud Against Taxpayers Act)

318.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

319.    This is a civil action brought by Relators, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

320.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented or caused to be presented, and may still be presenting or causing to

be presented, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

321.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

322.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

323.   The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made, or knowingly caused to be made, by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state funded health insurance programs.

324.   As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

WHEREFORE, Relators pray for judgment against Defendants as follows:

(a)     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 et seq.; Colo. Rev. Stat. § 25.5-4-304 et seq.; Conn. Gen. Stat. § 17b-301a et seq.; D.C. Code § 2-308.13 et seq.; Fla. Stat. § 68.081 et seq.; Ga. Code Ann. § 49-4-168 et seq.; 740 Ill. Comp. Stat. § 175/1 et seq.; Ind. Code § 5-11-5.5 et seq.; Md. Code Ann., Health-Gen. § 2-601 et seq.; Mass. Gen. Laws ch. 12, § 5A et seq.; N.J. Stat. Ann. § 2A:32C-1 et seq.; N.M. Stat. Ann. § 27-14-1 et seq.; N.Y. State Fin. Law § 187 et seq.; N.C. Gen. Stat. § 1-605 et seq.; Okla. Stat. tit. 63, § 5053 et seq.; Tex. Hum. Res. Code Ann. § 36.001 et seq.; and Va. Code Ann. § 8.01-216.1 et seq.

(b)     That judgment be entered in Relators' favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(c)     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §§ 3730(d) and 3730(h), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e(e), D.C. Code § 2-308.15(f), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i), 740 Ill. Comp. Stat. § 175/4(d), Ind. Code § 5-

11-5.5-6, Md. Code Ann., Health-Gen. § 2-605, Mass. Gen. Laws ch.12, § 5F, N.J. Stat. Ann. § 2A:32C-7, Okla. Stat. tit. 63, § 5053.4, Tex. Hum. Res. Code Ann. § 36.110, and Va. Code Ann. § 8.01-216.7, including without limitation (i) reinstatement of Relator #1's employment with no diminution of seniority, (ii) double back-pay for the period since Relator #1's unlawful retaliatory termination, (iii) interest on such back-pay for Relator #1, and (iv) special damages for Relator #1, including reasonable attorneys' fees and litigation costs.

(d)   That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(e)   That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 17b-301b(b)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False

Claims Act, as provided by Conn. Gen. Stat. § 17b-301b(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(f)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(g)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from

the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(h)  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(i)  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(j)  That judgment be entered in Relators' favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of

Defendants' unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) for each false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(k)     That judgment be entered in Relators' favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than five thousand dollars ($5,000) dollars and not more than ten thousand dollars ($10,000), plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch. 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(l)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. §

2A:32C-3, plus a civil penalty of not less than and not more than the civil penalties allowed under the federal False Claims Act (31 U.S.C. § 3729 et seq.) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(m)    That judgment be entered in Relators' favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(n)    That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more

than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, §

5053.1(B), to the extent such multiplied penalties shall fairly compensate

the State of Oklahoma or its political subdivisions for losses resulting

from the various schemes undertaken by Defendants, together with

penalties for specific claims to be identified at trial after full discovery;

(o)     That judgment be entered in Relators' favor and against Defendants for

restitution to the State of Texas for the value of payments or benefits

provided, directly or indirectly, as a result of Defendants' unlawful acts, as

provided for in Tex. Hum. Res. Code Ann. § 36.052(a), multiplied as

provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on

the value of such payments or benefits at the prejudgment interest rate in

effect on the day the payment or benefit was paid or received, for the

period from the date the payment or benefit was paid or received to the

date that restitution is made to the State of Texas, pursuant to Tex. Hum.

Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than five

thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000)

for each unlawful act committed that resulted in injury to an elderly or

disabled person, and of not less than one thousand dollars ($1,000) or

more than ten thousand dollars ($10,000) for each unlawful act committed

that did not result in injury to an elderly or disabled person, pursuant to

Tex. Hum. Res. Code Ann. §§ 36.052(a)(3)(A) and (B), to the extent such

multiplied penalties shall fairly compensate the State of Texas for losses

resulting from the various schemes undertaken by Defendants, together

88

with penalties for specific claims to be identified at trial after full discovery;

(p)    That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(q)    That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

(r)    That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit; and

(s)    That Relators be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relators demand a trial by jury of all issues so triable.

Dated: July 14, 2015

Counsel for Plaintiffs/Relators

James A. O'Brien
Stephen A. Weiss *(Pro Hac Vice Application to be filed)*
SEEGER WEISS LLP
77 Water Street,
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

## CERTIFICATE OF SERVICE AND DISCLOSURE

On July 10, 2015, Relators served a copy of their Disclosure Statement and a copy of their proposed Complaint upon the United States Attorney General Loretta E. Lynch, by certified (return receipt requested) U.S. Mail pursuant to Rule 4(i)(1)(B), and the Hon. Carmen M. Ortiz, United States Attorney for the District of Massachusetts, by certified (return receipt requested) U.S. Mail pursuant to Rule 4(i)(1)(A)(ii); and upon Assistant United States Attorney Gregg Shapiro of the United States Attorney's Office, District of Massachusetts, by email service.

On July 13, 2015, Relators served a copy of their Disclosure Statement and a copy of their proposed Complaint upon Assistant United States Attorney Gregg Shapiro of the United States Attorney's Office, District of Massachusetts, by certified (return receipt requested) U.S. Mail pursuant to Rule 4(i)(1)(A)(ii), and upon George Zachos, Director, Medicaid Fraud Control Unit, Office of the Massachusetts Attorney General, by certified (return receipt requested) U.S. mail pursuant to Rule 4(j)(2)(B).

On July 10, 2015, Relators served a copy of their Disclosure Statement and a copy of their proposed Complaint by Federal Express on:

Maura Healey, Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1518

Cynthia Coffman, Attorney General
Office of the Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203

George C. Jepsen, Attorney General
Office of the Attorney General
55 Elm Street
Hartford, CT 06106

Karl Racine, Attorney General
Office of the Attorney General
441 4th Street, NW,
Washington, DC 20001

Pam Bondi, Attorney General
Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Lisa Madigan, Attorney General
Office of the Attorney General
100 West Randolph Street
Chicago, IL 60601

Greg Zoeller, Attorney General
Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204

Brian E. Frosh, Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

John Jay Hoffman, Attorney General
Office of the Attorney General
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, NJ 08625-0080

Eric Schneiderman, Attorney General
Office of the Attorney General
The Capitol
Albany, NY 12224-0341

E. Scott Pruitt, Attorney General
Oklahoma Attorney General's Office
313 NE 21st Street
Oklahoma City, OK 73105

Mark R. Herring, Attorney General
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

Ken Paxton, Attorney General
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

James A. O'Brien
Seeger Weiss, LLP