**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOHN DOE #1 & JOHN DOE #2, and on behalf of the STATES of COLORADO, CONNECTICUT, THE DISTRICT OF COLUMBIA, FLORIDA, ILLINOIS, INDIANA, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, OHIO, OKLAHOMA, TEXAS, AND VIRGINIA,<br><br>Plaintiffs,<br><br>v.<br><br>SPINEFRONTIER, INC.; IMPARTIAL MEDICAL EXPERTS, LLC; KIC MANAGEMENT GROUP, INC.; AXIOMED, LLC, KICVENTURES, LLC; LESSURGEON INSTITUTE FLORIDA, LLC; KINGSLEY R. CHIN, M.D.; ADITYA HUMAD; VANESSA DUDLEY; JEFFREY R. CARLSON, M.D.; JOSUE P. GABRIEL, M.D.; VIVEK KUSHWAHA, M.D.; F. PAUL DEGENOVA, D.O.; MICHAEL MURRAY; JOSEPH SHEHADI, M.D.; AGHA KHAN, M.D.; and JOHN G. ATWATER, M.D.,<br><br>Defendants. | Civil Action No. 1:15-cv-12908-IT<br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER
31 U.S.C. § 3729 ET SEQ. AND STATE LAW COUNTERPARTS**

Stephen A. Weiss, Esq.
Christopher Ayers, Esq.
Justin M. Smigelsky, Esq.
SEEGER WEISS LLP
55 Challenger Rd., 6th FL
Ridgefield Park, N.J. 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-9393

*Counsel for Plaintiffs/Relators*

**Table of Contents**

I.    SUMMARY OF THE CASE ........................................................................1

II.   JURISDICTION AND VENUE...................................................................5

III.  PARTIES ......................................................................................................5

    A.   PLAINTIFF/RELATOR JOHN DOE NUMBER ONE.................................5

    B.   PLAINTIFF RELATOR JOHN DOE NUMBER TWO ...............................7

    C.   PLAINTIFFS UNITED STATES OF AMERICA AND QUI TAM STATES
        ......................................................................................................................8

    D.   DEFENDANT SPINEFRONTIER..................................................................9

    E.   DEFENDANT KICVENTURES LLC...........................................................10

    F.   DEFENDANT AXIOMED, LLC...................................................................10

    G.   DEFENDANT KIC MANAGEMENT ..........................................................10

    H.   DEFENDANT LESSURGEONS INSTITUTE FLORIDA LLC..................11

    I.   DEFENDANT IMPARTIAL MEDICAL EXPERTS LLC .........................11

    J.   DEFENDANT KINGSLEY R. CHIN, M.D. .................................................11

    K.   DEFENDANT ADITYA HUMAD.................................................................12

    L.   DEFENDANT VANESSA DUDLEY .............................................................12

    M.   DEFENDANT JEFFREY R. CARLSON, M.D...........................................12

    N.   DEFENDANT JOSUE P. GABRIEL, M.D. ..................................................13

    O.   DEFENDANT VIVEK KUSHWAHA, M.D. .................................................13

    P.   DEFENDANT F. PAUL DEGENOVA, D.O...................................................13

    Q.   DEFENDANT MICHAEL MURRAY ..........................................................13

    R.   DEFENDANT JOSEPH SHEHADI, M.D.....................................................13

    S.   DEFENDANT AGHA KHAN, M.D..............................................................13

    T.   DEFENDANT JOHN G. ATWATER, M.D. ..................................................14

IV.   SPINAL SURGERY AND DEVICES......................................................14

    A.   SPINAL SURGERY ......................................................................................14

    B.   TYPES OF SPINAL DEVICES....................................................................15

V.    DEFENDANTS' KICKBACK SCHEME .............................................16

    A.   DIRECT CONSULTING AGREEMENTS ...................................................16

    B.   IME CONSULTANTS/PHYSICIAN DEFENDANTS ...............................18

C.      IME'S ON-LINE WEB PORTAL AND CONSULTANT "FEEDBACK"..32

D.      RECRUITMENT EFFORTS BY IME CONSULTANTS TO BUILD DEFENDANTS' BUSINESS........................................................................37

E.      THE IME CONSULTANT AGREEMENTS DO NOT FALL WITHIN THE SAFE HARBOR PROVISIONS OF THE ANTI-KICKBACK STATUTE OR STARK LAW ..........................................................................39

F.      DEFENDANTS' CONDUCT WAS AIMED AT SHIELDING THEIR VIOLATIONS OF FEDERAL LAW............................................................40

G.      DEFENDANTS INDUCED PHYSICIANS TO PARTICIPATE IN THE KICKBACK SCHEME WITH INCENTIVES THAT INCLUDED ROYALTY PAYMENTS AND BOARD POSITIONS ..............................42

H.      EXAMPLES OF DEFENDANTS' KICKBACK-TAINTED RELATIONSHIPS WITH PHYSICIANS ....................................................45

    1.  Dr. John Atwater.............................................................................46

    2.  Dr. Francis Paul DeGenova ...........................................................47

    3.  Dr. Agha Khan................................................................................49

    4.  Dr. Michael Murray .......................................................................50

    5.  Dr. Joseph Shehadi ........................................................................52

I.      DEFENDANTS' AGGRESSIVE GROWTH PLAN TO INCREASE SALES OF SPINEFRONTIER'S MEDICAL DEVICES...........................................53

J.      DEFENDANTS' SALES REVENUES OF SPINEFRONTIER'S MEDICAL DEVICES THROUGH THE IME CONSULTANTS...................................54

K.      RELATOR #1'S ATTEMPTS TO REFORM SPINEFRONTIER ...............55

L.      RELATOR #2'S ATTEMPTS TO REFORM SPINEFRONTIER ...............57

M.      DEFENDANTS' ILLEGAL KICKBACK SCHEME VIOLATED FEDERAL LAW ....................................................................................58

N.      DEFENDANTS' HCPCS/CPT CODES .....................................................60

O.      PROVIDER AGREEMENTS AND HOSPITAL COST REPORTS SUBMITTED FOR REIMBURSEMENT FROM MEDICARE ..................60

P.      THE PRESENTATION OF FALSE CLAIMS TO THE GOVERNMENT .62

VI.   PHYSICIAN-OWNED DISTRIBUTORSHIPS AND RELATED

INVESTIGATIONS BY THE OFFICE OF THE INSPECTOR GENERAL AND THE U.S. DEPARTMENT OF JUSTICE............................................................64

   A. THE OIG'S SPECIAL FRAUD ALERT .........................................................64

   B. THE OIG'S 2013 REPORT ON SPINAL DEVICES SUPPLIED BY PODS 65

   C. THE U.S. DOJ'S ACTIONS AGAINST SPINAL DEVICE PODS ..............67

VII.   SPINEFRONTIER'S ILLEGAL TERMINATION OF RELATOR #1................68

VIII.  SPINEFRONTIER'S ILLEGAL TERMINATION OF RELATOR #2.................69

IX.   THE UNITED STATES AND QUI TAM STATES WERE CHEATED OUT OF SUBSTANTIAL SUMS AS A RESULT OF THE FALSE REPORTS INDUCED BY DEFENDANTS' KICKBACK SCHEME.......................................................69

X.    STATUTORY AND REGULATORY ENVIRONMENT ...................................70

   A.   THE FALSE CLAIMS ACT .........................................................70

   B.   THE FCA'S AND MASSACHUSETTS' ANTI-RETALIATION PROVISIONS AND STATE COMMON LAW PROHIBITING WRONGFUL TERMINATION....................................................71

   C.   THE ANTI-KICKBACK STATUTE.........................................72

   D.   THE STARK STATUTE..................................................................75

   E.   THE PHYSICIAN PAYMENTS SUNSHINE ACT...................................76

XI.   REMBURSEMENT BY GOVERNMENT-FUNDED HEALTH CARE PROGRAMS ..............................................................................................78

   A.   MEDICARE PART A ...........................................................80

   B.   MEDICARE PART B ...........................................................81

   C.   TRICARE ..............................................................................84

   D.   REIMBURSEMENT FOR SURGERIES USING SPINE FRONTIER MEDICAL DEVICES ......................................................................84

   E.   COMPLIANCE WITH THE AKS AND THE SUNSHINE ACT IS A CONDITION OF PAYMENT.....................................................85

XII.  DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY KNOWINGLY CAUSING THE SUBMISSON OF FALSE OR FRAUDULENT CLAIMS OR STATEMENTS ...............................................................................88

XIII. CAUSES OF ACTION ..............................................................................89

COUNT I  (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) .................89

COUNT II  (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729 (a)(1)(B)) ...........................................................................................89

COUNT III  (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3a); 31 U.S.C. § 3729 (a)(1)(C)) .........................................................................................90

COUNT IV  (Violation of False Claims Act, 31 U.S.C. § 3730(h)) ........................90

COUNT V  (Violation of Mass. Gen. Laws Ch. 12, § 5J) .......................................91

COUNT VI  (Wrongful Termination in Violation of Public Policy) ........................92

COUNT VII  (Violation of Colorado Medicaid False Claims Act) ..........................93

COUNT VIII  (Violation of Connecticut False Claims Act)....................................94

COUNT IX  (Violation of District of Columbia False Claims Act) .........................96

COUNT X  (Violation of Florida False Claims Act) ...............................................97

COUNT XI  (Violation of Illinois False Claims Whistleblower Reward and Protection Act)........................................................................................98

COUNT XII  (Violation of Indiana False Claims and Whistleblower Protection Act) .......................................................................................................100

COUNT XIII  (Violation of Maryland False Health Claims Act)...........................101

COUNT XIV  (Violation of Massachusetts False Claims Act)...............................102

COUNT XV  (Violation of New Jersey False Claims Act) ....................................103

COUNT XVI  (Violation of New York False Claims Act).....................................105

COUNT XVII  (Violation of Oklahoma Medicaid False Claims Act)....................107

COUNT XVIII  (Violation of Texas Medicaid Fraud Prevention Act) ..................108

COUNT XIX  (Violation of Virginia Fraud Against Taxpayers Act)....................109

COUNT XX  (Unjust Enrichment)........................................................................111

COUNT XXI  (Payment by Mistake)....................................................................111

PRAYER FOR RELIEF ........................................................................................112

XIV.  DEMAND FOR JURY TRIAL....................................................................118

**AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER
31 U.S.C. § 3729 ET SEQ., AND STATE LAW COUNTERPARTS**

Plaintiffs Relators, John Doe #1 and John Doe #2, on their behalf and on behalf of the United States of America, and on behalf of the State of Colorado, the State of Connecticut, the District of Columbia, the State of Florida, the State of Illinois, the State of Indiana, the State of Maryland, the State of Massachusetts, the State of New Jersey, the State of New York, the State of Ohio, the State of Oklahoma, the State of Texas, and the State of Virginia (collectively, the "Qui Tam States"), bring this qui tam action against the Defendants SpineFrontier, Inc., Impartial Medical Experts, LLC, KIC Management Group, Inc., AxioMed, LLC, KICVentures LLC, LESSurgeons Institute Florida LLC, Kingsley R. Chin, M.D., Aditya Humad, and Vanessa Dudley (collectively, "Defendants"). In support thereof, Relators allege, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I. SUMMARY OF THE CASE

1.     This case arises from the Defendants' unlawful participation in (a) the presentment to the federal government and the relevant States of false or fraudulent claims for payment under federal health care programs relating to the medical device products designed, manufactured, marketed and sold by SpineFrontier, Inc., and (b) the making or use of false records or statements material to the false or fraudulent claims relating to the SpineFrontier medical device products.

2.     Manufacturing Defendants are companies that manufacture, market, and sell a variety of medical device products relating to spine surgery. Beginning in approximately 2006, Defendants have engaged in a variety of fraudulent activities involving their medical spine device products. Physician Defendants are physicians who have received illegal kickbacks for using these designated medical devices.

3.      Manufacturing Defendants have, as part of their fraudulent scheme and under the guise of "consulting" arrangements, engaged in an illegal kickback scheme and a scheme to not disclose certain financial relationships with physicians (including, but not limited to, the named Physician Defendants) and hospitals as required by federal law, all part of a successful effort by Manufacturing Defendants to induce the third-party physicians and hospitals to submit false claims to the government for Medicare and Medicaid reimbursement.

4.      Specifically, Manufacturing Defendants paid physicians and hospitals to use SpineFrontier's medical devices over devices manufactured by competitors. Defendants attempted to conceal the true nature of such payments by characterizing them as consulting fees for evaluations of SpineFrontier medical devices and other consulting activities. In fact, the consulting physicians performed little or no true consulting work in exchange for the consulting payments; rather, payments were made to the physicians and facilities based on the volume and value of the SpineFrontier medical devices they utilized for procedures. Further, where consulting physicians did perform actual consulting work, the physicians were paid for significantly more time than they actually had spent consulting, and without regard for the quality or quantity of any feedback the physicians provided. Moreover, SpineFrontier often paid physicians for time spent merely using its medical devices during spine surgeries, including procedures reimbursed by federal health care programs.

5.      Defendants were well aware that their scheme violated federal and state law. In an effort to skirt detection, Defendants created and used a sham company, Impartial Medical Experts, LLC ("IME"), to pay the "consulting" physicians, engaged in extensive recruitment efforts to build their consultant network, and conveyed to prospective consultants that government regulators would not scrutinize the consultant payments if IME was utilized.

Although marketed as a separate referral company through which physicians could perform consulting and expert witness services, IME was under the ownership and control of Defendant Kingsley R. Chin, M.D., the founder and principal owner of SpineFrontier.

6.      Defendants did not limit or cap the number of times SpineFrontier and IME paid a physician to "evaluate" a particular SpineFrontier device. Indeed, Defendants marketed the absence of a limit or cap to prospective "consultants" to convince them join the illegal referral network. Oftentimes, physicians would receive multiple payments for purportedly evaluating the same medical device. To the extent the consultants provided any real feedback in regard to the device through such "evaluations," the feedback was duplicative, unnecessary, and ignored.

7.      Through IME, SpineFrontier paid over $8 million in illegal kickbacks by way of sham consulting fees to approximately 35 physicians. Through their use of SpineFrontier medical devices in spine surgeries, these "consultants" generated more than $100 million – the vast majority of SpineFrontier's total domestic sales of medical devices – in revenue for SpineFrontier from at least March 2013 through December 2018.

8.      The Defendants' illegal conduct caused the submission of false claims for payment to federal health care programs in violation of the False Claims Act and State law counterparts. Relators bring this action on behalf of the United States and the Qui Tam States to recover damages and civil penalties under the False Claims Act and State qui tam statutes against Defendants for causing the submission of false or fraudulent claims; and for making, using, or causing to be made or used false records or statements material to false or fraudulent claims.

9.      Relators bring this action against the Defendants pursuant to the following State qui tam provisions: the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304

et seq. (2010); the Connecticut False Claims Act, Conn. Gen. Stat. § 17b- 301a et seq. (2010); the District of Columbia False Claims Act, DC Code §§ 2-381.01 to 2-381.09; the Florida False Claims Act, Fla. Stat. § 68.081 et seq. (2000); the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 et seq. (2000); the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7-1 through 5-11-5.7-18; the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-601 et seq. (LexisNexis 2010); the Massachusetts False Claims Act, Mass. Gen. Laws, Chapter 12, §§ 5A -5O; the New York False Claims Act, N.Y. State Fin. Law. § 187 et seq. (McKinney 2010); the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.; the Ohio Medicaid Fraud Act, R.C. § 2913.40 et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053.1 through 5053.7; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. (West 2006); and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq. (2011) (collectively, the "State qui tam statutes" or "Qui Tam States").

10.     In addition, Relator #1 and Relator #2 bring this action to recover under the anti-retaliation provisions of the federal False Claims Act, 31 U.S.C. § 3730(h), the anti-retaliation provisions of the Massachusetts False Claims Act, M.G.L. ch. 12, § 5J, and Massachusetts common law prohibiting wrongful termination in violation of clearly established public policy.

11.     Relators seek civil penalties, damages, declaratory relief, injunctive relief and such other relief as is available under the False Claims Act and/or the State False Claims Acts, and demand a trial by jury for all claims for which the right to a jury trial is authorized.

## II.  JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730, 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

13.     The Court has original jurisdiction of the State law qui tam claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under State laws for the recovery of funds paid by the Qui Tam States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

14.     This Court has personal jurisdiction over the Defendants because, among other things, SpineFrontier, Inc. and KICVentures LLC have their principal places of business in Massachusetts, all of the Defendants transact business in this judicial district, and all of them engaged in wrongdoing in this judicial district.

15.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  The Defendants transact business within this judicial district, and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

16.     The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## III.  PARTIES

### A.  PLAINTIFF/RELATOR JOHN DOE NUMBER ONE

17.     Plaintiff/Relator John Doe Number 1 ("Relator #1") was employed as a member of the executive staff of SpineFrontier from August 2014 through on or about April 7, 2015, when he was wrongfully terminated by the company after urging reforms  to prevent it

from engaging in the unlawful activities that resulted in the illegal sale and reimbursement of SpineFrontier's medical device products.

18.     Relator #1 has personal knowledge and experience regarding Defendants' kickback and off-label promotion activities, including personal contact with the employees and executives who have committed violations of law alleged herein. Relator #1 was personally aware of Defendants' participation in the scheme involving the providing of illegal kickbacks to healthcare providers in exchange for their favorable treatment of its medical device products. By reporting to SpineFrontier's legal counsel that the scheme and Defendants' failure to comply with the Physician Payments Sunshine Act were improper, he was attempting to stop further violations of the False Claims Act that involved the sale and reimbursement (by the Government) of SpineFrontier's products.

19.     Prior to filing this Complaint, Relator #1 brought allegations of the wrongdoing described in this Complaint (i.e., those relating to the Defendants' kickback scheme, off-label promotion, and lack of compliance with the Physician Payments Sunshine Act) to the attention of Defendants' legal and regulatory executives. Relator #1 raised these concerns with Paul L. Speidel, General Counsel for SpineFrontier and its Regulatory Affairs Manager. For example, approximately five months before he was terminated, Relator #1 told Speidel that the scheme involving the consulting agreements was improper because it did not comply with the Physician Payments Sunshine Act, and violated federal law. Later, upon discovering that Defendants still had not complied with the Physician Payments Sunshine Act, Relator #1 repeated his concerns to Speidel in or about March 2015. Relator #1 also separately reported to SpineFrontier's Director of Quality and Regulatory Affairs that Defendants were engaging in illegal off-label promotion. Shortly after raising these concerns, on April 7, 2015, as a result of Relator #1's

internal reports to members of the executive staff, SpineFrontier abruptly terminated his employment.

20.     Upon his termination, Relator #1 was presented with a separation agreement and release, which he did not sign. The terms of the release provided in part that, if he signed, Relator #1 would not file any complaints or claims with any court or agency arising from his employment, and would be precluded from receiving any compensation as a result of his participation in any investigation or proceeding before any federal or state agency.

21.     Relator #1 is an original source of the allegations in this Complaint, and these allegations are not based upon publicly-disclosed information. Prior to filing this action, Relator #1 voluntarily disclosed to the Government the information forming the basis of this Complaint pursuant to 31 U.S.C. § 3730(e)(4)(B).

**B.  PLAINTIFF RELATOR JOHN DOE NUMBER TWO**

22.     Plaintiff/Relator John Doe Number 2 ("Relator #2") was employed as a sales representative by Defendant SpineFrontier from February 2, 2015 through April 7, 2015, when he was terminated by the company.

23.     Relator #2 has personal knowledge and experience regarding Defendants' off-label promotion activities, including personal contact with the employees who instructed sales representatives employed by SpineFrontier to commit violations of federal law. He also observed numerous instances of such conduct, which involved off- label promotion to healthcare providers to induce their favorable treatment of SpineFrontier's medical device products.

24.     Prior to filing this Complaint, Relator #2 brought allegations of the wrongdoing described in this Complaint (i.e., those relating to the Defendants' kickback scheme, off-label

promotion, and lack of compliance with the Physician Payments Sunshine Act) to the attention of his supervisor, the Vice President of Sales, as well as SpineFrontier's Human Resources Manager, Michael Barbin. For example, on or about March 27, 2022, approximately one week before he was terminated, Relator #2 told Barbin that SpineFrontier's kickback scheme was improper because it violated federal law, and that he did not feel comfortable following directions from Dr. Chin to engage in such activity. Shortly after raising these concerns, on April 7, 2015, as a result of Relator #2's internal reports to SpineFrontier's Human Resources Manager, Relator #2 received a telephone call from SpineFrontier COO (also AxioMed's President) Jake Lubinski, wherein Relator #2's employment was abruptly terminated. When Relator #2 asked Lubinski the reason for the termination, Lubinski responded that Relator #2 was being terminated "because of [his] conversation with Michael."

25.     Upon his termination, Relator #2 was offered a severance package, which he refused to accept.

26.     Relator #2 is an original source of the allegations in this Complaint, and these allegations are not based upon publicly-disclosed information. Prior to filing this action, Relator #2 voluntarily disclosed to the Government the information forming the basis of this Complaint pursuant to 31 U.S.C. § 3730(e)(4)(B).

### C.  PLAINTIFFS UNITED STATES OF AMERICA AND QUI TAM STATES

27.     Plaintiff United States of America is acting on behalf of the United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), which administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.* ("Medicare"), and the Department of Defendant ("DoD"), including DoD compenent the Defense Health Agency

("DHA"), which administers the TRICARE program ("TRICARE").

28.     Plaintiffs Qui Tam States participate in the Medicaid program and have State False Claims Act which permit private persons, such as Relators, to sue on their own behalf to recover for false and fraudulent claims submitted for payment by Medicaid programs and/or other government healthcare programs.

**D.  DEFENDANT SPINEFRONTIER**

29.     Defendant SpineFrontier, Inc. is an S-Corp that was incorporated in Delaware on June 16, 2006, and has its principal place of business at 350 Main Street, Malden Massachusetts 02148. It is a medical device company that is owned, and was founded by, Dr. Kingsley R. Chin. He is its sole corporate officer, listed as its Director and Chairman, Chief Technology Officer, President and Chief Executive Officer. SpineFrontier manufactures, designs, develops, and markets implants and instruments, including medical devices and technologies, used in the treatment of spinal diseases. SpineFrontier is a privately-held company and has approximately seventy employees. It is also a portfolio company of KICVentures LLC. Its revenue in 2014 totaled over $26,000,000.00.

30.     SpineFrontier is part of a Physician-Owned Distributorship ("POD"), which is owned solely by Dr. Kingsley R. Chin. It derives revenue from selling implantable medical devices and instruments for use in surgical spine-related procedures, many of which are performed by IME Consultants who work indirectly, through IME, for SpineFrontier and KICVentures.

31.     As described more fully herein, SpineFrontier is engaged in the manufacture, promotion, distribution, commercialization, and sale of medical device products. At all times material hereto, SpineFrontier manufactured, marketed and sold spine-related medical

devices throughout the United States, including within this judicial district.

32.     SpineFrontier manufactures, markets and sells, and marketed and sold, brand-name medical device products that are paid for, or reimbursed by, various government programs, including Medicare, Medicaid, the Department of Defense's TRICARE/CHAMPUS programs, the Department of Veterans Affairs' CHAMP/VA program, and the Federal Employees Health Benefit Plan.

### E.  DEFENDANT KICVENTURES LLC

33.     KICVentures LLC ("KICVentures") is a Delaware Corporation that is owned by Dr. Kingsley R. Chin and was founded by him in 2005.  Dr. Chin is the CEO of KICVentures.  Its principal place of business is 350 Main Street, Malden, Massachusetts 02148. KICVentures LLC is an umbrella company that owns multiple businesses, including SpineFrontier and the LESS Institute. The manager of KICVentures is the Kingsley Investment Company LLC, which is located in Beverly, Massachusetts and also is owned by Dr. Chin.

### F.  DEFENDANT AXIOMED, LLC

34.     Defendant AxioMed, LLC ("AxioMed") is a Delaware limited liability company with a principal place of business at 350 Main Street, Malden, MA 02148. AxioMed is wholly owned and operated by KIC Ventures, which is managed by Kingsley Investment Company LLC and owned by Dr. Chin.

### G.  DEFENDANT KIC MANAGEMENT

35.     Defendant KIC Management is a Delaware corporation with a principal place of business at 350 Main Street, Malden, MA 02148. KIC Management is owned by Dr. Chin, and manages both SpineFrontier and IME.

## H.  DEFENDANT LESSURGEONS INSTITUTE FLORIDA LLC

36.     LESSurgeons Institute Florida LLC ("LESS Institute" or "LESSurgeons Institute" or "Lessi") is a Delaware Corporation.  It is managed by LESSurgeons Institute Holdings LLC, which in turn is owned by Dr. Chin. LESS Institute is registered in Florida as a foreign limited liability corporation, with an address of 1100 W. Oakland Park Boulevard, #3, Fort Lauderdale, Florida, 33311.

## I.  DEFENDANT IMPARTIAL MEDICAL EXPERTS LLC

37.     Impartial Medical Experts, LLC ("IME") is a Delaware corporation formed in 2012 by Dr. Kingsley R. Chin. IME is one of the portfolio companies of KICVentures LLC. IME's website describes IME as "a premier consultant referral firm that connects its Clients to leading medical and surgical specialists with extensive, real- world experience in healthcare services, medical device and instruments design and evaluations, lectures, didactic skills training, and expert witness and litigation support." IME's website[1] states that it "is a premier consultant referral firm that connects its Clients to leading medical and surgical specialists with extensive, real-world experience in healthcare services, medical device and instruments design and evaluations, lectures, didactice skills training, and expert witness and litigation support." However, its website does not disclose that it is owned by Dr. Chin.

## J.  DEFENDANT KINGSLEY R. CHIN, M.D.

38.     Kingsley R. Chin, M.D., holds a Doctor of Medicine from Harvard Medical School, graduating on June 6, 1996.  He is the founder and owner of all of the companies that are Defendants in this action (SpineFrontier, Inc., KICVentures LLC, A x i o M e d , LESSurgeons Institute, Impartial Medical Experts LLC), as well as other companies that are related and were

---

[1] http://impartialmedicalexperts.com/

involved in the scheme alleged in this Complaint, including LESS Institute Online, Less Exposure Surgery Society, LESSurgeons Institute Holdings LLC, LESS Institute Clinical, PLLC, Kingsley Investment Company, LLC, INVU Holdings LLC, 1801 Sample Road LLC, and the Institute for Minimally Invasive Spine Surgery LLC (or "IMIS"). Dr. Chin founded SpineFrontier in 2006 and, at all times relevant hereto, served as its CEO and Director.

### K. DEFENDANT ADITYA HUMAD

39.     Aditya Humad has worked together with Dr. Chin for over ten years. He is a co-founder and the Chief Financial Officer of KICVentures, having been employed at it since November 2009. Since July 2011, Humad has been the Chief Financial Officer of SpineFrontier, Inc. He has been the President of SpineFrontier, Inc. since June 2014, and works at the Beverly, Massachusetts headquarters of SpineFrontier and KICVentures. Since November 2014, he has also been the Chief Financial Officer of AxioMed LLC. Prior to June 2014, Humad was employed by SpineFrontier as the Vice President of Business Development, from July 2011 through June 2014, and as its Director of Finance and Business Relations, from July 2010 through July 2011. Prior to that, he was employed by SpineFrontier as a financial analyst, from July 2009 through July 2010.

### L. DEFENDANT VANESSA DUDLEY

40.     Vanessa Dudley is a resident of Florida, has served as IME's Business Administrator since IME's inception in or around May of 2012, and is IME's sole employee. Dudley married Dr. Chin in 2015.

### M. DEFENDANT JEFFREY R. CARLSON, M.D.

41.     Jeffrey R. Carlson, M.D. holds a Doctor of Medicine from George Washington University School of Medicine. He has practices orthopaedic surgery at the Orthopaedic & Spine

Center in Newport News, Virginia, since 1999. In addition to having his own private practice, Dr. Carlson is an affiliated physician at Bon Secours Mary Immaculate Hospital.

### N.  DEFENDANT JOSUE P. GABRIEL, M.D.

42.     Josue P. Gabriel, M.D., holds a Doctor of Medicine from the Perelman School of Medicine at the University of Pennsylvania. He practices orthopaedic surgery in Columbus, Ohio at his private practice, the Spine Institute of Ohio.

### O.  DEFENDANT VIVEK KUSHWAHA, M.D.

43.     Vivek Kushwaha, M.D., holds a Doctor of Medicine from the University of Texas School of Medicine at San Antonio. Based in Houston, Texas at the Memorial Hermann Texas Medical Center, Dr. Kushwaha has been practicing orthopaedic surgery since 1991.

### P.  DEFENDANT F. PAUL DEGENOVA, D.O.

44.     F. Paul DeGenova, D.O., holds a Doctor of Osteopathic Medicine from the Ohio University Heritage College of Osteopathic Medicine, graduating in 1988. Dr. DeGenova practices orthopaedic surgery at the OhioHealth Physician Group in Columbus, Ohio.

### Q.  DEFENDANT MICHAEL MURRAY

45.     Michael Murray is an orthopedic surgeon in New York. He is employed by the Department of Veteran Affairs.

### R.  DEFENDANT JOSEPH SHEHADI, M.D.

46.     Joseph Shehadi, M.D., holds a Doctor of Medicine from the University of Rochester School of Medicine and Dentistry, graduating in 1993. Dr. Shehadi practices neurosurgery at Neurosurgery Associates, LLC, in Columbus, Ohio.

### S.  DEFENDANT AGHA KHAN, M.D.

47.     Agha Khan, M.D., holds a Doctor of Medicine from the University of Health

Sciences at Lahore Nishtar Medical College, graduating in 1979. Dr. Khan practices neurosurgery in Baltimore, Maryland.

**T.  DEFENDANT JOHN G. ATWATER, M.D.**

48.     John G. Atwater, M.D. holds a Doctor of Medicine from the University of Virginia School of Medicine. Based in Vero Beach, Florida, Dr. Atwater practices orthopaedic surgery at his private practice, Ortho Spine America.

**IV.   SPINAL SURGERY AND DEVICES**

**A.  SPINAL SURGERY**

49.     There are four regions of the spine: the cervical, thoracic, lumbar, and sacral regions. The cervical spine consists of seven vertebra in the neck region; the thoracic spine consists of twelve vertebrae in the mid-back region; and the lumbar spine consists of five vertebrae in the lower back region. The sacral region of the spine is below the lumbar region and consists of additional fused (*i.e.*, non-articulating) vertebrae.

50.     Spinal implants may be used to help stabilize the spine and facilitate the fusion. Cervical fusion surgeries are surgical procedures that surgeons perform to join or fuse two or more vertebrae in the cervical spine region. Surgeons perform lumbar fusion surgeries in a number of different ways. A procedure in which the surgeon accesses the lumbar spine region through an incision in the back is called a posterior fusion. A procedure in which the surgeon accesses the lumbar spine region through an abdominal incision is called an anterior fusion. A procedure in which the surgeon accesses the lumbar spine region through an incision in the psoas muscle – which is located at the side of the lumbar region and extends into the pelvis – is often called an XLIF (or extreme lateral interbody fusion). A procedure in which the surgeon approaches through both the abdomen and the back is called a 360-degree fusion.

### B.  TYPES OF SPINAL DEVICES

51.    At all times relevant hereto, SpineFrontier sold, among other things, the types of medical devices described below.

52.    A "cage" is a medical device, typically made of polyetheretherketone plastic ("PEEK"), which a surgeon may implant during a cervical or lumbar fusion surgery to maintain space between vertebral segments. SpineFrontier's cases included Arena-C, Arena-L, A-CIFT, A-LIFT, E-LIFT, LES P-LIFT, S-LIFT, and T-LIFT.

53.    A "pedicle screw" is a medical device, typically made of titanium, which a surgeon implants into the bones of the spine to facilitate the fixation of spinal vertebrae. A surgeon implants a pedicle screw into two or more adjacent spinal segments to anchor "rods" or "plates." SpineFrontier's pedicle screws included FacetFuse, PedFuse Respond, PedFuse Remind, PedFuse Reset, PedFuse Return, and MISquito.

54.    A "rod" is a medical device, anchored by pedicle screws, which a surgeon places longitudinally along the back of the lumbar and thoracic spine. SpineFrontier's rods are part of the PedFuse pedicle screw system.

55.    A "plate" is a medical device that a surgeon anchors with screws and places longitudinally along the front of the cervical spine. SpineFrontier's plates included Invue, Invue Inset, Invue MAX, InSpan, and InSpan-SLIM, with four levels of plates offered for purchase.

56.    A percutaneous sacroiliac ("SI") screw is a medical device that a surgeon implants in connection with a SI joint fusion.

57.    Biologics and allografts are materials that attract cells to increase bone formation in spinal fusion procedures. SpineFrontier's biologics included DBMForm, DBMPure Micro, DBMPure Macro, Cancellous Chips, DBMPutty, and DBM Crunch.

## V. DEFENDANTS' KICKBACK SCHEME

58.     Defendants' kickback scheme involves a conspiracy to pay millions of dollars in sham "consulting" fees to physicians to induce them to use SpineFrontier's medical devices – over competitors' medical devices – during spinal surgeries. Defendants' business model incentivizes physicians to use SpineFrontier medical devices by rewarding them with lucrative consulting agreements, investment opportunities in the Defendants' business, memberships on the boards of Defendants' companies, bonuses for successfully recruiting other surgeons to become IME Consultants, shares in profits of Defendants' medical device products, medical malpractice insurance coverage, an AMEX card for expenses, and royalty fees—all as an illegal quid pro quo. In addition, Defendants offer remuneration to the physician IME Consultants in the form of reimbursement, to induce the physicians to use Defendants' medical devices while performing certain surgical spine-related procedures.

### A. DIRECT CONSULTING AGREEMENTS

59.     Knowing that physicians generally decide which medical devices they used in performing surgeries, SpineFrontier focused its sales and marketing efforts on persuading physicians to use its medical devices over competitors' medical devices.

60.     Prior to September 2013, SpineFrontier directly contracted with numerous physicians as consultants. Pursuant to these direct "consulting" agreements, SpineFrontier agreed to pay physicians fro, *inter alia*, supposed feedback on SpineFrontier's medical devices, discussion time with SpineFrontier employees and third parties pertaining to SpineFrontier's medical devices, and other miscellaneous consulting services.

61.     Similarly, prior to September 2013, SpineFrontier offered investment opportunities to surgeons who used SpineFrontier medical devices.

62.     However, in or about 2013, as the result of a Special Fraud Alert issued by HHS-OIG, and implementation of strict disclosure requirements under the Physician Payments Sunshine Act, the regulatory climate affecting Defendants' operations changed significantly.

63.     As discussed in detail below, on March 26, 2013, HHS-OIG issued a Special Fraud Alert concerning physician-owned distributorships ("PODs"), which detailed its concerns that, because implantable medical devices are typically "physician preference items," which can create strong financial incentives in the physician's selection of the brand and type of device, the "financial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the devices the PODs sell in lieu of other, potentially more clinically appropriate devices." *See* HHS-OIG, *Special Fraud Alert: Physician-Owned Entities*, 78 Fed. Reg. 19271-3 (Mar. 26, 2013).

64.     Further, as discussed in detail below, the Physician Payments Sunshine Act ("PPSA" or "Sunshine Act," a/k/a "Open Payments program") was enacted at or about this time, requiring medical device manufacturers to disclose to CMS any payments or other transfers of value made to physicians or teaching hospitals. Under the "Sunshine Act", a covered manufacturer (such as SpineFrontier) became obligated to disclose to CMS any payment or transfer of value made to a physician or hospital, as well as any physician ownership or investment in the covered manufacturer. This Open Payments program also makes this information available to the public.

65.     Defendants SpineFrontier, Chin, and Humad were well aware that SpineFrontier's direct "consulting" agreements and direct investment opportunities with surgeons would generate

increased government scrutiny.[2] Defendants SpineFrontier, Chin, and Humad also believed, however, that SpineFrontier needed to continue paying surgeons to induce them to use SpineFrontier's medical devices over competitors' medical devices.

66.     In an attempt to conceal their kickbacks, and to circumvent the disclosure requirements implemented by the Sunshine Act as well as the potential government scrutiny of PODs, Defendants decided to create and use IME as a pass-through vehicle for SpineFrontier's illegal payments to physicians.

## B.  IME CONSULTANTS/PHYSICIAN DEFENDANTS

67.     A central aspect of the Defendants' kickback scheme involves consulting agreements arranged by IME, whereinIME enters into consulting agreements with physicians through which the physicians agree to provide a "referral service" purportedly involving product consulting for clients referred to the physician-consultants by IME. The IME Consultants are characterized by IME as providing an impartial opinion to determine product usability, and may assist clients in training with the products, research related to the products, and discussing industry trends. The Consultants (or physicians) retained by IME agree to provide the clients referred by IME with evaluations and reviews of spine-related medical products. In return, IME agrees to compensate the Consultants between $500 and $1,000 per hour for their work, depending upon the type of spine-related medical device product reviewed (or other service provided, such as discussing industry trends or assisting in training on the client's products) and upon receipt of payment from the client for the service. Part of the job of an IME Consultant

---

[2] In a document titled "Memo: Changes in Consulting Agreements" dated September 26, 2013, Aditya Humad told potential "consulting" physicians that SpineFrontier "recognizes and understands the evolving compliance environment in lieu of the Physician Payments Sunshine Act, Anti-Kickback Statute and the Stark Law."

includes leveraging the surgeons of the client company to become part of the LESSurgeons Institute network.

68.     SpineFrontier presented IME to prospective "Consultant" physicians as a separate, third-party entity, and sought to disguise IME's true nature when touting its purported benefits. As a SpineFrontier sales representative wrote to a prospective physician in March of 2014:

> We have recently partnered with a new company, IME, to help us with this agreement. Basically, what it is, is a 3rd party company that we hired to help find surgeons willing to help us with consulting. Therefore, it eliminates the need for a surgeon to get paid directly from the manufacturer and shields them from OIG, sunshine act, and kickback concerns.

69.     In reality, and despite Defendants' knowing steps to create such a false appearance that IME was separate, IME was not separate from SpineFrontier, Dr. Chin, Aditya Humad, KICVentures, AxioMed or KIC Management[3]. Defendants did not inform prospective "consultants" that KICVentures and KIC Management, which own and manage SpineFrontier, jointly own IME. Dr. Chin is the owner and operator of KICVentures, AxioMed, and KIC Management, and Vanessa Dudley (Chin's wife) is IME's only employee[4]. Humad has served as the President of SpineFrontier, as well as Chief Financial Officer for KICVentures, since 2014,

---

[3] By e-mail of April 21, 2014, Vanessa Dudley told Aditya Humad, Dr. Chin, and others that "IME needs its own website link, not a subset of [SpineFrontier]," "if we are trying to create separation between entities."

[4] In a further attempt to create the illusion of a bona fide separate company from SpineFrontier, IME "kept" a 5% administrative fee on all "consulting" fees it paid to physicians for SpineFrontier. As set forth in the IME consulting agreement: "[Consulting f]ees will be paid by IME, net of a 5% processing fee for IME administrative costs as well as the time expended and expenses incurred in the presentation of consulting opportunities to Consultant." In reality, IME incurred virtually no administrative costs. Defendants did not procure a physical office or business space for IME, apart from obtaining a post office box located in Fort Lauderdale, Florida. IME has only ever had one employee – Vanessa Dudley.

and frequently performed various services on IME's behalf, including determining how much to pay each surgeon for their purported consulting.

70.     SpineFrontier employees performed work on behalf of IME and other companies under the KICVentures and KIC Management umbrella. Defendants commingled funds between the companies under the KICVentures and KIG Management umbrella, including SpineFrontier and IME. SpineFrontier and KICVentures paid the "consulting" fees to the physicians through IME, drawing on SpineFrontier revenues and funds from other companies Defendants owned and controlled.

71.     SpineFrontier and IME sent coordinated communications to physicians with direct consulting agreements explaining SpineFrontier's rationale for "outsourc[ing]" consulting arrangements to IME. For example, in a document titled "Memo: Changes in Consulting Agreements" dated September 26, 2013, Humad told potential "consulting" physicians that SpineFrontier "recognizes and understands the evolving compliance environment in lieu of the Physician Payments Sunshine Act, Anti-Kickback Statute and the Stark Law" and is "taking the step to remove direct consulting relationships with surgeons to lessen the potential risks of conflict. We have chosen to outsource all related consulting services to [IME."

72.     Also in the fall of 2013, IME's Business Administrator and sole employee, Vanessa Dudley, forwarded a letter to prospective consulting physicians stating:

> We believe government oversight of the industry will continue, as demonstrated by recent press related to investigations of [PODs] by [HHS-OIG]. IME understands the compliance issues facing its clients and consultants, and has positioned itself to enable its consultants to provide services at fair market hourly rates in a statutorily compliant manner with respect to the Physician Payment Sunshine Act, Anti-Kickback Statute and the Stark Law as outlined in the enclosed legal opinion from our attorney.

Dudley attached two documents to this letter. One of the documents[5] was a form consulting agreement stating that "IME manages a referral service providing product consulting and expert witness assignments to certain technology companies, law firms, insurance companies, and other interested parties ('Clients')." In reality, SpineFrontier was always IME's only "client." Also, the IME consulting agreement did not disclose KICVentures', KIC Management's, or Dr. Chin's ownership and control of IME.

73. The IME consulting agreement described how IME ostensibly would compensate physicians to "provide real-time evaluations of medical products…" In a section titled "2.1.1. Medical Product and System Services ($250-500 per hour)," it stated:

> It is expected that a cervical spinal product/construct evaluation is conducted within approximately 30-60 minutes, and a lumbar spinal product/construct evaluation is conducted within approximately 1-2 hours. **This will not include surgical time spent utilizing and/or implanting spinal products.**
>
> You agree to document and submit any time related to product/construct evaluation, training, research or discussions on a monthly basis through a Product/System Services Form provided by IME…The attached Exhibit…is the IME recommended format of a Product/System Services Form, however a Client may change this format to match Client requirements. All Product/System Services Forms provided by IME and completed by the Consultant will be submitted directly to IME. [bold emphasis added; underline in original]

74. The IME consulting agreement described the invoicing process that IME and

---

[5] The other document that Dudley attached to her letter was a legal opinion from Peter J. Baxter of Strong & Hanni, P.C., a law firm in Salt Lake City, Utah. The one-page opinion stated that Strong & Hanni, acting as counsel "only for IME," had reviewed the proposed IME consulting agreement and concluded that it complied with the Sunshine Act and Anti-Kickback Statute. The opinion expressly assume that IME would pay compensation "*for bona fide services* by the Consultant consistent with fair market value, in arms' length transactions[,] and…*will not be determined in a manner that takes into account the volume or value of any referrals or business*." Neither of these express assumption was true in practice.

SpineFrontier superficially instructed physicians to follow in order to be paid for "consulting time spent evaluating SpineFrontier medical devices:

> Each invoice shall include an itemization of the activities performed, the amount of time spend (rounded to the nearest 30 minute increment) on each activity, and the date on which such activity was performed. For Medical Product/System Services, each Form should be completed and signed for the month in which Services were provided with the amount of time spent on each activity.

In practice, no one at IME or SpineFrontier conducted a review of itemized "consulting" activities to determine the amount of payment due. The physicians' time submissions did not matter to Defendants – Defendants paid physicians based on how many surgeries they performed with SpineFrontier products, not the quality or usefulness of the physicians' feedback or the actual time the physicians devoted to evaluating products.

75.     Defendants understood that SpineFrontier, through IME, based its payments for "consulting" hours on the volume and type of surgical spine cases (which, in combination, determined the value of the cases for SpineFrontier) that the physicians performed using SpineFrontier medical devices. Defendants assured physicians that the time they spent in surgery using SpineFrontier medical devices constituted "consulting" time for which SpineFrontier would pay, and the Defendants instructed physicians to bill on a per-case basis when they used a SpineFrontier medical device in surgery.

76.     Defendants directed SpineFrontier sales personnel to market per-surgery case fees. For example, by email of September 6, 2013, Dr. Chin, copying Aditya Humad, provided the following direction to a SpineFrontier employee:

> Here is an email you could customize and send
>
> Dear Dr[,]
>
> I want to followup [sic] on our discussion yesterday.

I value your evaluation of our products as we compete to make each product the best in class. If surgeons like you keep working together into [sic] SpineFrontier Inc [sic] I expect this company to move to the front for innovative products.

It seems you want to test things out with us first so I propose that you start by evaluating each product in the cervical spine and lumbar spine and **we compensate you for each case** that you consult with us on purely to evaluate products and instruments.

**We propose $250-500 for a cervical construct and $500-1000 per lumbar construct depending on what you evaluate.** This makes it easy to track and over time you can go to a more general consulting agreement or be involved with the company with your ideas. **So you evaluate a [sic] 100 lumbar constructs we compensate you a $100,000 and so forth.**

If this can work we can send you an official letter.

[emphasis added]

77.    Likewise, by email of May 2, 2015, Dr. Chin described Defendants' billing arrangement to Vanessa Dudley, Aditya Humad, and six SpineFrontier employees, stating in relevant part:

Team

To clarify how our advisors should bill for this service

Cervical
Anticipate 1 hour of evaluation

Lumbar
Anticipate 2 hours[.]

In reality, this was more than "anticipation." Defendants provided instructions to physicians to bill set amounts of time for every surgery, and Defendants frequently "corrected" hourly submissions when surgeons did otherwise.

78.    Consistent with Dr. Chin's direction, on September 27, 2013, a SpineFrontier

sales representative wrote an email to a prospective consulting physician stating that the physician would be "compensated for the evaluations of our products **on a per case basis** ($500/cervical and $1000/lumbar)…" [emphasis added]

79.    Defendants Dr. Chin, Humad, and Dudley closely supervised and directed negotiations with prospective "consulting" physicians. For example, Dr. Chin agreed to a physician's request for a higher per-case fee for the physician's agreement to use more SpineFrontier medical devices. By email of February 26, 2014, a SpineFrontier sales representative advised the physician:

> I have talked to Dr. Chin and he in turn has been negotiating with IME. We have come to an agreement for you to be able to bill at $1000/hour per case evaluated…For example, **if you were to do 2 cervical cases** [at SpineFrontier's pre-set formula of 1 hour per cervical case] **and 2 lumbar cases** [at 2 hours per lumbar case] **a week at the average time of surgery, that would be an additional $6K a week, or more than $300K annually**…Considering Spine Frontier has negotiated a higher than normal rate for you as a consultant, they are wanting you to be a lead consultant…**Basically, what that means is that they are asking for you to do all your cases with Spine Frontier products to justify that rate.** [emphasis added]

80.    Defendants further promised prospective "consultants" that Defendants would not cap or limit the amount of money Defendants would pay, so long as the physician consultants continued using SpineFrontier medical devices in spine surgeries. For examples:

- By email dated October 30, 2013, a SpineFrontier Senior Sales Representative advised a prospective consulting physician:

> For this evaluation of our current products and in helping us make these the best in class products **we are willing to compensate you $500 per cervical construct and $1000 per lumbar construct**…As we discussed, there is no quota and no non compete clause within this agreement. **Also, there is no cap on how much you are able to consult with us.** This is run through a consulting firm called IME and therefore you would be receiving everything

from them, and not from any manufacturing company, including us. That makes this really appealing to most surgeons considering the Sunshine Act and OIG. You would be contracted to IME, consulting on behalf of [SpineFrontier], based on the rate we have discussed with them that I have passed on to you. You will also find an attorney opinion letter in the documents that I gave you validating this agreement. [emphasis added]

- By email of December 2, 2013, a SpineFrontier Senior Sales Representative followed up with a prospective consulting physician, stating:

  I just wanted to highlight some of the feautures for you to think about when making your decision between us and the other opportunity you have mentioned looking at.
  -SF pays the highest rate of anyone in the market for product evaluation **(flat rate per case)**
  -**No caps on the amount of consulting you can do or the money you can earn**
  -No non-compete clause
  -Works with a 3rd party to protect you from OIG or sunshine act…[emphasis added]

81.     Once signed on to a consulting agreement, IME Consultants used SpineFrontier medical device products in performing surgeries on their own patients. Defendants then paid that physician based on the number and type of surgical spine cases he or she performed using SpineFrontier medical devices, not for the time, if any, spent evaluating the medical devices (whether in the operating room, which the IME agreement prohibited, or elsewhere).

82.     Many of the patients for which SpineFrontier medical devices were used were covered by a government health-care program, including federal and state benefit programs such as Medicare, TRICARE, and Medicaid.

83.     Surgeons who are IME Consultants, in addition to Physician Defendants, include those listed as such in Exhibit F (listing at least 34 IME Consultants); *see also* Exhibit A.

84.     In an email dated June 4, 2014, Dr. Chin, discussing several Physician

Defendants, states "we are in [the] Ohio Health System with [Drs.] Josue Gabriel, Paul DeGenova and Joseph Shehadi." In another email to SpineFrontier's legal counsel, Dr. Chin states that "Dr. Gabriel, Dr. Shehadi, etc. are using us."

85. For years, even before the creation of IME, the other Manufacturing Defendants engaged in financial arrangements and agreements with physicians (similar to the IME consulting agreements) whereby the physicians hired by Defendants would use SpineFrontier's medical devices in their surgeries.

86. The medical device products that Defendants characterize as being reviewed and evaluated by IME Consultants include those produced by SpineFrontier. For SpineFrontier cervical products, these include Arena-C, Invue, Invue Max, and Inset. For SpineFrontier biologics products, these include DBM Pure Micro, DBMPure Macro, Cancellous MORSelized, DBMForm, FacetFuse-Allo, Arena-L Allo, and Cervical Allograft. For SpineFrontier lumbar products, these include Arena-L, S-Lift, P-Lift, T- Lift, E-Lift, FacetFuse, PedFuse Return, PedFuse Respond, PedFuse Reset, PedFuse Remind, MISquito, InSpan, and InSpan Slimm.

87. Between 2005 and 2014, the United States Patent Office granted 25 patents to SpineFrontier, many of which concern its spine-related medical devices.

88. Although Defendants describe the alleged purpose of the consulting agreements as providing consulting work for IME as described above, most of the time no consulting work is provided. Rather, approximately eighty percent of the time, IME Consultants, acting on behalf of SpineFrontier, perform surgeries involving its medical devices, but do not provide any follow-up product review, feedback or evaluation, or other consulting work. In turn, IME pays the Consultants for this work without requiring any such product evaluation, review or feedback. For

example, pursuant to a formula for surgical procedures involving SpineFrontier medical devices, IME pays a fee for cervical cases based on an estimated one-hour rate, and for lumbar cases based on an estimated two-hour rate – as notes, for most cases without any corresponding product review. In other words, the IME Consulting positions essentially are sham consulting jobs that are intended to operate as channels for selling SpineFrontier's medical devices for use in spine-related surgeries on the patients of the IME Consultants.

89.     While Defendants purport to compensate the IME Consultants for consulting services, the Defendants in fact made these payments, and conferred other benefits upon them, as kickbacks to induce the IME Consultants to use SpineFrontier medical devices in the surgeries performed on the IME Consultants' clients – i.e., the physician is paid a kickback for each procedure he or she performs where a SpineFrontier medical device is implanted in a patient. These kickbacks were a substantial factor in causing the IME Consultants, acting on behalf of the owner of SpineFrontier, to use SpineFrontier medical devices in their surgeries.

90.     As an example of the involvement of SpineFrontier medical devices in surgeries performed by IME Consultants as part of their paid "consulting" work, in a September 2, 2014 email to SpineFrontier executive staff members concerning Dr. Jacob Rosenstein, an IME Consultant, Dr. Chin states "Please let surgeons know if they are only doing pedicles screws they cannot bill for a full hour per me unless more than one level…otherwise they will consult on the interbody and with us on the screws and double dip which will raise a red flag."

91.     In a September 2, 2014 email from Aditya Humad, the President and Chief Financial Officer of SpineFrontier, to Dr. Chin, Humad notes that a physicians' organization, Your Extra Hands Surgical Services ("YEHSS"), located in Normal, Illinois, "receives $3,200

per month as management fee for [SpineFrontier sales] rep (Sid covering Dr. Atwater). Sid receives $2,500 per month for coverage. Total of $5,800 per month, but Dr. Atwater has been doing 1-2 cases per month for $10-15K/month. With Dr. Atwater moving to FL, this will drop further." Another physician wants to replace Dr. Atwater and "is adamant on current arrangement of flat rate but I cannot justify the numbers given low sales volume."

92.     In an email dated September 8, 2014 from Dr. Chin to SpineFrontier executive staff members, Dr. Chin asks Kevin Chappius, a technology deployment director, to "call Dr. Bash," an IME Consultant, and states "I think we should visit with him to show the midline screw technique on a Sawbone so he can do a case in a week or so. . . . I recommend [the SpineFrontier] unilateral Remind and Inspan or FacetFuse or bilateral Remind if no spinous process or big slip or heavy patient or diabetic or smoker."

93.     In a February 25, 2015 email to Dr. Richard Francis, another IME Consultant, Dr. Chin states "I think you will want to try this [SpineFrontier] stand alone cervical cage. It is the best engineered product I have ever placed in the spine and the simplest. . . . You have to try it. . . . I expect you will want to use it all the time."

94.     On a monthly basis, Defendants tracked the number of surgical spine cases each IME Consultant performed using SpineFrontier medical devices, the sales generated by those cases, and the number of "consulting" hours submitted by the physician. Defendants entered this information into a monthly spreadsheet titled "Total Number of Surgeon Cases & Sales."

95.     To determine how much to pay a "consulting" physician, Defendants did not assess the value of the physician's feedback and did not attempt to confirm how much time the surgeon had actually engaged in consultant work. Instead, Aditya Humad gathered the monthly spreadsheet described above, and then frequently applied a formula of one hour for each cervical

case and two hours for each lumbar case. Humad did not review the phsyicians' consulting feedback (to the extent any existed) when applying this formula. Humad sometimes delegated this task of reviewing the monthly spreadsheet to a "Junior Financial Analyst" at SpineFrontier, who similarly did not review physicians' consulting feedback (to the extent any existed) when calculating how much to pay a surgeon for purported consulting. Humad instructed the Junior Financial Analyst to review and approve so-called consulting time by looking only to the volume of medical devices the surgeon had used. By email of February 12, 2015, Humad directed the Junior Financial Analyst "to review reports with me of hours submitted against the monthly sheet you prepare for all surgeons showing total cases and total sales and the[n] we review monthly so you can approve final hours online[,]"

96.     On occasion, Aditya Humad and others acting at his direction would approve consulting hours that did not perfectly align with Defendants' predetermined formulas. However, at no point did Humad, or anyone acting at his direction, review, assess, or otherwise consider any consulting feedback when determining how many hours to approve, or make any inquiry into how much time a physician had actually spent doing consulting work. In some instances, Dr. Chin and Humad advised physicians they could get more consulting hours approved overall if the physicians used more, or more expensive, SpineFrontier medical devices during spine surgeries.

97.     When a surgeon submitted "consulting" hours that exceeded the predetermined ratio of cases to hours, Defendants frequently reduced the hours to bring them into conformity with the per-surgical-case formula. As examples:

- By email dated April 7, 2014, titled "Reconciling IME hours with payments," Dr. Chin stated to Aditya Humad, IME (i.e., Vanessa Dudley), and SpineFrontier employees:

> The surgeons made a great point that we should manually reconcile their final payments with their IME numbers. So if they bill 14 hours

and we pay for 10 hours we should change their online numbers to the 10 hours and not leave a discrepancy.

- By email of October 14, 2014, Vanessa Dudley stated to Aditya Humad and another SpineFrontier employee that a physician "seemed to have discrepancies in his hours before where he had more hours than cases I believe…Would like to monitor this."

- On April 16, 2015, Dr. Chin sent an email to Aditya Humad, physician-consultant Dr. John Atwater, Vanessa Dudley, and two SpineFrontier employees stating:

> Aditya[,] Please call Dr[.] Atwater to discuss his consulting hours that is [sic] submitted online and how it matches up[.]
>
> This process is one of the easiest I am aware of among spine companies online. Because we provide our own input to sign off it completes the circle to make it true consulting activity by the paying company SpineFrontier. IME being the independent vehicle. **If there is no oversight then we all can be accused of a sham system to pay surgeons for business.** [emphasis added]

That same day, Humad spoke with Dr. Atwater and they agreed to reduce the 21.5 hours of time Dr. Atwater had submitted to 9 hours "for the 5 case evaluations done with IME for February," in order to bring the total into alignment with Defendants' predetermined ratio of cases to hours. Humad summarized this conversation in a subsequent email to Dr. Chin, Dr. Atwater, IME (i.e., Vanessa Dudley), and three SpineFrontier employees. Dudley responded to Humad via email, stating "Good job Aditya."

98.    By instructing physicians to submit hours on a per-case basis, and by enforcing pre-determined formulas when reviewing physicians' submissions, Defendants ensured they would pay consulting fees based on the volume and value of SpineFrontier medical devices the physicians used during spine surgeries, without regard for the actual time the physicians spent in consultative work (if any) or the utility of the physicians' feedback.

99.    Examples of substantial kickback payments to IME Consultants are set forth in

Exhibit B, which details the payments that were made by Defendants from IME and KIC Management Group bank accounts to the IME Consultants on their payroll. For example, IME paid Dr. F. Paul DeGenova $43,700 on January 2, 2015, $19,950 on February 9, 2015, $14,725 on March 6, 2015, and $18,525 on April 16, 2015. IME paid Dr. Josue Gabriel $34,912.50 on February 9, 2015, and $22,800 on March 6, 2015.

100.    Defendants knew that their sham consulting payments were a driving factor in the physicians' use of SpineFrontier medical devices. For example, Defendants created a spreadsheet titled "WHY Report," which detailed that "consulting was a primary reason for many physicians' use of SpineFrontier's medical devices:

| Surgeon | Hospital | Why do they use use? |
|---|---|---|
| Jeffrey Carlson, M.D. | Bon Secours Mary Immaculate | **Consulting**, told him we would develop his ideas. Wanted to be a part of something bigger, grass roots effort |
| Jeffrey Moore, D.O. | Bon Secours Mary Immaculate | **consulting**. |
| Paul DeGenova, D.O. | Grant Medical Center | **consulting**. also wants to teach other surgeons |
| Joseph Shehadi, M.D. | Grant Medical Center | **Consulting**, wants to be involved with surgeon network |
| Mike Murray, M.D. | Lawrence Hospital Center | **consulting**, and Dan Ullman is a veteran |
| Vivek Kushwaha, M.D. | Houston Orthopedic and Spine Hospital | **Consulting, value of growth**, equity |
| Jason Tinley, M.D. | USMD Ft. Worth | **consulting and business growth** potential. |
| Jason Montone, D.O. | North Ks. City Hospital | **Consulting** |
| Bonaventure Ngu, M.D. | Indirect | converted from alphatec. **consulting**. Outreach work in Africa and support while he brings his business to the surgery center |
| Matthew Wasserman, M.D. | Memorial Hermann Katy | **Consulting**, teaching opportunities |
| Jacob Rosenstein, M.D. | USMD Arlington | Was looking for a new cervical plate option. Scott Autrey cold called and discovered that need. Dr. Rosenstein was eager to work with our design team to create an ideal |

| | | |
|---|---|---|
| | | multi-level cervical plate. **Consulting revenue was also very appealing to him**. He liked our one-level cervical plate and we promised to make him a TLIF inserted and to design a multi-level cervical plate |
| John Atwater, M.D. | | **consulting**, said we would use his neural monitoring company and Kyle Black's PA-on-demand service |
| Agha Khan, M.D. | Maryland General Hospital | **consulting** opportunities. Told him we'd host 5 labs per year at his facility. Also told him we'd help him bring better surgical care to Africa. |
| Dhruv Pateder, M.D. | Reston Medical Center | **Consulting opportunites** |

[emphasis added; excerpts from original]

101.    Defendants imposed no substantive qualifications or prerequisites before a physician could sign up as a consultant. Rather, Defendants encouraged all physicians who used SpineFrontier's medical devices to be "consultants."

102.    Further, Defendants did not truly seek expert consulting feedback from accomplished and experienced physicians. Indeed, Defendants even discussed offering IME consulting agreements to medical school residents in an effort to expand SpineFrontier's revenue potential once the residents graduated.

### C.  IME'S ON-LINE WEB PORTAL AND CONSULTANT "FEEDBACK"

103.    In order to provide IME with information regarding their consulting work,  IME Consultants, using a personalized URL and password, log onto a website provided by IME (the IME Product/System Services Form, available at IME's on-line web portal).  The URL and website is set up by a "web developer" employed by SpineFrontier.  The URL asks the Consultants to enter the date of their work involving  evaluation of medical device products

(relating to Cervical or Lumbar surgery) or other matters, the amount of time spent on each task, and the monthly number of cervical or lumbar cases evaluated. Times are split into 30 minute increments. There is a box that can be checked that states "Completed Monthly Review with CTO/Engineer for comprehensive feedback on Clients technology portfolio." But there is no provision made for the entry of the information or details regarding product review or evaluation. There are also three categories of SpineFrontier medical devices listed, each with their own individual check box, and concerning at least twenty-four such devices. The instructions state "check the box for the products you have evaluated. If product is not listed, enter the product name in 'Other Products' column."

104.     The IME Product/System Services Form, which replaced Form A, permitted physicians to input their "consulting" hours and provide written feedback on SpineFrontier's medical devices via the on-line portal. Defendants paid physicians purportedly consulting on a SpineFrontier medical device even when the physicians submitted multiple hours to IME using the Product/System Services Form but left no written feedback whatsoever in regard to the device. For example:

- Dr. Atwater entered no comments into the IME Products/Systems Services Form on six occasions over 20 months, but SpineFrontier paid him for approximately 10.5 aggregate hours of cervical time and for 39 aggregate hours of lumbar time for those occasions;

- Dr. Francis Paul DeGenova entered no comments into the IME Product/System Services Form on 12 occasions over 16 months, but SpineFrontier/IME paid him for approximately 64.5 aggregate hours of cervical time and for 230 aggregate hours of lumbar time for those occasions;

- Dr. Agha Khan entered no comments into the IME Product/System Services Form on six

occasions over 24 months, but SpineFrontier/IME paid him for approximately six aggregate hours of cervical time and for 24 aggregate hours of lumbar time for those occasions;

- Dr. Michael Murray entered no comments into the IME Product/System Services Form on 12 occasions over 28 months, but SpineFrontier/IME paid him for approximately 24 aggregate hours of cervical time and 36 aggregate hours of lumbar time for those occasions; and

- Dr. Joseph Shehadi entered no comments into the IME Product/System Services Form on eight occasions over 14 months, but SpineFrontier/IME paid him for approximately 15 aggregate hours of cervical time and for 62.5 aggregate hours of lumbar time for those occasions.

105. In other instances, Defendants paid physicians for purportedly consulting on a SpineFrontier medical device when they submitted multiple hours to IME using the Product/System Services Form but left sparse, repetitive, or trivial comments, sometimes wholly unrelated to any medical device they supposedly evaluated. For example:

- Dr. Atwater entered the comment, "Excited to continue to work with Spine Frontier" for the period of July 1, 2015 to August 11, 2015 in the IME Product/System Services Form. SpineFrontier/IME paid him for approximately eight and a half hours of lumbar time for that period;

- Dr. DeGenova entered "March 2015," "April 2015," and "May" on three consecutive monthly forms between March 1, 2015 and May 20, 2015 in the IME Product/System Services Form. SpineFrontier/IME paid him for approximately 15 aggregate hours of cervical time and for 107 aggregate hours of lumbar time for these occasions;

- Dr. Khan entered "will continue to evaluate products" and "will continue to evaluate and use products" on 18 occasions over 24 months in the IME Product/System Services Form. SpineFrontier/IME paid him for approximately 10 aggregate hours of cervical time and 24 aggregate hours of lumbar time for these occasions; and

- Dr. Shehadi entered "[t]here were 9 cases this month. Not 7" for the period November 1, 2014 to December 4, 2014 in the IME Product/System Services Form. SpineFrontier/IME paid him for approximately one hour of cervical time and nine hours of lumbar time for that period. He also entered "12 cases in total" for the period of December 1, 2014 to January 4, 2015 in the IME Product/System Services Form. SpineFrontier/IME paid him for approximately two hours of cervical time and 12 hours of lumbar time for that period.

106. In the event a physician provided some substantive feedback, Defendants showed no interest in same. When a physician comments on a SpineFrontier medical device using the IME Product/System Services Form, IME did not share the feedback with SpineFrontier and its engineers, the SpineFrontier employees who supposedly needed the feedback to enable modification or improvement to SpineFrontier's medical devices. Thus, by email of December 10, 2015, a SpineFrontier sales representative observed to a SpineFrontier mechanical engineer that "no one was paying attention" to the feedback offered by a physician on the Form.

107. Some physicians gave in-person verbal feedback regarding SpineFrontier medical devices to SpineFrontier's sales representatives and engineers. However, even in such instances, the hours these physicians submitted often far exceeded the actual time spent consulting or providing feedback to SpineFrontier sales representatives and engineers. Aditya Humad, and other working at his direction, did not seek confirmation from the SpineFrontier's sales representatives and engineers as to whether the physicians provided any verbal feedback, let

alone whether the hours the surgeons submitted properly corresponded to the time the SpineFrontier sales representatives or engineer spent receiving verbal feedback from the physician regarding the medical devices. Further, Defendants did not require SpineFrontier sales representatives and engineers to report the time they spent with physicians receiving verbal feedback in regard to the medical devices.

108.    Defendants paid many physicians for evaluating the same SpineFrontier medical device on numerous occasions, even when the device was simple, stable, or relatively rudimentary (*e.g.*, a pedicle screw used in lumbar or cervical spine surgeries). For example:

- Dr. DeGenova "evaluated" more than 100 PedFuse Remind pedicle screws in 2014, and more than 255 of the same screws in 2015, in addition to several other SpineFrontier products. In 2014 and 2015 combined, Defendants paid Dr. DeGenova $243,110 in "consulting" fees for 80.5 hours of cervical product evaluation time and 367 hours of lumbar product evaluation time. Dr. DeGenova, however, performed minimal or no consulting work for IME and/or SpineFrontier in exchange for these payments.

- Dr. Shehadi "evaluate" approximately 96 PedFuse Reset pedicle screws in 2014 and 58 in 2015, in addition to several other SpineFrontier products. In 2014 and 2015 combined, Defendants paid Dr. Shehadi $61,037.50 in "consulting" fees for 18 hours of cervical product evaluation time, and 106 hours of lumbar product evaluation time. Dr. Shehadi, however, performed minimal or no consulting work for IME and/or SpineFrontier in exchange for these payments.

- None of the Defendants followed up with SpineFrontier sales representatives, SpineFrontier engineers, or the physicians themselves to determine whether any of the hours the physicians submitted to IME captured the time physicians *actually* spent

consulting or evaluating SpineFrontier medical devices. Rather, as described above,

Defendants reviewed the physicians' number of surgical spine cases in which

SpineFrontier medical devices were used (and the total sales generated by those cases)

against the number of hours submitted to determine how much to pay the "consulting"

physicians.

### D. RECRUITMENT EFFORTS BY IME CONSULTANTS TO BUILD DEFENDANTS' BUSINESS

109.    The services performed by IME Consultants include efforts to recruit other

surgeons to join IME as a consultant, and the promotion of Manufacturing Defendants'

medical device products, investment opportunities in Manufacturing Defendants' businesses, and

job opportunities as an IME Consultant or surgeon with LESSurgeons Institute, in violation of

federal law. IME Consultants are rewarded with bonuses for successfully recruiting other

surgeons to become IME Consultants.In connection with recruiting surgeons, Dr. Chin stated

in a March 26, 2015 email (copied to SpineFrontier executives) that "[w]e need to blow out

sales [of our products] by simply letting young surgeons know we are the next big deal and

they should check us out. We feel [']fellows['] are ripe to try something new and we are

[']it[']."

110.    In an email dated July 24, 2014 from Dr. Jason Tinley to Aditya Humad and

Dr. Chin, Tinley inquires "[w]hat sort of compensation is appropriate for me getting other

surgeons involved?  I have 15 or so that would be good candidates for LES, SF, and LESS

Institute in addition to my own 2 other guys." In response, Humad advises Tinley that "[a]s a

Board Member, we will pay you a discretionary bonus per quarter. The executive team will

discuss this with you personally and confidentially."

111.    LESSurgeons Institute is another part of Defendants' recruitment of physicians

into their kickback scheme. The LESSurgeons Institute is a single member LLC that is owned by KICVentures. It provides spine and orthopaedic treatments (surgical procedures) through a surgeon network. LESSurgeons pays the surgeons with money provided by patients, including cash and proceeds from personal injury settlements.

112.    Surgeons hired by LESSurgeons are also encouraged to become partners and receive bonuses by recruiting other surgeons. For example, surgeons performing work for it earn as much as $1 million in bonuses merely by bringing other surgeons into the LESSurgeons Institute that provide substantial revenue to the company.

113.    In an email dated December 26, 2014 concerning the subject of incentivizing surgeons to network for LESS Institute and SpineFrontier, Lucas Diehl, a Field Clinical Engineer for SpineFrontier, asks Aditya Humad "what kind of bonus could we offer [surgeons] for introducing us to a new user? It would probably be especially powerful to offer to graduating fellows, since they're likely to get excited about making a quick lump sum." In response, Humad responded that "[s]urgeons already [working for] LESSi will do this as being part of the company and have bonuses based on company performance."

114.    In an email dated March 15, 2015 from Dr. Kingsley Chin to Jake Lubinski, the Chief Operating Officer at SpineFrontier, other executives, and "Surgeon[s]," Dr. Chin discusses his preferred sales technique of "cold calling" by sales representatives on physicians, and states that he "added our LES surgeons on the email because they are going to be one of our most formidable weapons to bring on more surgeons through viral marketing."

115.    As part of the hiring process with LESSurgeons Institute, a "Non-Binding Letter of Intent" is sent to the prospective surgeon, in which it is stated that "[t]he intention is for [LESS Institute] members to secure a pipeline of patients." Such letters have offered

"partnerships," issuance of a "LESS Institute AMEX card for expenses," "Medical Malpractice Insurance coverage," and the cost of a medical license to practice in a LESS Institute location. The job duties listed in the "letter" include "[c]ollaborat[ing] with our internal research organization to become a prolific researcher *without personally writing papers*." [emphasis added]

116.     Surgeons hired by LESSurgeons Institute sign a Professional Services Agreement and agree to provide clinical and ambulatory spine-related surgery services on behalf of LESSurgeons Institute or LESS Institute Clinical, PLLC. The Agreement states that surgeons who are hired "provide clinical and ambulatory surgery services on behalf of the Company." The surgeons who sign the agreement are paid a range of fees depending upon the type of spine surgery performed. As part of the Agreement, LESSurgeons Institute or LESS Institute Clinical, PLLC agrees to provide SpineFrontier medical devices to the surgeons. The Agreements are processed by the Human Resources Manager for KICVentures.

### E.  THE IME CONSULTANT AGREEMENTS DO NOT FALL WITHIN THE SAFE HARBOR PROVISIONS OF THE ANTI-KICKBACK STATUTE OR STARK LAW

117.     The arrangement described in the IME consulting agreements was a fiction. The Defendants did not enforce the IME consulting agreement as written and ignored many of its provisions in practice. Nor did the Defendants operate and manage IME and SpineFrontier as separate entities, despite expressly describing them as such.

118.     The IME consulting agreements do not fall within the safe harbor provisions set forth by the Anti-Kickback statute's regulations.

119.     The IME consulting agreements do not set forth whether the term of employment is for not less than one year.

120. The IME consulting agreements do not set forth in advance the aggregate amount of compensation paid to the consultant over the term of his employment, but instead indicate that IME Consultants are paid on an hourly rate basis, depending upon the type of service provided or the type of surgery provided (all of which involved SpineFrontier medical devices). Thus, since the hours of service can vary, the compensation arrangement does not qualify for safe harbor protection.

121. The IME consulting agreements are intended to provide for services on a periodic, sporadic or part-time basis, rather than on a full-time basis, and they fail to specify exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

122. Although the IME consulting agreements provide that the consulting duties "will not include surgical time utilizing and/or implanting spinal products," the IME Consultants' actual job duties, for which they are compensated by IME, include performing such surgical work involving SpineFrontier medical devices. Thus, the IME consulting agreements do not cover all of the services the Consultants provide for the term of their agreements and do not specify the services to be provided by the Consultants.

123. The aggregate services performed under the IME consulting agreements by the IME Consultants exceed those which are reasonably necessary to accomplish the commercially reasonable business purposes of the IME consulting service. As set forth above, IME Consultants perform as part of their job duties surgeries involving SpineFrontier products and attempt to recruit other surgeons to join IME as a Consultant.

### F. DEFENDANTS' CONDUCT WAS AIMED AT SHIELDING THEIR VIOLATIONS OF FEDERAL LAW

124. One of the central underpinnings of Defendants' kickback scheme is that none of

the consulting agreements and related remuneration through which IME enters with Physician

Defendants and numerous other surgeons and puts on their payroll are disclosed as required

under federal law. Specifically, the compensation and other forms of remuneration that are

received by those surgeons who work for IME are not reported, as required by the Physician

Payments Sunshine Act.

125.    In this regard, the purpose of IME and the consultancy agreement scheme is not

only to grow the revenues of Defendants' business, but also to avoid having to disclose the

involvement of KICVentures and SpineFrontier in the scheme, and to avoid compliance with the

reporting requirement of the Physicians Payment Sunshine Act, 42 U.S.C. § 1320a-7h. In fact,

none of the Consultant fees paid by IME are reflected in the database created as part of the

Sunshine Act and as required by that law. Defendants were required to report, by March 31,

2014, such payments or transfers of value for the last five months of 2013, the first reporting

cycle, and by March 31, 2015, for payments or transfers of value during the year 2014, the

second reporting cycle. Defendants did not comply with these requirements. By avoiding

compliance with the Sunshine Act, which would have disclosed Defendants' financial

arrangements with IME Consultants, Defendants sought to avoid liability under the False Claims

Act, the Stark Law, and the Anti-Kickback statute.

126.    In a SpineFrontier advertisement for IME Consultant positions circulated by

SpineFrontier sales representatives to surgeons, the advertisement states that "[w]e have recently

signed an agreement with Impartial Medical Experts (IME) to have surgeons consult for

[SpineFrontier]. Therefore, you would sign up as a consultant with them and consult for one of

their clients, SpineFrontier. This protects you from the Sunshine Act and OIG [Office of

Inspector General], by not having to disclose working directly with a single device company and

receiving anything directly from them." The advertisement further states "Consultants are through a 3rd party (IME), protecting you from disclosing consulting with a specific company." This advertisement also sets forth the "Benefits" to joining IME, including "[a]ll the benefits SpineFrontier offers additionally to surgeons" and the "[o]pportunity to make over $150,000 annually."

127.    On or about October 20, 2014, in an email to SpineFrontier staff members that discusses this advertisement, Dr. Kingsley Chin states that "[t]his letter would have a better feel without mentioning OIG and Sunshine Act."

128.    In a September 23, 2014 email responding to a surgeon's concern that "the association between SpineFrontier and IME is to[o] close," Aditya Humad states that "we decided to have it through IME so no direct payments come from SF just as an added layer of separation."

### G.  DEFENDANTS INDUCED PHYSICIANS TO PARTICIPATE IN THE KICKBACK SCHEME WITH INCENTIVES THAT INCLUDED ROYALTY PAYMENTS AND BOARD POSITIONS

129.    Another aspect of the scheme involves inducements to surgeons in the form of Defendants' payment of royalty payments and positions on the boards of Defendants' companies.  Specifically, selected physicians are invited to join one of the Defendants' Boards (i.e., the Clinical Advisory Board ("CAB"), Strategic Medical Advisory Board ("SAB"), and Executive Advisory Board ("EAB")).  Such individuals are also given royalty agreements, which entitles them to a share of profits on specific SpineFrontier products, ranging from approximately a 0.5% to 1% royalty percentage, and "10,000 units" as part of the membership on SpineFrontier's CAB. The royalty agreements are developed by Dr. Chin. In the event that SpineFrontier becomes a public company, Defendants proposed that each of the Boards would be

allotted approximately 15% of the shares in SpineFrontier (split among the respective Board members) from SpineFrontier's revenue.

130.    Most of the surgeons who sign or are given royalty agreements with Defendants do not perform any design or development work on, or in connection with, the SpineFrontier medical devices to which the agreements relate. There is no transfer of intellectual property between a physician who signs a royalty agreement and Defendants. The agreements that most of the surgeons are parties to involve SpineFrontier medical device products that are already designed, developed, and on the market and selling. Moreover, many of the surgeons who are parties to the royalty agreements are not listed as owners of the medical devices. The only owners listed for the medical devices produced by SpineFrontier are Dr. Chin and a select handful of other individuals.

131.    The royalty agreements do not set forth in advance the aggregate amount of compensation paid to the surgeons who receive them, but instead indicate that the royalties are paid to surgeons as a percentage of the profits from sales of SpineFrontier medical devices.

132.    The purpose of the royalty agreements is to motivate surgeons to use SpineFrontier's medical devices. In a KICVentures executive summary, Defendants observe that "surgeons see a royalty agreement from these [large public, competitor] companies as the ultimate value and a compliant way to be paid for their loyalty."

133.    In an email dated August 28, 2014, from Seth Jacknowitz, a SpineFrontier Territory Manager for South Florida, Mr. Jacknowitz discusses his meeting with the contract administrator of the Carilion Clinic in Roanoke, Virginia, in which he explained which SpineFrontier products Dr. Caleb Behrend and his partner Dr. John Carmouche want to use at the Clinic. Mr. Jacknowitz explains that Dr. Behrend "wants to use us in small non deformity cases

and…as his 'LES surgery' option. This will be 1 to 2 level lumbar and cervical…Dr. Behrend…will not give us 100% of his business, but he definitely will use us regularly." In response, Dr. Chin directed Mr. Jacknowitz to "[o]ffer his partner and himself royalty agreements and [an] IME [consulting agreement]."

134.   In an August 9, 2014 email to executive staff members, Dr. Chin discusses Dr. Darren R. Lebl of New York as "a very important surgeon for us to partner with." Dr. Chin notes that Lebl had been given a Clinical Advisor Agreement, and directs that SpineFrontier "[s]end him a portfolio of our products he can understand and appreciate. Send him a royalty agreement on our pedicles screw reset system. Dr. Lebl can be an ambassador to get other surgeons to join us. He will also head up the LES Society Local Manhattan Chapter." Dr. Chin also states: "he needs a great [SpineFrontier sales] rep to cover his cases."

135.   In an email dated August 6, 2014 from Dr. Chin to Aditya Humad, Dr. Chin directs Mr. Humad: "Please send Dr. Ghiselli [an IME Consultant] a royalty agreement in the Inset plate."

136.   In an email dated August 8, 2014 to Dr. Bonaventure Ngu, an IME Consultant, Mr. Humad states: "I wanted to follow-up on the TLIFT Royalty Agreement for 0.5% and the 10,000 units granted as part of your membership to Spinefrontier's CAB [Clinical Advisory Board]. Latest copies of both documents are uploaded to your personal profile."

137.   In an email dated March 15, 2015 to executive staff members and select physicians working for LESS Institute, Dr. Chin highlights his preferred method of calling by sales representatives on physicians (involved in minimally invasive surgery ("MIS")) in connection with SpineFrontier medical devices. The sales script he quotes states, in part, "If you accept our invitation [to look at our MIS portfolio or to join our Perc Screws development

team], you would be among 20 select MIS surgeons and you will receive $2 M in royalty milestone payments."

## H. EXAMPLES OF DEFENDANTS' KICKBACK-TAINTED RELATIONSHIPS WITH PHYSICIANS

138. Based on guidelines that SpineFrontier, Dr. Chin, and Aditya Humad communicated to them, Drs. Atwater, DeGenova, Khan, Murray, and Shehadi admitted to reporting consulting hours to IME materially in excess of the number of hours they actually spent engaged in consultative activities, and admitted that Defendants paid each for consulting hours he did not work. Consequently, Drs. Atwater, DeGenova, Khan, Murray, and Shehadi reached settlements with the United States of America and executed Settlement Agreements for their respective roles in the misconduct. Drs. Atwater, DeGenova, Khan, Murray, and Shehadi further admitted that SpineFrontier, Dr. Chin, and Aditya Humad, respectively, told them that they could bill a per-case rate, usually (although not always) one hour whenever they used any SpineFrontier cervical spine medical device, and usually (although not always) two hours whenever they used any SpineFrontier lumbar spine medical device, ostensibly for "evaluations" of those medical devices, but regardless of the actual amount of hours (if any) they spent consulting. SpineFrontier and IME paid Drs. Atwater, DeGenova, Khan, Murray, and Shehadi even when they provided only minimal or no substantive feedback to SpineFrontier.

139.     Drs. Atwater[6], DeGenova[7], Khan[8], Murray[9], and Shehadi[10] also admitted that Defendants never asked them to provide more consultative work or expressed any dissatisfaction with their performance as consultants, even when SpineFrontier paid for product evaluations that contained minimal or no substantive content.

### 1.  Dr. John Atwater

140.     Dr. John Atwater is an orthopedic surgeon who is currently practicing in Florida and who previously practiced in Illinois.

141.     During June 2013, SpineFrontier and Dr. Atwater discussed a direct consulting agreement under which SpineFrontier would have paid Dr. Atwater at a rate of $500 per hour. Before the parties executed such an agreement, SpineFrontier informed Dr. Atwater that it had "outsourced" its consulting services to IME, and IME and Dr. Atwater entered into a consulting agreement on or about October 17, 2013.

142.     According to data that Defendants submitted to the Open Payments program[11], between January 1, 2014, and December 31, 2014, SpineFrontier paid Dr. Atwater through IME, a total of approximately $13,775 in purported consulting fees. During this time, Dr. Atwater used SpineFrontier medical devices in surgical procedures reimbursed by Federal health care

---

[6] SpineFrontier paid Dr. Atwater$13,775 in consulting fees between January 1, 2014, and December 31, 2014.
[7] SpineFrontier paid Dr. DeGenova $243,200 in consulting fees between January 1, 2014, and July 31, 2015.
[8] SpineFrontier paid Dr. Khan $146,925 in consulting fees between March 15, 2013, and December 31, 2017.
[9] SpineFrontier paid Dr. Murray $86,925 in consulting fees between July 1, 2013, and December 31, 2017.
[10] SpineFrontier paid Dr. Shehadi $61,037.50 in consulting fees between June 1, 2014, and December 31, 2015.
[11] Aditya Humad oversaw SpineFrontier's submission of data to the Open Payments program with respect to every doctor to whom SpineFrontier made payments, including Drs. Atwater, DeGenova, Khan, Murray, and Shehadi.

programs, including Medicare.

143.    Aditya Humad informed Dr. Atwater that he could bill SpineFrontier, via IME, a flat rate of one hour whenever he used a SpineFrontier cervical medical device and two hours whenever he used a SpineFrontier lumbar medical device.

144.    Dr. Atwater did as Humad instructed. Based upon Humad's instructions, Dr. Atwater billed SpineFrontier for consulting hours materially in excess of the number of hours in which he actually performed consultative activities.

145.    Defendants paid Dr. Atwater consulting fees even when Dr. Atwater provided minimal or no consulting feedback on SpineFrontier's products. Moreover, Defendants never communicated to Dr. Atwater that his purported consulting work was unsatisfactory, even when SpineFrontier paid Dr. Atwater for medical device "evaluations" with minimal or no substantive content. Defendants' decision to pay Dr. Atwater even though he submitted hours that frequently reflected no consulting work was consistent with Humad's instruction to Dr. Atwater that SpineFrontier would pay Dr. Atwater based on the number and type of cases he performed.[12]

### 2. Dr. Francis Paul DeGenova

146.    Dr. Francis Paul DeGenova is a surgeon based in Columbus Ohio.

147.    On February 14, 2013, SpineFrontier and Dr. DeGenova entered into a direct consulting agreement. On October 3, 2013, SpineFrontier informed Dr. DeGenova that it was "outsourcing" its consulting agreement to IME based on concerns regarding the Open Payments

---

[12] SpineFrontier, acting via Dr. Chin and Aditya Humad, also paid Dr. Atwater a kickback to another entity he owned, known as Your Extra Hands Surgical Services, LLC ("YEHSS"). Pursuant to a sham agreement between SpineFrontier and YEHSS, SpineFrontier paid YEHSS $3,200 a month between March and October 2014. Dr. Atwater admits that YEHSS did not provide services worth $3,200/month to SpineFrontier, that SpineFrontier was aware YEHSS was not providing such services, and that SpineFrontier nevertheless did not communicate any dissatisfaction with YEHSS.

program and HHS-OIF's POD Special Fraud Alert; however, Aditya Humad also told Dr. DeGenova that SpineFrontier decided to change from SpineFrontier's consulting agreement to the IME consulting agreement because of an accounting or bookkeeping issue. In late 2013, IME and Dr. DeGenova entered into a consulting agreement.

148.    According to data that Defendants submitted to the Open Payments program, between January 1, 2014, and July 31, 2015, SpineFrontier paid Dr. DeGenova, through IME, a total of $243,200 in purported consulting fees. During this time, Dr. DeGenova utilized SpineFrontier products in surgical procedures reimbursed by Federal health care programs, including Medicare.

149.    Dr. Chin and Aditya Humad told Dr. DeGenova that he could bill one hour of consulting time for a cervical surgery using SpineFrontier medical devices and two hours of consulting time for each lumbar procedure using SpineFrontier medical devices.

150.    Dr. DeGenova did as Dr. Chin and Humad instructed. Based upon the instruction that Dr. Chin and Humad provided, Dr. DeGenova billed SpineFrontier for consulting hours materially in excess of the number of hours in which he actually performed consultative activities. As a general matter, in calculating his purported consulting hours, Dr. DeGenova tallied the number of cervical and lumbar procedures he performed each month using SpineFrontier medical devices and multiplied those numbers according to Defendants' formula – one hour for ervical, two hours for lumbar – to calculate the "consulting" time he submitted to IME using the IME Product/System Services Form each month.

151.    Defendants paid Dr. DeGenova consulting fees even when Dr. DeGenova provided minimal or no consulting feedback on SpineFrontier's medical devices. Furter, Defendants never communicated to Dr. DeGenova that his purported consulting work was

unsatisfactory, even when SpineFrontier paid Dr. DeGenova for medical device evaluations with minimal or no substantive content. Defendants' decision to pay Dr. DeGenova even though he submitted hours that frequently reflected no consulting work was consistent with Dr. Chin's and Aditya Humad's direction to Dr. DeGenova that SpineFrontier would pay him based on the number and type of cases he performed.

### 3. Dr. Agha Khan

152.    Dr. Agha Khan is a neurosurgeon practicing in Maryland.

153.    On or about March 15, 2013, SpineFrontier and Dr. Khan entered into a direct consulting agreement. Pursuant to the March 15, 2013 agreement, SpineFrontier agreed to pay Dr. Khan at a rate of $500 per hour.

154.    On or about October 4, 2013, SpineFrontier informed Dr. Khan that it had "outsourced" its consulting services to IME. On or about April 1, 2014, IME and Dr. Khan signed an IME consulting agreement.

155.    According to data that Defendants submitted to the Open Payments program, between March 15, 2013, and December 31, 2018, SpineFrontier paid Dr. Khan directly, and indirectly through IME, a total of $146,925 in purported consulting fees. During this time, Dr. Khan used SpineFrontier medical devices in surgical procedures reimbursed by Federal health care programs, including Medicare.

156.    SpineFrontier informed Dr. Khan that he could bill SpineFrontier , via IME, a flat rate of one hour whenever he used a SpineFrontier cervical device and two hours whenever he used a SpineFrontier lumbar device.

157.    Dr. Khan did as SpineFrontier directed. Based upon the SpineFrontier instruction, Dr. Khan billed SpineFrontier for consulting hours materially in excess of the number of hours in

which he actually performed consultative activities.

158.   SpineFrontier assured Dr. Khan that it was simply paying him consistent with the agreed-upon ratio of payments to SpineFrontier medical devices used. For example, by email of on or about January 24, 2016, SpineFrontier's Chief Sales Officer stated to Aditya Humad:

> It looks like you are correct that Dr[.] Khan is submitting too many hours relative to the number of cases that he is doing, as you can see in my attached analysis. I ran a scenario assuming that he might have done an average of 1.5 hours of consulting per case. Even though [sic] the two are not related, **its [sic] the only proxy I can use for his level of activity.** Based on that assumption, we would owe him for about 54 hours or $25,650.
>
> I will make sure that Dr[.] Khan understands how the consulting works so that he doesn't continue to submit too many hours moving forward. [emphasis added]

The "attached analysis" demonstrated that Defendants determined Dr. Khan's "consulting" fees by comparing the number of cases in which he used SpineFrontier medical devices against his submitted hours, and only "approved" hours for payment in line with the agreed-upon ration – and not based on any consulting work that Dr. Khan did (or did not) do.

159.   Defendants paid Dr. Khan consulting fees even when Dr. Khan provided only minimal or no substantive feedback to SpineFrontier. Furthermore, Defendants never communicated to Dr. Khan that his purported consulting work was unsatisfactory, even when they paid Dr. Khan for medical device evaluations with minimal or no substantive content. Defendants' decision to pay Dr. Khan even though he submitted hours that frequently reflected no consulting work was consistent with SpineFrontier's instruction to Dr. Khan that it would pay him based on the number and type of cases he performed.

### 4. Dr. Michael Murray

160.   Dr. Michael Murray is an orthopedic surgeon practicing in New York.

161.    On or about July 1, 2013, SpineFrontier and Dr. Michael Murray entered into a direct consulting agreement. Pursuant to the July 1, 2013 agreement, SpineFrontier agreed to pay Dr. Murray at a rate of $500 per hour.

162.    On or about October 5, 2013, SpineFrontier informed Dr. Murray that it had "outsourced" its consulting services to IME. IME and Dr. Murray entered into an IME consulting agreement in or about February 2014.

163.    According to data that Defendants submitted to the Open Payments program, between July 1, 2013, and December 31, 2017, SpineFrontier paid Dr. Murray directly, and indirectly through IME, a total of $86,925 in purported consulting fees. During this time, Dr. Murray used SpineFrontier medical devices in surgical procedures reimbursed by Federal healthcare programs, including Medicare.

164.    SpineFrontier informed Dr. Murray that he could bill SpineFrontier, via IME, a flat rate of one hour whenever he used a SpineFrontier cervical device and two hours whenever he used a SpineFrontier lumbar device.

165.    Dr. Murray did as SpineFrontier instructed. Based upon SpineFrontier's instruction, Dr. Murray billed SpineFrontier for consulting hours materially in excess of the number of hours in which he actually performed consultative activities.

166.    Defendants paid Dr. Murray consulting fees even when Dr. Murray provided only minimal or no substantive feedback to SpineFrontier. Further, Defendants never communicated to Dr. Murray that his purported consulting work was unsatisfactory, even when they paid Dr. Murray for medical device evaluations with minimal or no substantive content. Defendants' decision to pay Dr. Murray even though he submitted hours that frequently reflected no consulting work was consistent with SpineFrontier's instruction to Dr. Murray that it would pay

DR. Murray based on the number and type of cases he performed.

### 5. Dr. Joseph Shehadi

167.    Dr. Joseph Shehadi is a neurosurgeon practicing in Ohio.

168.    Dr. Shehadi first heard about SpineFrontier from a colleague in Ohio in early 2014. After IME sent him an invitation to become a consultant, IME and Dr. Shehadi signed an IME consulting agreement on or about June 1, 2014. Under the June 1, 2014 agreement, Defendants agreed to pay Dr. Shehadi at a rate of $500 per hour.

169.    According to data that Defendants submitted to the Open Payments program, between June 1, 2014, and December 31, 2015, SpineFrontier paid Dr. Shehadi, through IME, a total of $61,037.50 in purported consulting fee. During this time, Dr. Shehadi used SpineFrontier medical devices in surgical procedures reimbursed by Federal health care programs, including Medicare.

170.    Aditya Humad informed Dr. Shehadi that he could bill SpineFrontier, via IME, a flat rate of one to one-and-one half hours whenever he used a SpineFrontier cervical device and two hours whenever he used a SpineFrontier lumbar device.

171.    Dr. Shehadi did as Humad directed. Based upon the instruction that Humad gave him, Dr. Shehadi billed SpineFrontier for consulting hours materially in excess of the number of hours in which he actually performed consultative activities.

172.    At certain times, Defendants did not pay Dr. Shehadi for the full amount of hours he submitted to IME via the Product/Systems Services Form. In response to Dr. Shehadi's inquiries concerning the discrepancy in compensation, Humad told Dr. Shehadi that he did not use enough of SpineFrontier's products to justify his consulting hours. Humad further communicated to Dr. Shehadi that, if Dr. Shehadi used more SpineFrontier products, then

SpineFrontier could pay him more "consulting" fees.

173.     Defendants paid Dr. Shehadi consulting fees even when Dr. Shehadi provided only minimal or no substantive feedback to SpineFrontier. Further, Defendants never communicated to Dr. Shehadi that his purported consulting work was unsatisfactory, even when they paid Dr. Shehadi for medical device evaluations with minimal or no substantive content. Defendants' decision to pay Dr. Shehadi even though he submitted hours frequently reflected no consulting work was consistent with Humad's direction to Dr. Shehadi that SpineFrontier would pay Dr. Shehadi based on the number and type of cases her performed.

## I.   DEFENDANTS' AGGRESSIVE GROWTH PLAN TO INCREASE SALES OF SPINEFRONTIER'S MEDICAL DEVICES

174.     Another aspect of the kickback scheme involves an aggressive growth plan to significantly increase the profitability of Defendants' medical devices, including the aim of the Defendants to enroll surgeons as investors in the Defendants' companies, using its "sales people" to meet with surgeons and "sell" them the investment opportunity. In a September 6, 2014 email to Aditya Humad, Dr. Chin states that he "want[s] to revisit raising money though KICVentures from surgeons. . . . A guaranteed 10% per year return is still very good with the upside formula we have."

175.     In a February 14, 2015 email exchange between Dr. Chin and Dr. Bob Barcohana, captioned "Join the Growing Investor Network in Motion Preservation," Dr. Barcohana discuss investment opportunities in AxioMed, LLC, another KICVentures portfolio company that would develop a disc replacement product. Dr. Chin asks Dr. Barcohana if he "can interest [his] investor friends," and "suggest[s] tak[ing] a loan" to invest in AxioMed and in return obtain a 5% return, and that "using [SpineFrontier Inc. to] cover the loan you don't touch your cash. . . . Get some investors we talk."

176.     In a February 18, 2015 email between Dr. Chin and Dr. Caleb Behrend, captioned "Working together Axiomed," Dr. Chin "invite[s] Dr. Behrend to the advisory board on AxioMed, and asks him "how can we get you and your partner to use us. There is a lot at stake if we don't get surgeons to come together. There is $8 B in surgeries evaporating every year and surgeons are propping up the companies making all that cash."

177.     In a March 30, 2015 email to Dr. James Fleming, Dr. Chin states: "I am attaching our executive summary so you see we are going to blue we are next. Need to get to $50 M this year could use your help. Please read and come on board."

178.     As another example of Defendants' ambitious growth plan, SpineFrontier projected that for 2014 the LESS Institute, through one surgeon, would collect $8 million and generate $40 million in receivables, and would handle 6,000 patients. It also predicted that LESS Institute would expand to 20 surgeons in 2015 handling 24,000 patients, and then to 500 surgeons in 2018 handling 600,000 patients, resulting in an estimated $1 billion in collections and $8 billion in receivables.

179.     An executive summary for KICVentures, in describing its revenue model for Defendants' businesses, including SpineFrontier, states that "[t]he goal is to get a high number of surgeons buying into what we stand for and earning over 50% of their business. We will then provide each with a direct employed service representative at a lower commission."

**J.  DEFENDANTS' SALES REVENUES OF SPINEFRONTIER'S MEDICAL
       DEVICES THROUGH THE IME CONSULTANTS**

180.     The IME Consultants employed by Defendants generated substantial revenues as a result of sales of SpineFrontier's spinal medical devices for use in surgical procedures they performed.

181.     For example, the sales revenues of Defendants' devices through the IME

Consultants amounted to $21,714,814.00 for fiscal year 2013, and $26,316,200.00 for fiscal year 2014. Exhibit C.

182.    As for representative examples involving individual physicians working as IME Consultants, revenue from sales of SpineFrontier devices in fiscal year 2014 through Dr. Josue Gabriel of Columbus, Ohio, amounted to $3,701,510.00. Exhibit C.

183.    Revenue from sales of SpineFrontier medical devices in fiscal year 2014 through Dr. Jeffrey R. Carlson of Newport News, Virginia, amounted to $2,393,962.00. Exhibit C.

184.    Revenue from sales of SpineFrontier medical devices in fiscal year 2014 through Dr. Vivek Kushwaha of Houston, Texas, amounted to $2,142,417.00. Exhibit C.

185.    Revenue from sales of SpineFrontier medical devices in fiscal year 2014 through Dr. F. Paul DeGenova of Columbus, Ohio, amounted to $1,258,995.00. Exhibit C.

186.    Other such representative examples of revenue from sales of SpineFrontier medical devices through IME Consultants are set forth in Exhibit C.

**K.  RELATOR #1'S ATTEMPTS TO REFORM SPINEFRONTIER**

187.    As part of his employment with SpineFrontier, Relator #1's job was to manage the company's sales business. Relator #1 learned that Defendants were funneling the consulting agreements through IME in order to shield the surgeons hired by IME from having to report the consulting agreements under the Physician Payments Sunshine Act and therefore avoid liability under federal law. Relator #1 knew that Defendants were not complying with the Sunshine Act by reporting the consulting agreements and related remuneration as required by that federal law. About five months before he was terminated, as part of his effort to reform the company, Relator #1 contacted SpineFrontier's legal counsel, Paul Speidel, in an effort to alert the Defendants to

the illegal conduct associated with the kickback scheme, including the Defendants' failure to comply with the Sunshine Act.

188.    Relator #1 pushed back against the IME consulting arrangement, and advised Speidel that not reporting the consultant fees as required by the Sunshine Act was improper under federal law. Relator #1 repeated his concerns to Speidel in March 2015. Defendants, however, never responded to or addressed Relator #1's concerns.

189.    In a February 27, 2015 email, less than six weeks before he was terminated, Relator #1 brought to the attention of Ed Rule, Director of Quality and Regulatory Affairs at SpineFrontier, an email from Dr. Kingsley Chin that concerned a "stand alone cervical cage" (a SpineFrontier medical device) and that was sent by Dr. Chin to potential customer physicians of SpineFrontier. In the email, Dr. Chin urges the potential customer physicians to "try" the medical device. In his email to Ed Rule, Relator #1 expressed concern that he has "seen the [slide] images [of the procedure involving this medical device performed by Dr. Chin] being sent" by SpineFrontier to potential physician customers and that the slides involved improper "promoting off label." In an email in response to Relator #1, Rule admitted that Relator #1 was correct: "You're right, the indications are for one level between C2/C3 and C7/T1. I will start with CAPA [Corrective Preventative Action] so that this issue is properly addressed."

190.    Rather than expressing gratitude to Relator #1 for coming forward and seeking to reform the company, on April 7, 2015, SpineFrontier terminated Relator #1 in retaliation for his whistleblowing activities. The Defendants' retaliatory act was, not coincidentally, taken shortly after Relator #1 raised his concerns about the illegal conduct. Defendants' wrongful termination of Relator #1 was made in violation of the False Claims

Act's prohibition against such retaliation. *See* 31 U.S.C. § 3730(h).

## L. RELATOR #2'S ATTEMPTS TO REFORM SPINEFRONTIER

191. Within the first month of his employment, Relator #2 learned that Defendants were engaging in an illegal kickback scheme, wherein Defendants paid physicians and hospitals to use SpineFrontier's medical devices over devices manufactured by competitors, and attempted to conceal the true nature of such payments by characterizing them as consulting fees for evaluations of SpineFrontier medical devices and other consulting activities. Indeed, Dr. Chin directly instructed Relator #2 via e-mail to offer the payment of kickbacks in various forms— including offering shares in AxioMed, board positions, and consulting agreements—to generate "sales" of SpineFrontier products.

192. Relator #2 brought allegations of such wrongdoing (i.e., those relating to the Defendants' kickback scheme, off-label promotion, and lack of compliance with the Physician Payments Sunshine Act) to the attention of his supervisor, the Vice President of Sales, as well as SpineFrontier's Human Resources Manager, Michael Barbin. On or about March 27, 2022, approximately one week before he was terminated, Relator #2 told Barbin that SpineFrontier's kickback scheme was improper because it violated federal law, and that he did not feel comfortable following directions from Dr. Chin to engage in such activity.

193. Shortly after raising these concerns to SpineFrontier, on April 7, 2015, as a result of Relator #2's internal reports to SpineFrontier's Human Resources Manager, Relator #2 received a telephone call from SpineFrontier COO and AxioMed President, Jake Lubinski, wherein Lubinski abruptly terminated Relator #2's employment in retaliation for his whistleblowing activities. When Relator #2 asked Lubinski the reason for the termination, Lubinski responded that Relator #2 was being terminated "because of [his] conversation with Michael."

Approximately one week after his termination, Relator #2 was contacted by SpineFrontier and offered a severance package, which he refused to accept.

194.    The Defendants' retaliatory act was, not coincidentally, taken shortly after Relator #2 raised his concerns about Defendants' illegal conduct. Defendants' wrongful termination of Relator #2 was made in violation of the False Claims Act's prohibition against such retaliation. *See* 31 U.S.C. § 3730(h).

## M. DEFENDANTS' ILLEGAL KICKBACK SCHEME VIOLATED FEDERAL LAW

195.    Defendants' illegal kickback scheme has caused numerous false claims to be submitted to federal and state healthcare programs throughout the United States, and constitutes a violation of the Anti-Kickback and Stark statutes. Defendants' misconduct cheated the federal and state governments out of hundreds of thousands of dollars that should not have been paid, thereby illegally enriching the Defendants at taxpayer expense.

196.    At all relevant times, Defendants have known that SpineFrontier's spine- related medical devices were being paid for or reimbursed by Government Programs, including Medicaid and Medicare Parts A and B. Defendants supervised the kickback scheme and knew that Medicare, Medicaid, and other federal program beneficiaries represent a significant percentage of spine-surgery patients, and that as a result of the kickbacks, doctors across the country had performed spinal surgeries on Medicare and Medicaid patients using SpineFrontier's medical devices.

197.    Approximately eighty percent of all medical devices approved by the FDA are covered by Medicare. Moreover, Medicare spends more than $20 billion per year on Implantable Medical Devices ("IMD") as part of its Part A (hospital insurance) budget, and Part A payments increased 4.3% each year from 2004 to 2009 according to the US

Government accountability Office (cumulatively, a 52% increase since 2002). Medicare Part A payments for IMDs between 2006 and 2014 increased 32.6% alone.

198.    The largest users of medical devices are the elderly, people 65 years-old or older, who are covered by Medicare. Elderly populations (those over 65 and otherwise eligible) are the largest consumer of orthopaedic medical devices. And most spinal implant surgeries are performed to treat degenerative disease that occurs in the elderly, namely, osteoarthritis. Dr. Chin has stated that one of the reasons he founded SpineFrontier, Inc. was to expand spine surgery to treat elderly patients.

199.    Defendants knew, or reasonably should have known, that their conduct described herein would lead to the submission of claims for reimbursement by government programs that were not eligible for reimbursement. But for Defendants' illegal conduct, reimbursement for the use of Defendants' medical device products would not have occurred. As a result, Defendants have caused, and continue to cause, the submission of false claims to government programs, and they have benefited from the payment of those false claims.

200.    The fraudulent kickback scheme served its intended purpose, as it has induced physicians to seek reimbursement for surgical procedures involving Defendants' medical device products. The government programs did, in fact, reimburse those claims based on Defendants' illegal kickback scheme.

201.    The fraudulent kickback scheme has caused substantial claims for reimbursements of Defendants' medical device products to be submitted for reimbursement by Government Programs. The Government Programs did, in fact, reimburse those claims.

202.    At least in part as a result of Defendants' illegal kickback scheme, Defendants' medical device products have been heavily used for the treatment of Medicaid, Medicare Part

A, Medicare Part B, Medicare Part D, and other government program participants.

**N. DEFENDANTS' HCPCS/CPT CODES**

203.    When a healthcare provider seeks reimbursement from Medicare, it first identifies the particular reimbursement code for the drug or device prescribed. These reimbursement codes are a component of the CMS Healthcare Common Procedure Coding System ("HCPCS"), under which Current Procedural Terminology ("CPT") codes are assigned to various procedures. The HCPCS or CPT code system is designed to bill Medicare for drugs and devices that are utilized in the physician's office, clinic or at a hospital.

204.    The HCPCS or CPT codes assigned to SpineFrontier's spine-related medical devices are 22899, 22840, 22612, 22630, 22558, 22851, 20930, and 20936.

**O. PROVIDER AGREEMENTS AND HOSPITAL COST REPORTS SUBMITTED FOR REIMBURSEMENT FROM MEDICARE**

205.    In order to establish eligibility for Medicare reimbursement, health care providers and hospitals must sign mandatory Medicare Enrollment forms known as CMS 855 (the "Provider Agreement"). Within the CMS 855 form, the services rendered must be identified by entering the relevant HCPCS code. In signing the Form CMS-855, providers and hospitals agree to comply with all Medicare laws, regulations, and program instructions, including the Anti-Kickback Statute and Sunshine Act, as a precondition of Medicare payment. The certification of compliance with these requirements that is contained in the Provider Agreement and to which health care providers and hospitals attest in signing the form reads:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions

(including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I. The Provider Agreement further states that this certification is one of the "requirements that the provider must meet and maintain in order to bill the Medicare program."

206.    Hospitals, but not doctors, must submit a Hospital Cost Report along with their claim for reimbursement for Medicare. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. The Hospital Cost Report includes the following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

CMS Form 2552. The person certifying the report is required to sign a statement which reads:

> To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

207.    In reimbursing hospitals for operating costs, Medicare pays according to a per-patient standardized rate, called the Diagnostic Related Group ("DRG") rate. 42 U.S.C. § 1395ww(d)(3)(A), (D). The hospital submits a claim for a surgery by identifying the DRG associated with the surgery. The DRG reimbursement rate is "intended to fairly compensate the hospital for all costs associated with the surgery, including the medical device costs."

## P. THE PRESENTATION OF FALSE CLAIMS TO THE GOVERNMENT

208.    As part of the kickback scheme discussed above, health care providers who worked as IME Consultants for Defendants entered into such Provider Agreements, pursuant to which each provider was induced to submit at least one false claim to the Medicare Program for performing surgical procedures involving SpineFrontier's medical devices, and that was paid for by Medicare. For example, Dr. Jeffrey Carlson, an orthopaedic surgeon located in Newport News, Virginia, received, as an IME Consultant, various forms of remuneration from Defendants, including consulting fees, as discussed above. As a direct and intended result of Defendants' kickback scheme, Dr. Carlson has used a SpineFrontier medical device product while performing at least one surgery for which he sought and received Medicare reimbursement. In 2012, for example, he billed Medicare for 52 procedures involving an HCPCS code assigned to SpineFrontier medical devices (22612), and for which he sought $291,564.00 in Medicare reimbursements, and received $52,151.75 in such reimbursements. *See* Exhibit D. In 2013, he billed Medicare for 86 procedures involving HCPCS codes assigned to SpineFrontier medical devices (22612, 22851), and for which he sought $400,042.00 in Medicare reimbursements, and received $73,441.81 in such reimbursements. *See* Exhibit E.

209.    Dr. F. Paul DeGenova received, as an IME Consultant, various forms of remuneration from Manufacturing Defendants, including consulting fees, as discussed above. As a direct and intended result of Defendants' kickback scheme, Dr. DeGenova has used a SpineFrontier medical device product while performing at least one surgery for which he sought and received Medicare reimbursement. In 2012, he billed Medicare for 69 procedures involving several HCPCS codes assigned to SpineFrontier's medical devices (22612, 22840, and 22851), and for which he sought $170,858.00 in Medicare reimbursements, and received

$49,981.55 in such reimbursements. *See* Exhibit D. In 2013, he billed Medicare for 70 procedures involving HCPCS codes assigned to SpineFrontier medical devices (22612, 22840, 22851), and for which he sought $159,152.00 in Medicare reimbursements, and received $44,521.00 in such reimbursements. *See* Exhibit E.

210.    As described herein, and as further illustrated in the attached Exhibits D and E, providers employed as IME Consultants billed Medicare for surgical procedures involving SpineFrontier medical devices, and received reimbursement as the result of these false claims and the kickback scheme. The examples of Medicare claims involving SpineFrontier medical devices in Exhibits D and E are representative of the instances in which Consultants were employed by Defendants as part of a kickback scheme that entailed using SpineFrontier products in procedures involving Government Program beneficiaries, and which has results in the submission and reimbursement of false claims for such procedures.

211.    As another result of the kickback scheme discussed above, hospitals in which IME Consultants performed surgeries involving SpineFrontier's medical devices entered into the aforementioned Provider Agreements and Hospital Cost Reports, pursuant to which each such hospital submitted at least one false claim to the Medicare Program in connection with such surgical procedures involving SpineFrontier's medical devices, and for which each such hospital was reimbursed by Medicare. For example, Dr. Jeffrey Carlson performed his surgeries at Bon Secours Mary Immaculate Hospital in Newport News, Virginia. Dr. F. Paul DeGenova performed his surgeries at Grant Medical Center in Columbus, Ohio. The examples of hospitals that submitted Medicare claims involving SpineFrontier medical devices used by IME Consultants are listed in Exhibits D and E and are representative of the instances in which hospitals submitted such claims, and which resulted in the reimbursement of such

false claims for such procedures.

## VI. PHYSICIAN-OWNED DISTRIBUTORSHIPS AND RELATED INVESTIGATIONS BY THE OFFICE OF THE INSPECTOR GENERAL AND THE U.S. DEPARTMENT OF JUSTICE

### A. THE OIG'S SPECIAL FRAUD ALERT

212.    Congress established the Office of Inspector General ("OIG") in 1976 to identify and eliminate fraud, abuse, and waste in federal healthcare programs. To this end, OIG issues Special Fraud Alerts to discuss "trends of health care fraud and certain practices of an industry-wide character." 59 Fed. Reg. 65,372, 65,373 (Dec. 19, 1994). The purpose of these Alerts is "to provide general guidance to the health care industry" and offer "additional insight to the Medicare carrier fraud units in identifying health care fraud schemes." *Id.*

213.    Physician-owned distributorships ("PODs") have attracted scrutiny from Congress and the OIG of the Department of Health and Human Services for several years. On March 26, 2013, the HHS-OIG issued a Special Fraud Alert that addressed physician-owned entities that derive revenue from selling, or arrange the sale of, implantable medical devices.

214.    The OIG's Alert stated that it applies to a "'POD,'" which is defined as "any physician-owned entity that derives revenue from selling, or arranging for the sale of, implantable medical devices and includes physician-owned entities that purport to design or manufacture . . . their own medical devices or instrumentation."

215.    The OIG's Alert noted that in guidance it provided by letter in 2006, it had "noted 'the strong potential for improper inducements between and among the physician investors, the entities, device vendors, and device purchasers' and stated that such ventures 'should be closely scrutinized under the fraud and abuse laws.'"

216.    The Alert noted that "[w]hen remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated." Per the Alert:

> PODs that exhibit questionable features potentially raise four major concerns typically associated with kickbacks—corruption of medical judgment, overutilization, increased costs to the Federal health care programs and beneficiaries, and unfair competition. This is because the financial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the devices the PODs sell in lieu of other, potentially more clinically appropriate, devices. We are particularly concerned about the presence of financial incentives in the implantable medical device context because such devices typically are "physician preference items," meaning that both the choice of the brand and the type of device may be made or strongly influenced by the physicians, rather than being controlled by the hospital or ASC [ambulatory surgery center] where the procedure is performed.

OIG Special Fraud Alert, at 2.

217.    The Alert further opined: "we believe that PODs are inherently suspect under the anti-kickback statute. We are particularly concerned when PODs, or their physician owners, exhibit any of the following suspect characteristics:

. . . .

•    Physician-owners are required, pressured, or actively encouraged to refer, recommend, or arrange for the purchase of the devices sold by the POD…

•    The POD is a shell entity that does not conduct appropriate product evaluations…

## B. THE OIG'S 2013 REPORT ON SPINAL DEVICES SUPPLIED BY PODS

218.    In October 2013, the OIG issued a Report or Study entitled "Spinal Devices Supplied by Physician-Owned Distributors: Overview of Prevalence of Use." The Report responded to a congressional request (from members of the Senate Finance and Judiciary

Committees) that expressed concerns that PODs were a breeding ground for fraud and could have potential adverse effects on Medicare beneficiaries and the Federal health care programs. The Report noted that PODs have the opportunity to profit using spinal devices that the PODs sell, and that critics of PODs had asserted that they create a conflict of interest that might affect physicians' clinical decision making. The OIG thus set out to determine the extent to which PODs provide spinal medical devices to hospitals.

219.   The Report noted that in Fiscal Year 2012, Medicare paid hospitals a total of $3.9 billion for 178,789 spinal surgeries. Medicare reimbursed hospitals an average of $21,613 for the least complicated spinal surgeries and $34,676 for the most complicated spinal surgeries.

220.   As part of the Study, the OIG selected a sample of 1,000 claims billed to Medicare in fiscal year 2011 that included spinal fusion surgery.

221.   The Report found that for Fiscal Year 2011, out of this sample, PODs supplied spinal devices that were used in 19 percent of, or nearly one in five, spinal fusion surgeries billed to Medicare.

222.   Among the hospitals in the OIG's sample, thirty-four percent, or about a third, reported buying spinal devices from PODs. When hospitals in the sample began buying from PODs, their growth rates of spinal surgery grew by three times (by 16%) the rate for all hospitals. Moreover, the hospitals' rate of spinal fusions—surgeries that are more likely to use spinal devices—grew more than twice as fast (by 21%) among hospitals that used PODs compared to the rate for hospitals overall.

223.   The majority (88%) of hospitals that purchased from PODs began doing so after 2005. Nearly half of the hospitals that purchased from PODs began doing so between 2010 and 2012.

224.    Ninety-four percent of hospitals that purchased from PODs reported that surgeon preference influenced their decision to purchase from PODs.

225.    In Fiscal Year 2012, surgeons performed more spinal surgeries (28% more) at hospitals in the OIG's sample that purchased from PODs than at those that did not purchase from PODs.

226.    The OIG's Report concluded that, taken together, these factors may increase the cost of spinal surgery to Medicare and its beneficiaries over time.

227.    Upon receiving the OIG's Report, the congressional members who requested it found that the Report shows a direct correlation between doctors who have a financial relationship in spinal medical device companies, and an increase in spinal fusion surgeries—putting patients' health at risk and imposing costs on taxpayers through increased billings to the Medicare program caused by unnecessary surgeries. "The findings of the [OIG] show that [PODs] are driving up health care costs and may even be encouraging unnecessary surgeries."

**C. THE U.S. DOJ'S ACTIONS AGAINST SPINAL DEVICE PODS**

228.    In September of 2014, the U.S. Department of Justice first sued over a kickback scheme involving a POD. It filed two complaints under the FCA against Dr. Aria Sabit, a spinal implant company (Reliance Medical Systems), two spinal device PODs (Apex Medical Technologies and Kronos Spinal Technologies), and their owners, for alleged kickbacks and medical unnecessary surgeries.

229.    The DOJ alleged that the defendants paid physicians, including Dr. Sabit, to induce them to use the spinal implant company's medical device products in the surgeries they performed. "Improper payments to physicians can alter a physician's judgment about

patients' true health care needs and drive up health care costs for everyone," DOJ stated. "The Justice Department is committed to enforcing the laws that prohibit such payments."

230. Apex allegedly paid Sabit $438,570 between May 2010 and July 2012, during which Sabit used Reliance implants in approximately 90 percent of his spinal fusion surgeries.

## VII. SPINEFRONTIER'S ILLEGAL TERMINATION OF RELATOR #1

231. SpineFrontier terminated Relator #1 in direct retaliation for his having come forward to report the Defendants' kickback scheme, off-label promotion, and Sunshine Act violations.

232. On April 7, 2015, SpineFrontier abruptly terminated Relator #1's employment, shortly after he brought to the attention of SpineFrontier's legal and regulatory executives the fact that it was engaging in conduct, detailed above, that was improper under federal law. As the facts set forth above also show, SpineFrontier knew that Relator #1 was engaged in conduct protected under the FCA.

233. SpineFrontier also took adverse employment action against Relator #1 in the form of his termination as a direct response to his complaining internally. Until he was terminated, SpineFrontier never informed Relator #1 that he had any performance issues.

234. Relator #1's efforts to alert executives at SpineFrontier that its conduct was illegal reasonably could have led to an FCA action, because proof that Defendants' kickback scheme, off-label promotion, and failure to comply with the Sunshine Act, caused false claims to be submitted to the government would demonstrate a violation of the FCA.

235. As a direct and proximate result of this unlawful retaliation, Relator #1 has suffered emotional pain and mental anguish, together with serious economic hardship.

## VIII. SPINEFRONTIER'S ILLEGAL TERMINATION OF RELATOR #2

236.    SpineFrontier terminated Relator #2 in direct retaliation for his having come forward to report the Defendants' kickback scheme, off-label promotion, and Sunshine Act violations.

237.    On April 7, 2015, SpineFrontier abruptly terminated Relator #2's employment, shortly after he brought to the attention of SpineFrontier's Human Resource Manager the fact that it was engaging in conduct, detailed above, that was improper under federal law. As the facts set forth above also show, SpineFrontier knew that Relator #2 was engaged in conduct protected under the FCA.

238.    SpineFrontier also took adverse employment action against Relator #2 in the form of his termination as a direct response to his complaining internally. Until he was terminated, SpineFrontier never informed Relator #2 that he had any performance issues.

239.    Relator #2's efforts to alert SpineFrontier that its conduct was illegal reasonably could have led to an FCA action, because proof that Defendants' kickback scheme, off-label promotion, and failure to comply with the Sunshine Act, caused false claims to be submitted to the government would demonstrate a violation of the FCA.

240.    As a direct and proximate result of this unlawful retaliation, Relator #2 has suffered emotional pain and mental anguish, together with serious economic hardship.

## IX. THE UNITED STATES AND QUI TAM STATES WERE CHEATED OUT OF SUBSTANTIAL SUMS AS A RESULT OF THE FALSE REPORTS INDUCED BY DEFENDANTS' KICKBACK SCHEME

241.    Because Defendants intentionally intended that false reports be submitted to the Government, the Government was wrongfully overcharged for reimbursement of Defendants' medical device products.

242. Defendants knowingly (with actual knowledge of the information, and acting in deliberate ignorance, or reckless disregard, of the truth or falsity of the information) made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

243. By virtue of the false or fraudulent claims that Defendants knowingly caused to be presented, the United States and the Qui Tam States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

## X. STATUTORY AND REGULATORY ENVIRONMENT

### A. THE FALSE CLAIMS ACT

244. The federal False Claims Act ("FCA") was originally enacted during the Civil War, and was substantially amended in 1986 and 2009. Congress enacted these amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

245. The FCA imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2008). The statute further imposes liability on a person who "uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;" who "conspires to defraud the government by getting a false or fraudulent claim paid or approved by the government," or who uses "a false record or statement to conceal, avoid, or decrease an

obligation to pay or transmit money or property to the government." *Id*. at 3729 §§ (a)(2),

(3), (7). To satisfy the statute's knowledge requirement, a person must "(1) ha[ve] actual

knowledge of the information; (2) act in deliberate ignorance of the truth or falsity of the

information; (3) or act in reckless disregard of the truth or falsity of the information," but "no

specific intent to defraud is required." *Id*. § 3729(b).

246.    The False Claims Act does not create a private cause of action, but permits a

person, designated a "Relator" to bring a civil action "for the person and for the United States

government . . . in the name of the government." 31 U.S.C. § 3730(b).

247.    Liability under these FCA provisions is a civil penalty of up to $11,000 for each

such claim, plus three times the amount of the damages sustained by the Government.

248.    A "claim" means any request or demand for money or property provided by the

Government under one of its programs, such as Medicare or Medicaid. 31 U.S.C. § 3729(b)(2).

Claims made to the states are actionable under the False Claims Act if the Government will

reimburse the state for any portion of the claim. 31 U.S.C. § 3729(b)(2)(A).

## B. THE FCA'S AND MASSACHUSETTS' ANTI-RETALIATION PROVISIONS AND STATE COMMON LAW PROHIBITING WRONGFUL TERMINATION

249.    The False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h),

prohibits discrimination against a person in the terms and conditions of employment

because of that person's efforts in furtherance of an action under that statute or efforts to stop

one or more violations of the federal False Claims Act. A person retaliated against in violation

of this section is entitled to reinstatement, double the amount of lost back pay, interest on the

back pay, and special damages, including attorney fees and litigation costs.

250.    The anti-retaliation provision of the Massachusetts False Claims Act, 12 M.G.L.

ch. 12, § 5J(2), is similar to the FCA's anti-retaliation provision and prohibits efforts to stop violations of the Massachusetts False Claims Act, 12 M.G.L. ch. 12, § 5B, 5C. It is unlawful to terminate an employee from his job because of lawful acts done by him in furtherance of an action under 12 M.G.L. ch. 12, § 5B, or because of other efforts to stop a violation of 12 M.G.L. ch. 12, § 5B.

251.    Additionally, under the common law of Massachusetts, where SpineFrontier is headquartered and where Defendants manage their medical device business, an employer cannot terminate an at-will employee where to do so would violate clearly established public policy (such as investigating fraud on an agency of the Commonwealth).

### C.  THE ANTI-KICKBACK STATUTE

252.    The Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a- 7b(b) (the "Anti-Kickback Statute" or "AKS"), arose out of a Congressional concern that payoffs to those who influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

253.    The Anti-Kickback statute prohibits any person or entity from offering or providing "any remuneration" to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment is sought from under any federally-funded health care program, including Medicare, Medicaid, and TRICARE. 42 U.S.C. § 1320a- 7b(b). Violation of the statute can subject the perpetrator to criminal and civil penalties, as well

as exclusion from participation in federally-funded healthcare programs.

254. The term "remuneration" includes anything of value, in whatever form, whether in cash or in kind, or offered directly or indirectly.

255. Payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals.

256. Thus, the AKS prohibits medical device manufacturers or suppliers from offering to pay any remuneration, if one of the purposes of the remuneration is to induce physicians or others to recommend or use products paid in whole or in part by federal healthcare programs.

257. Examples of activities prohibited by the AKS include payments for sham consulting services, bogus research and educational grants, travel and lodging expenses, expensive meals and wine, and other gifts and discounts. These activities are especially suspect if the medical device supplier selects the physician based on its belief that the physician is likely to prescribe the company's products, rather than on the physician's professional qualifications or services he or she actually rendered to the company.

258. HHS-OIG has promulgated "Safe harbor" regulations that identify payment practices not subject to AKS enforcement because such practices are unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952. Safe harbor protection is afforded only to those arrangements that meet all of the specific conditions set forth in the regulations.

259. The AKS provides safe harbor provisions for personal service arrangements, 42 C.F.R. § 1001.952(d), which, as discussed above, Defendants do not satisfy. Defendants conduct does not fall within any regulatory safe harbor.

260. Each of the federally-funded health care programs requires every provider and

supplier providing items and services for federal healthcare beneficiaries to promise and ensure compliance with the AKS as a material condition of payment of the resulting claims.

261.    A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

262.    Giving a person the opportunity to earn money for referring patients may constitute an inducement under the AKS.

263.    As stated by the Office of Inspector General of the Department of Health

& Human Services ("OIG") with respect to medical device suppliers:

> Manufacturers, providers, and suppliers of health care products and services frequently cultivate relationships with physicians in a position to generate business for them through a variety of practices, including gifts, entertainment, and personal services compensation arrangements. These activities have a high potential for fraud and abuse and, historically, have generated a substantial number of anti-kickback convictions. There is no substantive difference between remuneration from a pharmaceutical manufacturer or from a durable medical equipment or other supplier--if the remuneration is intended to generate any federal health care business, it potentially violates the anti-kickback statute.

OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003).

264.    As discussed above, federal health care programs require every provider, hospital, and supplier who provides items and services to federal healthcare beneficiaries to sign Provider/Supplier Agreements, and Hospital Cost Reports, to establish their eligibility to seek reimbursement.

265.    The express language of the AKS, the certification of the provider/supplier

agreements and hospital cost reports, and the repeated statements of the agency charged with administering the statute establish without question that compliance with the AKS is material to decision to pay claims for federal program beneficiaries.

266. Compliance with the AKS is a material condition of payment under all publicly-funded healthcare programs, including Medicare, Medicaid, CHAMPUS- TRICARE, CHAMPVA, Federal Health Benefit Program, and other federal and state health care programs (hereinafter referred to as "government healthcare programs").

### D. THE STARK STATUTE

267. The Stark Statute, 42 U.S.C. § 1395nn, prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity with which he or she (or an immediate family member) has a financial relationship, unless an exception applies. The statute also prohibits the entity from billing Medicare for those referred services. The Center for Medicare and Medicaid ("CMS") has promulgated regulations interpreting the statute.

268. A financial relationship under the Stark laws includes arrangements involving any remuneration between a physician (or an immediate family member of such physician) and an entity. 42 U.S.C. §§ 1395nn(a)(2)(B), (h)(1)(A).

269. A "referral" includes, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare...." 42 C.F.R § 411.351. A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

270. Claims submitted in violation of the Stark Statute are ineligible for payment, and

violate material conditions of payment of federal healthcare programs.

271. A claim for payment that is based on a violation of the Stark Statute constitutes a false claim under the FCA.

### E. THE PHYSICIAN PAYMENTS SUNSHINE ACT

272. Regulatory scrutiny of the medical industry has also increased with the enactment of the Physician Payments Sunshine Act and the Patient Protection and Affordable Care Act in 2010, Pub. L. No. 111-148, § 6002, 124 Stat. 119 (codified as amended 42 U.S.C. § 1320a-7h) (2010)). Financial relationships between physicians and medical device companies can create negative influences on physician judgment that compromise patient care and jeopardize the public's trust. In response to these concerns, when Congress passed the Sunshine Act in March 2010, it seized the opportunity to mandate greater transparency regarding these financial relationships by including the Sunshine Act.

273. These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning August 1, 2013. It is applicable to manufacturers of prescription drugs, devices, biologicals and medical supplies requiring pre-market approval or notification and products covered under Medicare, Medicaid or the Children's Health Insurance Program ("CHIP").

274. Specifically, the Physician Payments Sunshine Act ("PPSA" or "Sunshine Act") – also known as section 6002 of the Affordable Care Act (ACA) of 2010 – requires medical device manufacturers to disclose to CMS any payments or other transfers of value made to physicians or teaching hospitals. 42 C.F.R. § 403.904. It also requires certain manufacturers and group purchasing organizations (GPOs) to disclose any physician ownership or

investment interests held in those companies. 42 C.F.R. § 402.906. Another broad category of reporting covers research payments. This includes any payment made for participation in preclinical research, clinical trials, or other product development activities. 42 C.F.R. § 403.904(f).

275.     As of August 1, 2013, a covered manufacturer (such as SpineFrontier) must disclose to CMS any payment or transfer of value made to a physician or hospital, as well as any physician ownership or investment in the covered manufacturer. *See* 42 U.S.C. § 1320a-7h(a)(1)(A) (the "Sunshine Act" a/k/a "Open Payments program"). This Open Payments program also makes this information available to the public. *See* 42 U.S.C. § 1320a-7h(c)(1)(A)(ii).

276.     As a whole, the Sunshine Act seeks to help make financial relationships clearer by providing a central location for financial interactions to be reported and monitored. Furthermore, it is meant to discourage "dishonest influence on research, education, and clinical decision-making."

277.     Unlike other state and federal laws governing the health care industry, the Sunshine Act depends on self-reporting instead of relying on whistleblowers and government investigators. In particular, the program requires "applicable manufacturers" and "applicable GPOs," collectively deemed "Reporting Entities," to report to CMS any payment or transfers of value made to physicians and teaching hospitals. Applicable manufacturers, such as medical device manufacturers, are required to report all payments falling into the following categories:

> consulting fees, compensation for services other than
> consulting, including serving as faculty or as a speaker at an
> event other than a continuing education program, [h]onoraria,
> [g]ifts, [e]ntertainment, [f]ood and beverage, [t]ravel and

lodging, [e]ducation, [r]esearch, [c]haritable contributions, [r]oyalty or [l]icense, [c]urrent or prospective ownership or investment interest, [c]ompensation for serving as faculty or as a speaker for an unaccredited and non-certified continuing education program, [c]ompensation for serving as faculty or as a speaker for an accredited or certified continuing education program, [g]rants, [and] [s]pace rental or facility fees (teaching hospital only).

Federal Register 66 (February 8, 2013): 78,9457, 78,9477-78,9481: 42 CFR 402 (as specified by Pub. L. No. 111-148 § 6002, (2010) (codified at 42 U.S.C.A § 1128G(a)(1)(A)(vi) (West Supp. 2011)).

278. Sunshine Act penalties are severe and include civil monetary penalties of up to $10,000 for each item not reported. There is an annual maximum of $150,000 with respect to each annual submission. If a company knowingly fails to accurately and completely report a payment or ownership interest, the penalty is up to $100,000 for each item with an annual maximum of one million dollars. 42 C.F.R. § 912.

## XI. REMBURSEMENT BY GOVERNMENT-FUNDED HEALTH CARE PROGRAMS

279. The Health Insurance for the Aged and Disabled Program, popularly known as Medicare, was created in 1965 as part of the Social Security Act (SSA). The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Studies ("CMS"), a component of HHS.

280. The Medicare program consists of two primary parts. Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c to 1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of other "medical and other services." 42 U.S.C. §§ 1395j to 1395w-5.

281.    The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low- income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The federal share of each state's Medicaid expenditures varies by state.

282.    Various other federally-funded medical coverage programs exist to help discrete populations of enrollees obtain medical care, including the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Veterans Administration, among others.

283.    Reimbursement practices under all federally-funded healthcare programs closely align with the rules and regulations governing Medicare reimbursement.

284.    Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b) (1994).

285.    To participate in the Medicare Program, a health care provider must file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation

in the Medicare Program and in order to receive reimbursement from Medicare. The provider agreement specifically requires compliance with the federal Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(b).

## A. MEDICARE PART A

286.    Part A of the Medicare program authorizes payment for institutional care, including hospitalization, for eligible patients.

287.    Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health items and services to treat Medicare patients. The hospital, also called a "provider," is authorized to bill Medicare for that treatment.

288.    During the relevant time period, CMS reimbursed hospitals for impatient Part A services through Medicare Administrative Contractors ("MACs").

289.    MACs are private insurance companies that are responsible for determining the amount of payments to be made to providers. See 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006). Under their contracts with CMS, MACs review, approve, and pay Medicare bills, called "claims," received from hospitals. See 42 C.F.R. § 421.5(b).

290.    Since 2007, in order to get paid, Hospitals must submit claims for payment on Form CMS-1450, also called Form UB-04. This form contains patient-specific information including the diagnosis and type of services that are assigned or provided to the Medicare patient. The Medicare program relies upon the accuracy and truthfulness of the UB-04 Forms to determine whether the service is payable and what amounts the hospital is owed.

291.    In addition, and at the end of every fiscal year, as a prerequisite to payment, CMS requires hospitals to submit to the MAC a form CMS-2552, commonly known as the hospital "cost report." 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. The cost report identifies any

outstanding costs that the hospital is claiming for reimbursement that year. It serves as the final claim for payment that is submitted to Medicare. The Medicare program relies upon the accuracy and truthfulness of the cost report to determine what amounts, if any, the hospital is owed, or what amounts the hospital has been overpaid during the year.

292.    In 1983, Congress established the prospective payment system ("PPS") as the system by which hospitals are reimbursed for inpatient hospital costs. Under PPS, the amount Medicare pays a hospital for treating an inpatient Medicare beneficiary is based in large part on the particular condition that led to the patient's admission to, or that was principally treated by, the hospital.

293.    Under PPS, a patient's illness or condition is categorized under a classification system called a diagnostic related group ("DRG"). The DRG establishes how much the hospital will be paid under Medicare and reflects the resources the patient's condition or treatment typically requires. The MAC uses the patient specific information (for example, the diagnosis codes) submitted by the hospital on the UB-04 to determine what DRG is assigned to a certain claim, and hence, what amount will be paid.

294.    The DRG is intended to reimburse the hospital for the expected costs of any items that it must purchase in connection with the hospitalization. The DRG is intended to compensate the hospital for any spinal implants, where those devices are appropriately used to treat a Medicare beneficiary.

**B. MEDICARE PART B**

295.    Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury. Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments

of monthly premiums. Payments under Medicare Part B are typically made directly under assignment to service providers and practitioners, such as physicians, rather than to the patient/beneficiary. In that case, the physician bills the Medicare Program directly.

296.    The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS. To assist in the administration of the Medicare Part B Program, CMS contracts with MACs. 42 U.S.C. § 1395u. MACs are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

297.    Medicare reimburses physicians for their professional services pursuant to a Physician Fee Schedule ("PFS"). 42 C.F.R. § 414.58(a). Physician fees under the PFS are determined according to a standardized coding system assigned to procedures set forth in the Health Care Financing Administration's Common Procedure Coding System (HCPCS).

298.    In order to bill Medicare, a physician must submit an electronic or hard- copy claim form called a CMS 1500 form to the carrier. When the CMS 1500 is submitted, the physician certifies that he or she is knowledgeable of Medicare's requirements and that the services for which payment is sought were "medically indicated and necessary for the health of the patient."

299.    Physicians wishing to submit the CMS 1500 electronically must submit a provider enrollment form.

300.    For a CMS 1500 claim to be paid by the Medicare Part B Program, the claim must identify each service rendered to the patient by the physician. As discussed above, under the HCPCS coding system, the service is identified through a corresponding code that is listed in the American Medical Association ("AMA") publication called the Current Procedural Terminology ("CPT") Manual. The CPT is a systematic list of codes for procedures and

services performed by or at the direction of a physician. Each procedure or service is identified by a five-digit CPT code. The CPT code set accurately describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation, organizations, and payers for administrative, financial, and analytical purposes.

301.    The CPT code assigned to a medical procedure determines the payment amount to the physician under Part B. The payment amount for each service paid under the PFS is the product of three factors-(1) a nationally uniform relative value for the service; (2) a geographic adjustment factor for each physician fee schedule area; and (3) a uniform conversion factor for the service." Final Rule, 68 Federal Register 63190 (November 7, 2003). For each physician service, there are three relative values: for physician work; for practice expense; and for malpractice expense. Id. These are referred to as Relative Value Units ("RVU's"). The work RVU's are based on national valuations of physician time expended for a particular service, and can be accessed on CMS's website in published schedules.

302.    In addition to the CPT Manual, the AMA publishes the International Classification of Diseases (ICD-9) Manual, which assigns a unique numeric identifier to each medical condition. In order to be payable by Medicare, the CMS 1500 claim form must identify both the CPT code that the provider is billing for and the corresponding ICD-9 code that identifies the patient's medical condition that renders the provider's service medically necessary.

303.    Thus, the DRG system establishes standardized payments for Part A (inpatient) services, and the CPT system established a standardized payment amount for physician services, based on evaluation of the actual average costs of performing that procedure, by

region and type of provider, as reported by providers annually.

## C. TRICARE

304.    TRICARE (formerly known as CHAMPUS) is a health care program administered by DHA. TRICARE provides health care insurance for active duty military personnel, military retirees, and military dependents.

305.    TRICARE is a "Federal health care program" for purposes of the AKA. *See* 42 U.S.C. § 1320a-7b(f).

306.    A physician seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions, and medical providers seeking payment from TRICARE have a duty to familiarize themselves with program requirements. 32 C.F.R. § 199.9(a)(4). TRICARE regulations identify kickbacks between suppliers and providers as presumptively fraudulent. *Id*. § 199.9(c)(12).

307.    In order to bill TRICARE, a surgeon must submit an electronic or hard-copy claim using the same CMS 1500 form the surgeon uses to submit a claim to Medicare. When a surgeon submits a claim to TRICARE using the CMS 1500 form, the surgeon certifies that he or she knows TRICARE's requirements and that the claim complies with applicable laws and regulations, including the AKS.

## D. REIMBURSEMENT FOR SURGERIES USING SPINE FRONTIER MEDICAL DEVICES

308.    Costs associated with spine surgery utilizing medical devices are separately billed by the hospitals and surgeons to payors, including Medicare, Medicaid, and TRICARE.

309.    Hospitals submit claims to federal programs for the inpatient costs associated with the surgeries, including the cost of the medical devices, on interim claims forms called Forms CMS-1450 (formerly UB-92's) and hospital cost report forms (the final claim).

Hospital claims identify the DRG associated with the surgery, which CMS uses to determine the payment amount to the hospital, to include payment for the medical devices used during the surgery.

310.    DRG codes are calculated in a manner intended to fairly compensate the hospital for all the costs associated with the surgery, including the medical device costs. DRG rates are recalculated annually based on, among other things, actual claims data.

311.    The surgeon performing the surgical procedure separately bills for his or her professional services on a Form CMS-1500, identifying the surgical procedure by the appropriate CPT code.

312.    Each surgeon chooses which manufacturer's spine hardware to use in each surgery. However, the devices utilized in a spinal surgery are generally purchased by the hospital from the manufacturer.

313.    The surgical devices used in spinal surgery include various products that are used to stabilize an injured or degenerating spine. Products used in cervical spinal surgery (neck) include anterior cervical plates and screws, lateral mass screws and rods, laminoplasty plates and screws and bone products, such as bone spacers or cellular bone matrix. Products used in lumbar spinal surgery (lower back) generally consist of pedicle screws and rods, interbody devices such as peek spacers, or corpectomy devices such as mesh spacers, anterior buttress plates and some bone products such as bone spacers and cellular bone matrix.

### E.  COMPLIANCE WITH THE AKS AND THE SUNSHINE ACT IS A CONDITION OF PAYMENT

314.    Compliance with the Anti-kickback Statue and the Sunshine Act is a condition of payment for federally-funded healthcare programs, including Medicare, Medicaid, and TRICARE, meaning that if a provider tells CMS or its agent that it

provided services in violation of the Anti-kickback Statute or the Sunshine Act, CMS will not pay the claim.

315. Hospitals and physicians enter into Provider Agreement with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from federal health care programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I.

316. When a hospital submits a claim for payment, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-kickback Statue and the Sunshine Act.

317. When a physician submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-kickback Statute and the Sunshine Act.

318. Every Hospital Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator.

319. The CMS Form 2552 Hospital Cost Report certification page includes the

following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

320. The cost-report certifier is also required to certify that:

> To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

321. Thus, by signing CMS Form 2552, a hospital provider is required to and does certify that its cost report was (1) truthful, *i.e*, that the cost information contained in the report is true and accurate; (2) correct, i.e., that it is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the cost report is based upon all information known to the provider; (4) did not include any services that resulted from an illegal kickback; and (5) the services provided in the cost report were billed in compliance with all provisions of the Stark laws.

322. As a result of the systematic payment of kickbacks to physicians made with the intent and effect of inducing them to use its spinal surgery products, and Defendants' violations of the Sunshine Act, Defendants caused hospitals to submit claims in violation of conditions of payment and claims with false certifications to the United States. Claims submitted as a result of illegally-induced surgeries were false claims.

## XII. DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY KNOWINGLY CAUSING THE SUBMISSON OF FALSE OR FRAUDULENT CLAIMS OR STATEMENTS

323.    As a party to a Medicaid Rebate Agreement with the United States Secretary of Health and Human Services pursuant to the Social Security Act, 42 U.S.C. § 1396s, Defendants' medical device products and surgical procedures involving such products are only eligible for reimbursement if and when Defendants are in compliance with applicable federal and state laws.

324.    These laws include, but are not limited to, the federal and corresponding state anti-kickback statutes, the FDMA, the Food, Drug & Cosmetic Act and all related regulations, HIPAA, and the Sunshine Act. As described in this Complaint, Defendants have been and continue to be in violation of the aforementioned laws.

325.    As described in this Complaint, Defendants have knowingly and repeatedly violated these laws in connection with the use and sale of its medical device products. These violations have not been incidental, but instead have been central to the Defendants' sales strategy.

326.    Accordingly, Defendants have knowingly caused the false or fraudulent certification of compliance with these federal and state statutes and regulations.

327.    The submission of false or fraudulent certifications of compliance with these statutes and regulations were material to Government Programs' decisions to make reimbursements for Defendants' medical device products. Had Government Programs known that the certifications of compliance with the law were false, they would not have made reimbursements for their medical devices.

328.    Defendants' knowingly causing the submission of false certifications of

compliance with the law constituted the making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, and this directly caused Government Programs to pay or reimburse for medical device products that were not eligible for payment or reimbursement.

329.　Defendants knew that the certifications of compliance with the law that they knowingly caused to be submitted were false, and that the false certifications would cause Government Programs to make payments for its drugs.

330.　Defendants' false certifications that they knowingly caused to be submitted have directly caused Government Programs to pay or reimburse for medical device products not eligible for payment or reimbursement.

## XIII.　CAUSES OF ACTION

### COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

331.　Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

332.　Defendants knowingly caused to be presented, and may still be knowingly causing to be presented, to the Government false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

333.　As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729 (a)(1)(B))

334.　Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

335. Defendants knowingly caused to be made or used, and may still be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

336. The United States, unaware of the falsity of the claims and/or statements made by Defendants, their IME Consultants, and certain hospitals, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Defendants' medical device products used in surgical procedures for patients enrolled in Federal Programs.

337. As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### COUNT III
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(3a); 31 U.S.C. § 3729 (a)(1)(C))**

338. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

339. As detailed above, Defendants knowingly conspired, and may still be conspiring, with health care professionals identified and described herein to commit acts, in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). Defendants and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

340. As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### COUNT IV
**(Violation of False Claims Act, 31 U.S.C. § 3730(h))**

341. Relators incorporate herein by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

342.     Relator #1 and Relator #2 were engaged in conduct protected under the FCA, including the investigation and reporting of fraud.

343.     Defendants knew that Relator #1 and Relator #2 were engaged in such protected conduct.

344.     The termination of Relators' employment was because of Relators' involvement in the protected conduct, causing Relators to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

## COUNT V
### (Violation of Mass. Gen. Laws Ch. 12, § 5J)

345.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

346.     Relator #1 and Relator #2 were engaged in conduct protected by the anti-relation provision of the Massachusetts False Claims Act, 12 M.G.L. ch. 12, § 5J(2) because t h e y were a SpineFrontier employees, and because of their efforts to stop Defendants' practice of failing to comply with the federal laws, including the Medicare and Medicaid laws, in connection with the illegal sales of Defendants' medical device products. Because Medicare and Medicaid are not authorized to pay for devices that cannot be legally sold, Relators' efforts to stop Defendants kickback scheme were efforts to stop violations of the Massachusetts False Claims Act, 12 M.G.L. ch. 12, § 5B, 5C.

347.     Defendants terminated Relators from their respective jobs because of lawful acts done by them in furtherance of an action under 12 M.G.L. ch. 12, § 5B, or because of other efforts by Relators to stop a violation of 12 M.G.L. ch. 12, § 5B.

348.     As a result of SpineFrontier's wrongful retaliatory conduct, Relators have

suffered substantial financial losses and suffered substantial emotional distress.

WHEREFORE, Relator #1 and Relator #2, on their behalf and pursuant to M.G.L. ch.12, § 5J(3), request that this Court:

(a)    Reinstate Relators to the same positions that they would have had but for the wrongful termination;

(b)    Award Relators two times the amount of back pay they would have earned but for the retaliation, and interest on that award;

(c)    Award Relators compensation for all special damages they have sustained as a result of SpineFrontier's termination in violation of public policy;

(d)    Award Relators their costs and reasonable attorneys' fees for prosecuting this action; and

(e)    Enter such other relief which the Court finds just and equitable.

### COUNT VI
### (Wrongful Termination in Violation of Public Policy)

349.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

350.    Under the common law, Massachusetts employees have a right to act in good faith to halt harm to the public, to try to prevent conduct that the employee believes will endanger the public. Any type of disciplinary action or termination which is taken in retaliation for such protected conduct is against public policy and constitutes wrongful retaliation or termination.

351.    Relator #1 and Relator #2 were retaliated against for conduct protected under the common law of Massachusetts. Conduct which results in the illegal sale of, and reimbursement for, medical devices may constitute a violation of federal and criminal law.

Relators were retaliated against for trying to prevent the sale and reimbursement of medical devices in violation of federal law, conduct which Relators believed would endanger the public.

352. SpineFrontier's termination of Relator #1 and Relator #2 was in violation of public policy and constitutes wrongful termination. As a result of the wrongful termination, Relators have suffered substantial financial losses, and suffered substantial emotion distress.

WHEREFORE, Relator #1 and Relator #2, on their behalf, requests that this Court:

(a) Reinstate Relators to the same position that they would have had but for the wrongful termination;

(b) Award Relators the amount of back pay they would have earned but for the retaliation, and interest on that award;

(c) Award Relators compensation for all special damages they have sustained as a result of SpineFrontier's termination in violation of public policy;

(d) Award Relators their costs and reasonable attorneys' fees for prosecuting this action; and

(e) Enter such other relief which the Court finds just and equitable.

**COUNT VII**
**(Violation of Colorado Medicaid False Claims Act)**

353. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

354. This is a civil action brought by Relators, on behalf of the State of Colorado, against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

355. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly caused to

be presented, and may still be causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

356.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

357.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

358.    The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state and state subdivision funded health insurance programs.

359.    As a result of Defendants' actions as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### (Violation of Connecticut False Claims Act)

360.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

361.     This is a civil action brought by Relators, on behalf of the State of Connecticut, against Defendants under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301d.

362.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

363.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(2).

364.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(7).

365. The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state and state subdivision funded health insurance programs.

366. As a result of Defendants' actions as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT IX
### (Violation of District of Columbia False Claims Act)

367. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

368. This is a civil action brought by Relators, on behalf of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

369. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

370. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

371.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

372.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance programs funded by the District.

373.    As a result of Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X
### (Violation of Florida False Claims Act)

374.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

375.    This is a civil action brought by Relators, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

376.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

377.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statement to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

378.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

379.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance plans funded by the State of Florida or its agencies.

380.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT XI
### (Violation of Illinois False Claims Whistleblower Reward and Protection Act)

381.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

382.    This is a civil action brought by Relators, on behalf of the State of Illinois, against Defendants under the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/4(b).

383.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois, or a member of the Illinois National Guard, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

384. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false record or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

385. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

386. The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state funded health insurance programs.

387. As a result of Defendants' actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XII
### (Violation of Indiana False Claims and Whistleblower Protection Act)

388. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

389. This is a civil action brought by Relators, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

390. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5- 2(b)(l).

391. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

392. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

393. The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state funded health insurance programs.

394. As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIII
### (Violation of Maryland False Health Claims Act)

395. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

396. This is a civil action brought by Relators, on behalf of the State of Maryland, against Defendants under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-604.

397. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

398. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code. Ann., Health-Gen. § 2-602(a)(2).

399. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

400. The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for Defendants' medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

401. As a result of Defendants' actions, as set forth above, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIV
## (Violation of Massachusetts False Claims Act)

402. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

403. This is a civil action brought by Relators, on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

404. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

405. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

406. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

407. The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

408. As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XV
### (Violation of New Jersey False Claims Act)

409. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

410. This is a civil action brought by Relators, on behalf of the State of New Jersey,

against Defendants pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

411.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

412.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

413.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

414.     The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants'

medical device products for recipients of health insurance programs funded by the state or its political.

415. As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XVI
### (Violation of New York False Claims Act)

416. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

417. This is a civil action brought by Relators, on behalf of the State of New York, against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

418. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer, employee or agent of the State of New York, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

419. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved by the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(b).

420. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information,

knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

421.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

422.    As to the New York Medicaid program, the state's regulatory regime provides that an "overpayment includes any amount not authorized to be paid under the medical assistance program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." N.Y. Comp. Codes R. & Regs. Tit. 18, § 518.1(c). The regime defines "unacceptable practice," to include "[b]ribes and kickbacks," *id*. § 515.2(b)(5), and lists within this category both "soliciting or receiving," *id*. § 515.2(b)(5)(ii), and "offering or paying," *id*. § 515.2(b)(5)(iv), "either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for purchasing, leasing, ordering or recommending any medical care, services or supplies for which payment is claimed under the program," *id*. § 515.2(b)(5)(ii), (iv). New York's anti-kickback statute forbids kickbacks in similar terms. *See* N.Y. Soc. Serv. Law §§ 366-d, -f.

423.    As a result of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVII
## (Violation of Oklahoma Medicaid False Claims Act)

424.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

425.     This is a civil action brought by Relators, on behalf of the State of Oklahoma, against Defendants pursuant to the Oklahoma Medicaid Fraud False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

426.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of  Okla. Stat. tit. 63, § 5053.1(B)(1).

427.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

428.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

429.     The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of Medicaid.

430.     As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XVIII
### (Violation of Texas Medicaid Fraud Prevention Act)

431.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

432.     This is a civil action brought by Relators, on behalf of the State of Texas against, Defendants under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

433.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted  Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was  greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

434.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information,  knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information

that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

435.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

436.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

437.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of Medicaid.

438.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XIX
### (Violation of Virginia Fraud Against Taxpayers Act)

439.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

440.     This is a civil action brought by Relators, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

441.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

442.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

443.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

444.     The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made, or knowingly caused to be made, by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Defendants' medical device products for recipients of state funded health insurance programs.

445.     As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XX
### (Unjust Enrichment)

446.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

447.     This is a claim for the recovery of monies by which all Defendants have been unjustly enriched.

448.     By directly or indirectly obtaining money from the United States and Qui Tam States, through federal and state health care programs, funds to which they were not entitled, Defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial.

### COUNT XXI
### (Payment by Mistake)

449.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

450.     This is a claim for the recovery of monies the United States and Qui Tam States paid directly or indirectly to Defendants as a result of mistaken understandings of fact.

451.     The United States' and Qui Tam States' mistaken understandings of fact were material to their decision to pay claims the Defendants caused to be submitted to federal and state health care programs for spinal surgeries using SpineFrontier medical devices.

452.     The United States and Qui Tam States, acting in reasonable reliance on the truthfulness of the claims to federal and state health care programs for spinal surgeries using SpineFrontier medical devices, paid monies directly or indirectly to Defendants to which they

were not entitled. Thus, the United States and Qui Tam States are entitled to recoup such monies, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment against Defendants as follows:

a)       That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 et seq.; Colo. Rev. Stat. § 25.5-4-304 et seq.; Conn. Gen. Stat. § 17b-301a et seq.; D.C. Code § 2-308.13, et seq.; Fla. Stat. § 68.081 et seq.; Ga. Code Ann. § 49-4-168 et seq.; 740 Ill. Comp. Stat. § 175/1 et seq.; Ind. Code § 5-11-5.5 et seq.; Md. Code Ann., Health-Gen. § 2-601 et seq.; Mass. Gen. Laws ch. 12, § 5A et seq.; N.J. Stat. Ann. § 2A:32C-1 et seq.; N.M. Stat. Ann. § 27-14-1 et seq.; N.Y. State Fin. Law § 187 et seq.; N.C. Gen. Stat. § 1-605 et seq.; Okla. Stat. tit. 63, § 5053 et seq.; Tex. Hum. Res. Code Ann. § 36.001 et seq.; and Va. Code Ann. § 8.01-216.1 et seq.;

b)       That judgment be entered in Relators' favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

c)       That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §§ 3730(d) and 3730(h), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e(e), D.C. Code § 2-308.15(f), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i), 740 Ill. Comp. Stat. § 175/4(d), Ind. Code § 5-11-5.5-6, Md. Code Ann., Health-Gen. § 2-605, Mass. Gen. Laws ch.12,

§ 5F, N.J. Stat. Ann. § 2A:32C-7, Okla. Stat. tit. 63, § 5053.4, Tex. Hum. Res. Code Ann. § 36.110, and Va. Code Ann. § 8.01-216.7, including without limitation (i) reinstatement of Relator #1's employment with no diminution of seniority, (ii) double back-pay for the period since Relator #1's unlawful retaliatory termination, (iii) interest on such back-pay for Relator #1, and (iv) special damages for Relator #1, including reasonable attorneys' fees and litigation costs;

d)　　　That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4- 305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

e)　　　That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 17b-301b(b)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 17b-301b(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

f)　　　That judgment be entered in Relators' favor and against Defendants in the amount

of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2- 308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

g)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

h)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

i)     That judgment be entered in Relators' favor and against Defendants in the amount

of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code §
5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind.
Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for
losses resulting from the various schemes undertaken by Defendants, together with penalties for
specific claims to be identified at trial after full discovery;

j) That judgment be entered in Relators' favor and against Defendants for
restitution to the State of Maryland or its political subdivisions for the value of payments or
benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for
in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-
Gen. § 2- 602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000)
for each false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such
penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting
from the various schemes undertaken by Defendants, together with penalties for specific
claims to be identified at trial after full discovery;

k) That judgment be entered in Relators' favor and against Defendants for
restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount
of a civil penalty of not less than five thousand dollars ($5,000) dollars and not more than ten
thousand dollars ($10,000), plus three times the amount of damages, including consequential
damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of
the civil action brought to recover such penalties and damages, as provided by Mass. Gen.
Laws ch. 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of
Massachusetts or its political subdivisions for losses resulting from the various schemes
undertaken by Defendants, together with penalties for specific claims to be identified at trial after

full discovery;

l)      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the civil penalties allowed under the federal False Claims Act (31 U.S.C. § 3729 et seq.) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

m)     That judgment be entered in Relators' favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

n)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of

Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

o)      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a), multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to Tex. Hum. Res. Code Ann. §§ 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

p)      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code

Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

q)  That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

r)  That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit; and

s)  That Relators be granted such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators demand a trial by jury of all issues so triable.

Dated: August 10, 2022

Respectfully submitted,
**SEEGER WEISS LLP**

*s/ Stephen A. Weiss*
STEPHEN A. WEISS, ESQ.
sweiss@seegerweiss.com
CHRISTOPHER AYERS, ESQ.
cayers@seegerweiss.com
JUSTIN M. SMIGELSKY, ESQ.
(*pro hac vice* forthcoming)
jsmigelsky@seegerweiss.com
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel:  (973) 639-9100
Fax:  (973) 639-9393

*Counsel for Plaintiffs/Relators*

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2022, the foregoing document was electronically filed using the Court's CM/ECF system which provides notification of such filing on all counsel of record.

*s/ Stephen A. Weiss*
STEPHEN A. WEISS, ESQ.
